UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CASHMAN DREDGING AND MARINE CONTRACTING CO., LLC, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Civil Action No. _____ |
| FRANK BELESIMO and CALLAN MARINE, LTD., | ) ) ) ) ) |
| Defendants. | ) ) |

## COMPLAINT

Plaintiff Cashman Dredging and Marine Contracting, Co., LLC ("CDMC"), by its undersigned counsel, as and for its complaint against Frank Belesimo ("Belesimo") and Callan Marine Ltd. ("Callan" and collectively with Belesimo, "Defendants") alleges as follows:

## PARTIES

1.      CDMC is a limited liability company formed under the laws of the Commonwealth of Massachusetts with a principal place of business at 549 South Street, Quincy, Massachusetts. CDMC is one of a family of Cashman companies that include Jay Cashman, Inc., Preload Cryogenics, LLC, Preload International, Preload Middle East, Sterling Equipment, Inc., Patriot Renewables and IPC Lydon, LLC (collectively, the "Cashman Companies").  The Cashman Companies employ over 750 employees worldwide in as many as 35 states and several foreign countries depending, in part, on the number and scope of projects at any one time.

2.      Until July 14, 2021, when Belesimo left CDMC to join Callan, Defendant Belesimo was the Executive Vice President of CDMC.  Belesimo is a resident of Easton,

Massachusetts and, upon information and belief, continues to work for Callan from Easton, Massachusetts.

3.     Upon information and belief, Callan is a corporate entity formed under the laws of the State of Texas with a principal place of business in Galveston, Texas.

## JURISDICTION AND VENUE

4.     This is an action for, among other things, misappropriation of trade secrets pursuant to the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, et seq. and for violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, et seq.

5.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1367.

6.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 in that a substantial part of the events or omissions giving rise to this dispute occurred in this judicial district, CDMC has suffered harm in this judicial district, and defendant Belesimo resides in this judicial district and continues to work for Callan from this judicial district.

## FACTS

7.     CDMC provides dredging services along the East Coast, Gulf Coast, and in the Caribbean Basin, specializing in the areas of navigation, beach renourishment, environmental dredging and coastal resiliency.  It also specializes in a wide range of marine contracting services including pier construction, jetty and revetment construction, and bulkhead construction.

8.     CDMC operates a variety of specialized dredges and attendant plant to maintain its strategic advantage in the highly competitive dredging industry.  Determining equipment operating costs, dredge production rates, and historical company performance is necessary confidential information to prepare and to successfully bid on and perform dredging projects.

13706122.1

9.      All of the Cashman Companies, including CDMC, take very substantial steps to keep its confidential information, including design documents and drawings protected from disclosure to third-parties, including but not limited to: (i) by maintaining this data on password-protected programs and systems; (ii) restricting access to this information to its key employees; and (iii) having clear provisions in its written employee manual that: (a) the Cashman Companies, including CDMC's, information concerning "the Company, its subcontractors, joint venture partners, suppliers, clients and fellow employees . . ." is proprietary and confidential information; (b) prohibiting, as a condition of an employee's continued employment by any of the Cashman Companies, including CDMC, the improper use or disclosure of this proprietary and confidential information; and (c) providing, as a condition of an employee's continued employment by the Cashman Companies, including CDMC, that all employees "must take proper precaution, exercise care, and use good judgment to avoid any breach of privacy, release and/or disclosure of confidential information . . . protect such information and ensure its appropriate use . . . in responsible exercise of the Company' s business . . ." A true and accurate copy the Cashman Companies' Employee Handbook is appended as **Exhibit A** to the Affidavit of Dale Pyatt (the "Pyatt Aff."), which is appended hereto as **Exhibit 1**.

10.      In May of 2007, CDMC hired Belesimo as CDMC's Vice President. In or about 2010, Belesimo was promoted to become CDMC's Executive Vice President. Belesimo was a long-time, key employee and officer of CDMC and, therefore was very highly compensated for his work on behalf of CDMC.

11.      Upon hiring Belesimo, his job responsibilities included bid estimating, project management and engineering for CDMC's projects. Belesimo is a co-inventor with Jay Cashman, CDMC's founder and co-manager, and others on a number of dredge-related patent

applications.  In his role as an officer and employee of CDMC, Belesimo sought and received a position of the highest trust, confidence and influence with CDMC.

12.     In December 2019, Belesimo was passed over for a promotion to the position of Chief Operating Officer for CDMC.  Belesimo expressed his unhappiness at CDMC after the decision and continued to express this unhappiness until his departure from CDMC.  In an effort to address Belesimo's unhappiness and to take full advantage of his engineering expertise, Jay Cashman placed him in charge of CDMC's project to develop the design and, ultimately, to construct  a new hopper dredge for CDMC (the "Project").  This Project is one of, if not the, largest internal undertaking in the Cashman Companies' history.  There are very few private hopper dredges in the United States and this Project is a key strategic undertaking in maintaining CDMC's competitiveness in the dredging industry.

13.     The first step of the Project, the concept process, required Belesimo to lead a team of CDMC employees to conduct a market survey to determine what dredge performance characteristics were most in demand in the market as well as thoroughly understand market size, market capacity, and historic utilization and capability of existing hopper dredges in the market. To undertake this market survey, Belesimo and the CDMC team, over many months and thousands of work-hours, submitted between 300 and 400 Freedom of Information Act requests to the United States Army Corps of Engineers concerning hundreds of dredging projects and contracts to gather a tremendous amount of data and to glean and to evaluate from that data as well as other data what were the dredge characteristics most often required for the larger, more profitable projects (the "Market Survey Data").

14.     Based on the Market Survey Data and CDMC's internal know how in determining costs of operations and dredge production rates, CDMC developed hopper dredge specifications

4

addressing, among other vessel criteria capacity, speed, and on board power requirements (the "Specifications").  The Specifications were developed for design and construction of a unique shallow draft hopper dredge that CDMC determined strategically met the needs of the current and forecasted marketplace.

15.     The second step of the Project consists of the design and construction of the new shallow draft hopper dredge based on the Specifications. It is expected that when completed that this project will cost CDMC as much as one hundred million dollars ($100,000,000.00).

16.     As part of Belesimo's new responsibilities for the Project, Belesimo, with the assistance of CDMC's in-house counsel, negotiated a design contract with IHC America, Inc. ("IHC") for a new 6500 cubic yard trailing suction hopper dredge.  Belesimo executed the agreement with IHC as CDMC's Executive Vice President on December 17, 2020 (the "IHC Agreement").

17.     On January 21, 2021, CDMC issued a press release, a true and accurate copy of which is appended to the Jay Cashman Affidavit ("Cashman Aff."), which is appended hereto as **Exhibit 2**, as **Exhibit A** announcing the IHC Agreement for IHC to design "one of the most technologically advanced dredges in the country . . . [which] will allow Cashman to easily maneuver in shallow draft areas, providing the company with greater dredge project versatility."

18.     On January 29, 2021, The Waterways Journal Weekly published an article, a true and accurate copy of which is appended as **Exhibit B** to the Cashman Aff., in which Belesimo is quoted as stating that:

> Maneuverability will distinguish it [the IHC designed hopper dredge] from many of the hopper dredges in the U.S. market.  "We are working closely with the designer to minimize the draft of the dredge so that we can operate in relatively shallow waters."

19.     Throughout 2020 and until his departure on July 14, 2021, Belesimo continued to express unhappiness at CDMC.  However, for most of that time, he continued to perform his bid estimating and engineering duties and continued to be CDMC's primary interface with IHC on the Project.  In the first half of 2021, Belesimo committed seventy five to eighty percent of his work hours to the Project in conjunction with IHC.  Previously, in 2020, Belesimo had committed as much as half of his work hours on the Project.  Belesimo also continued to do bid estimating and other tasks for CDMC.

20.     Including the monies paid to IHC and CDMC's own commitment of time and resources, by the middle of 2021, CDMC had already committed more than four million dollars ($4,000,000.00) toward the Market Survey and design phase of the Project.  In addition, to CDMC's own desire to keep the design documents developed in conjunction with IHC confidential, the IHC Agreement, which Belesimo negotiated and signed for CDMC, places an affirmative obligation on CDMC to keep these design documents confidential and for CDMC's use only.

21.     As part of Belesimo's bid estimating responsibilities, Belesimo worked along with CDMC's employees and had access to CDMC's proprietary and confidential information, including among other things, information gathered over many years and many projects related to CDMC's costs, equipment specifications and capabilities, dredge pumping and hydraulic flow data, subcontractor relationships and customer relationships, historical project performance data, dredge production rates, operating costs, vessel schematics, and historic profit margins) (the "Bid Estimating Data").

22.     The confidential Bid Estimating Data is crucial to CDMC maintaining its competitiveness to win future projects in the dredging industry.  A substantial part of CDMC's

value is therefore based on maintaining the confidentiality of the Bid Estimating Data and on the Bid Estimating Data itself.

23.     On behalf of CDMC, Belesimo had considerable involvement in the bid estimating process, including collecting and reviewing the Bid Estimating Data to prepare responses to requests for proposal and other project bidding submissions for CDMC.

24.     While Belesimo was still employed by CDMC, Belesimo was entrusted with access to and use of for purposes of his work for CDMC, CDMC's confidential and proprietary information concerning, including but not limited to CDMC's (i) Bid Estimating Data, (ii) the Market Survey Data, (iii) the Specifications and (iv) the IHC design documents for the new shallow draft hopper dredge (the "Trade Secrets").

25.     In early April, 2021Belesimo told Jay Cashman that he had been visiting Callan's offices.  He claimed he was merely visiting former employees of the company, C.F. Bean, which he had left to join CDMC in 2007.  During that conversation, Belesimo asked Jay Cashman if he was interested in selling CDMC to Callan.  Jay Cashman told him that he was not, but expressed a willingness to discuss some form of joint venture with Callan.

26.     In May 28, 2021, as part of conducting Belesimo's annual review meeting with him, Jay Cashman asked Belesimo about his continued unhappiness and asked him if he planned to leave CDMC.  Belesimo stated that he was not looking to leave at that time but was noncommittal about his future with CDMC.

27.     However, Jay Cashman became rightly concerned about Belesimo's commitment to CDMC.  In response, Jay Cashman spoke with Dale Pyatt ("Pyatt"), co-manager of CDMC, and instructed Pyatt to have a computer forensics firm make a backup copy of all of Belesimo's

work files on his CDMC electronic devices.  Thereafter, CDMC retained a computer forensics firm.

28.     At approximately 3:15 p.m. on July 14, 2021, Jay Cashman received a text message from Belesimo asking "Jay – Can I get a few minutes to talk to you today?"  Jay Cashman responded by text, "meet you in 5 minutes your office".  Thereafter, Jay Cashman and Belesimo met in Belesimo's office.  Belesimo told Jay Cashman that he was considering leaving CDMC.  Jay Cashman asked him how likely he was to leave and Belesimo stated that it was ninety-nine percent likely that he was leaving to join Callan.  Jay Cashman stated in response that it sounded like he was definitely leaving and, to that, Belesimo admitted that he was, in fact, leaving.  Jay Cashman wished him the best of luck and reminded Belesimo that all of his work product from his time at CDMC, including but not limited to all of his computer files and engineering resources and designs are the property of CDMC and that he cannot take these materials with him.  Belesimo responded that he knew this and would never try to take any files or materials with him.[1]

29.     Belesimo stated that he wanted to maintain a positive relationship with Jay Cashman and the Cashman Companies and did not want to end up like another executive who had left the Cashman Companies back in 2016.  Jay Cashman stated that that was a unique situation which lead to litigation with that former employee to protect the confidential information of the Cashman Companies.  Belesimo responded that he would never do anything like that.

---

[1] Belesimo requested permission, which Jay Cashman granted, to take personal photographs and a photographs of other companies' dredges that Belesimo had collected from public sources.

30.     Jay Cashman reminded Belesimo that CDMC had spent millions of dollars on developing the design for the new hopper dredge and that Belesimo cannot take anything relating to that project with him.  Jay Cashman then repeated that he should take nothing with him when he leaves CDMC.  In response, Belesimo assured Jay Cashman that he was an honest person and that he would not steal anything from CDMC.

31.     At the end of that discussion, although Belesimo offered to stay for a couple of additional weeks, Jay Cashman informed Belesimo that it would be best if he left CDMC that day.  Jay Cashman told him that we would continue to pay him for the remainder of the week, that he could retain his company car for the week, and that he should meet with Pyatt to discuss the procedure to complete his orderly exit from the company. For a third time, although Jay Cashman wished him well, he reminded Belesimo that he could not take anything from CDMC.

32.     In all, in an approximately fifteen minute conversation about his leaving CDMC, Jay Cashman reminded Belesimo, at least, three times that he could not take anything from CDMC when he left and, at least, three times Belesimo promised that, except for some personal photographs and some publicly available photographs of other companies' dredges, that he would not take any information, files, designs or data of any kind from CDMC.

33.     Thereafter Belesimo met with Pyatt.  Pyatt asked Belesimo when he would be moving his family to Galveston, Texas (where Callan is located) and Belesimo responded that his family would be staying in Easton, Massachusetts so that one of his children could finish her senior year of high school there.  Pyatt reminded Belesimo that he could not take any of CDMC's information, data, designs or files.  Belesimo responded that he would never do that and that the only computer files that he claimed that he had taken were personal photographs that he had saved on his CDMC laptop and his master's thesis.  Belesimo further requested to take

9

what he described as a collection of stock, public domain photographs that he had assembled over the years, of various dredges.  In response, Pyatt stated, that if the photographs were publicly available, then he could take them, and again reminded Belesimo that he could not take any other company information.

34.     At this point, Pyatt called CDMC's head of information technology, Jordan Rebello ("Rebello").  Pyatt instructed Rebello to collect Belesimo's CDMC laptop, iPad and cellphone and to remove Belesimo's ability to access CDMC's network.  Rebello then walked to Belesimo's office to collect CDMC's electronic devices and Belesimo and Pyatt watched as Rebello removed Belesimo's access to the network.

35.     After Rebello completed his work and left Belesimo's office, Belesimo told Pyatt that he was going to gather his personal belongings and depart.  Pyatt asked Belesimo if he would like to speak with anyone else in the office to announce his departure and Belesimo only asked to speak briefly with one employee, Bill Hussin ("Hussin").  Pyatt then left Belesimo's office and observed Belesimo leave CDMC's offices approximately ten minutes later.

36.     About an hour and half after observing Belesimo leave CDMC's offices, during Pyatt's drive home that evening, Pyatt received a call from Belesimo on Belesimo's home phone. Belesimo told Pyatt that he was looking for the stock photographs of dredges in the Dropbox files and, in the process Belesimo had found drawings related to the Pyatt dredge that he should not have.  Pyatt did not know to which Dropbox Belesimo was referring and had no idea what he was talking about.  Pyatt asked him if there was anything else in this Dropbox and Belesimo responded that there were some old bid documents, implying they were insignificant and of no value to CDMC.  Belesimo went on to state that since he could get the public domain dredge photographs another way, he had decided to delete the entire contents of the Dropbox.  Pyatt was

10

concerned by Belesimo's unilateral decision to delete company files without CDMC having had

an opportunity to inspect what was in the Dropbox and that Belesimo was not being forthright

with regard to the contents of the Dropbox account.  At the end of this very strange phone call

during which Pyatt had let Belesimo do almost all of the talking, Belesimo went on to state that

"I [Belesimo] don't want you and Jay to ever think that I would steal anything from Cashman.  I

hope you believe me."  Pyatt responded that he hoped Belesimo was telling the truth.

37.     After the brief call was over, Pyatt was left very concerned that Belesimo had not

been telling the truth and that this phone call was little more than a ruse for Belesimo to abscond

with CDMC's information that Belesimo was repeatedly told not to take.

38.     Unbeknownst to CDMC, Belesimo had received and accepted an employment

offer from Callan on or about July 12, 2021 and, thereafter, set out on his scheme to

surreptitiously steal CDMC's Trade Secrets, while still employed by CDMC, and to take the

Trade Secrets with him to Callan.

39.     Belesimo intentionally misrepresented to CDMC his intentions in his final days at

CDMC in order to conceal his unlawful intentions and actions to steal CDMC's Trade Secrets in

preparation for his departure to Callan.

*Belesimo's Theft of CDMC's Trade Secrets and Confidential Information*

40.     Due to CDMC's concerns over Belesimo's intentions, CDMC's retained

computer forensics consultant, Clifton Larson Allen, LLC ("CLA") to make copies of the files

on Belesimo's CDMC electronic devices.  In addition, CLA had installed certain monitoring

software on the CDMC computer that Belesimo was using so that despite Belesimo's efforts to

delete his tracks, CLA was able to determine over the weeks since Belesimo's departure that

Belesimo took CDMC's data, computer files including CDMC's Trade Secrets including but not

11

limited to its Bid Estimating Data, historical project performance data, dredge production rates, operating costs, and vessel schematics.

41.     CLA has determined that Belesimo had connected undisclosed and unauthorized external data storage devices to Belesimo's CDMC computer and had transferred files relating to the Market Survey Data, the Specifications and the IHC design documents for the new shallow draft hopper dredge.  Belesimo did not disclose nor did he provide these external data storage devices to CDMC when he left CDMC.

42.     In addition, CLA also learned that Belesimo had taken steps re-register a Dropbox that had previously been registered to a Cashman e-mail address, and therefore could be accessed by the Cashman Companies, to his personal email address so that the Cashman Companies could no longer access this Dropbox.

43.     CLA's forensic analysis shows that Belesimo routinely stored as many as 19,740 files in the Dropbox account, the vast majority of them related to CDMC business.

44.     The monitoring software installed by CLA also recorded Belesimo on July 14, 2021, the day of his departure, uploading 13,234 additional files to the Drobox account after had transferred control of the account to his personal email. Indeed, CLA has captured an image from Belesimo's CDMC computer that shows Belesimo had selected a large set of files for upload to Dropbox on July 14, 2021.  In fact, in one screen capture from the day of Belesimo's departure, CLA captured an image of a Dropbox upload progress indicator noting 11,527 files and 5 hours left to complete.   In total, to date, CLA has identified 32,974 files in the Dropbox account that remain under Belesimo's control after his departure from Cashman.[2]

---

[2] CLA also believe that additional time and forensic analysis will allow CLA to identify additional files which Belesimo has misappropriated from CDMC.

13706122.1

45.     On top of uploading tens of thousands of CDMC documents to Dropbox and transferring control of the account to his personal email on his last day, CLA's review of Belesimo's CDMC laptop showed that he maintained an Apple iCloud account where he stored 857 files and folders, a significant number of which are CDMC documents.  iCloud is a cloud storage service similar to Dropbox and documents kept in iCloud can be accessed later from a different device.  Belesimo also deleted the 857 iCloud folder and files stored locally on his computer, in an attempt to obscure his use of the service and the identity of the files stored there.

46.     In total, CLA was able to identify 27,340 files and folders that were removed from Belesimo's CDMC laptop between June 9, 2021 and his departure on July 14, 2021.  The vast majority of these files were CDMC's business files that Belesimo had no legitimate reason to delete at the time of his departure from CDMC.

47.     CLA found that Belesimo attempted throughout various times of the day on July 14, 2021 to delete 53,856 files from his portable USB hard drives (USB1 and USB2), which drives Belesimo did leave in his office upon leaving CDMC on July 14, 2021. Again, the vast majority of these files were CDMC's business files that Belesimo had no legitimate reason to delete at the time of his departure from CDMC.

48.     In addition, CLA found that Belesimo uninstalled the Dropbox application at 9:30 AM on July 14, 2021 and deleted all files previously stored in Dropbox from his computer. Doing so would not have removed the files from the Dropbox account but would have hidden the fact that he used Dropbox and details about which files were stored there.

49.     Along with deleting files, CLA's review of the monitoring software captured Belesimo purging additional evidence of his computer activities.  For example, CLA captured an image showing Belesimo deleting from his CDMC computer his Internet browsing history and

other traces of his activity.  In addition, CLA captured a further image from Belesimo's CDMC computer that shows Belesimo deleting System Restore and Shadow Copies of the laptop. System Restore and Shadow Copies are features in the Microsoft Windows operating system that help preserve previous states of the computer and files allowing a user to revert to a previous state in the event data is lost, deleted or corrupted.  In short, deleting the System Restore and Shadow Copies would have made it very difficult to discover the changes and deletions Belesimo made on this computer prior to his departure and recovering the deleted information without a forensic examination.

50.     CLA has found evidence of numerous undisclosed data storage devices that Belesimo had connected to his CDMC laptop and had access to confidential and proprietary CDMC Trade Secrets including, upon information and belief, the Market Survey data, the Specifications and the IHC design documents for the new shallow draft hopper dredge. Belesimo did not disclose these data storage devices to CDMC nor did he provide these data storage devices to CDMC when he left CDMC for employment with Callan.

51.     In addition, on July 14, 2021, without disclosing this to CDMC, Belesimo connected a USB thumb drive and transferred additional computer files, including CDMC's confidential information.  Although there is no record of the entirety of what Belesimo transferred to the USB thumb drive, except the files on the USB thumb drive itself that Belesimo retained when he left CDMC, there is a record on his CDMC laptop of some of the files opened from that thumb drive while it was attached to the CDMC laptop on July 14, 2021 that include confidential and proprietary dredge pumping and hydraulic flow data.

52.     Belesimo's acts in his final days at CDMC to affirmatively conceal his intention to leave for Callan was done to permit him an opportunity to betray the trust and confidence that

14

CDMC placed in Belesimo so that Belesimo could surreptitiously steal CDMC's Trade Secrets and then act to delete files and retain undisclosed portable storage devices all in further of and to conceal his unlawful scheme all to CDMC's detriment.

53.     CLA has worked diligently to uncover much of Belesimo's unlawful actions but still much of what Belesimo did in advance of his unlawful scheme remains concealed by Belesimo's actions in his final days at CDMC and further and additional information may come to light as to computer files and data that Belesimo, without authorization and/or by exceeding his authorization, copied, deleted and/or transferred from CDMC's computers and network.

54.     The full extent of Belesimo's potential misuse of Cashman devices and intellectual property is still under review.  Nonetheless, based on the information CLA has uncovered so far, Belesimo continues to maintain control of a significant amount of CDMC's Trade Secrets and proprietary computer files including, most importantly, Bid Estimating Data, the Market Survey Data, and documents concerning the Project.

55.     The Trade Secrets, of which the Bid Estimating Data is a primary part, are a substantial part of CDMC's enterprise value.  Prior to the theft of the Trade Secrets, CDMC had an enterprise value of approximately one hundred and seventy million dollars ($170,000,000). Belesimo's theft of CDMC's Trade Secrets has substantially diminished CDMC's enterprise value and stolen that value for himself and his new employer, Callan.

*Callan's Solicitation of Belesimo*

56.     Callan had previously announced its intention to build its own hopper dredge to directly compete with CDMC's new dredge.  A true and accurate copy of Callan Marine's June 22, 2021 announcement in *Dredging Today* is appended hereto as **Exhibit C** to the Cashman Aff.  On July 28, 2021, Callan Marine announced that they had hired Belesimo as an executive

15

vice president.  A true and accurate copy of Callan's Belesimo announcement in *Dredge Wire* is appended hereto as **Exhibit D** to the Cashman Aff.

57.     Callan is a direct competitor of CDMC in the Gulf Coast and the Caribbean Basin.

58.     Callan sent e-mail communications to Belesimo in Massachusetts to solicit him for employment with Callan.  For example, on July 12, 2021, Maxie MaGuire, Callan's President, e-mailed Belesimo in Massachusetts an offer for employment with Callan.  Belesimo received and reviewed the job offer e-mail with his CDMC computer.

59.     In addition, Belesimo and Callan negotiated the terms of his remaining in Massachusetts to work for Callan and for Callan to reimburse Belesimo in Massachusetts for his periodic travel to and from Massachusetts to Texas when necessary to work for Callan.

60.     Upon information and belief, Callan induced and has directly benefited from Belesimo's unlawful actions in Massachusetts to misappropriate CDMC's Trade Secrets, including the unlawful copying of over 30,000 computer files and the deletion of more than 50,000 computer files from CDMC's computers in Massachusetts all while Belesimo was still an officer and trusted employee of CDMC.

61.     Defendants, having been rebuffed in their efforts to buy CDMC, have undertaken to steal CDMC's Trade Secrets and, therefore, CDMC's value as a going concern.

62.     Upon information and belief, the above described unlawful accessing and deleting of CDMC's computer files was done with the intention to cover up and further Defendants' unlawful and deceptive scheme to steal CDMC's Trade Secrets from CDMC's computer in Massachusetts.  All of the Defendants' unlawful actions have substantially damaged CDMC's

13706122.1

value as a going concern and, by the theft of the Trade Secrets, stolen a substantial portion of CDMC's going concern value for the Defendants.

63.    Upon information and belief, Belesimo has delivered from Massachusetts to Callan in Texas, CDMC's Trade Secrets all to CDMC's substantial damage in Massachusetts and Defendants' unlawful benefit.

### COUNT I
### (Trade Secret Misappropriation in Violation of the Federal Defend Trade Secrets Act, 18 U.S.C. § 1836, et seq., Against Both Defendants)

64.    CDMC incorporates by reference paragraphs 1 through 63 of this complaint, as if set forth fully herein.

65.    CDMC's headquarters are in Massachusetts.  CDMC and its affiliate Cashman Companies typically employ over 750 employees working in as many as 35 states and several foreign countries depending, in part, on the number and scope of projects at any one time

66.    While Belesimo was still employed by CDMC, Belesimo conspired to and did, in fact, misappropriate the Trade Secrets of CDMC including but not limited to confidential and proprietary information concerning its (i) Bid Estimating Data, (ii) the Market Survey data, (iii) the Specifications and (iv) the IHC design documents for the new shallow draft hopper dredge.

67.    As described more fully above, CDMC takes reasonable steps to keep its Trade Secrets confidential.

68.    Defendants have continued to misappropriate CDMC's Trade Secrets.

69.    Upon information and belief, and as described more fully above and in the Cashman and Pyatt Affidavits, without authorization and entirely unbeknownst to CDMC, Defendants copied from CDMC's computers and network in Massachusetts a massive amount of confidential and trade secret data consisting of the Trade Secrets.

70.     Upon information and belief, Defendants intend to use the Trade Secrets to compete directly with CDMC for dredging projects in, at least, the Gulf Coast and in the Caribbean Basin.  The confidential Bid Estimating Data is crucial to CDMC maintaining its competitiveness to win future projects in the dredging industry.  A substantial part of CDMC's value is dependent on the confidentiality of and the Bid Estimating Data itself.  Defendants, having been rebuffed in their efforts to buy CDMC, have undertaken to steal CDMC's Trade Secrets and, therefore, steal CDMC's value as a going concern.

71.     The Trade Secrets, of which the Bid Estimating Data is a primary part, are a substantial part of CDMC's enterprise value.  Prior to the theft of the Trade Secrets, CDMC had an enterprise value of approximately one hundred and seventy million dollars ($170,000,000).  Belesimo's theft of CDMC's Trade Secrets has substantially diminished CDMC's enterprise value and stolen that value for himself and his new employer, Callan.

72.     Defendants have willfully and improperly misappropriated and used CDMC's Trade Secrets and have disclosed and intend to continue disclosing CDMC's Trade Secrets for their own financial benefit.  Defendants have provided no justification for this use and know or should know that CDMC's Trade Secrets are CDMC's property.

73.     Defendants have further willfully and knowingly misappropriated and continued to unlawfully use these Trade Secrets by (i) retaining the more than thirty thousand computer files that Belesimo unlawfully copied from CDMC's computers, network and hard drives in Massachusetts; and (ii) by further accessing CDMC's computers, including certain proprietary databases for purposes of misappropriating CDMC's Trade Secrets in Massachusetts.

74.     Belesimo breached his duties not to disclose or to use CDMC's Trade Secrets and Defendants have willfully and knowingly continued to unlawfully use CDMC's Trade Secrets.

75.     CDMC has not expressly or impliedly consented to Defendants' use or disclosure of CDMC's Trade Secrets in any way.

76.     As a direct and proximate result of Defendants misappropriation of CDMC's Trade Secrets, CDMC has suffered and will continue to suffer damages, in an amount to be determined at trial.

77.     Defendants' continuing misappropriation of CDMC's Trade Secrets was and continues to be knowing and willful and, therefore, CDMC should be awarded double the damages CDMC is awarded at trial plus its attorneys' fees and costs incurred in this action.

**COUNT II**
**(Misappropriation of Trade Secrets in Violation of M.G.L. Ch. 93, § 42, et seq., Against Both Defendants)**

78.     CDMC incorporates by reference paragraphs 1 through 77 of this complaint, as if set forth fully herein.

79.     While Belesimo was still employed by CDMC, Belesimo conspired to and did, in fact, misappropriate the Trade Secrets of CDMC.

80.     As described more fully above, CDMC takes reasonable steps to keep its financial and customer data confidential.

81.     Defendants have continued to misappropriate CDMC's Trade Secrets.

82.     Upon information and belief, and as described more fully above and in the Cashman and Pyatt Affidavits, without authorization and entirely unbeknownst to CDMC, Defendants copied from CDMC's computers and network in Massachusetts a massive amount of confidential and trade secret data consisting of the Trade Secrets.

83.     Upon information and belief, Defendants intend to use the Trade Secrets to compete directly with CDMC for dredging projects in, at least, the Gulf Coast and in the

19

Caribbean Basin.  The confidential Bid Estimating Data is crucial to CDMC maintaining its competiveness to win future projects in the dredging industry.  A substantial part of CDMC's value is dependent on the confidentiality of and the Bid Estimating Data itself.  Defendants, having been rebuffed in their efforts to buy CDMC, have undertaken to steal CDMC's Trade Secrets and, therefore, steal CDMC's value as a going concern.

84.     The Trade Secrets, of which the Bid Estimating Data is a primary part, are a substantial part of CDMC's enterprise value.  Prior to the theft of the Trade Secrets, CDMC had an enterprise value of approximately one hundred and seventy million dollars ($170,000,000). Belesimo's theft of CDMC's Trade Secrets has substantially diminished CDMC's enterprise value and stolen that value for himself and his new employer, Callan.

85.     Defendants have further willfully and knowingly misappropriated and continued to unlawfully use these Trade Secrets by (i) retaining the more than thirty thousand computer files that Belesimo unlawfully copied from CDMC's computers, network and hard drives in Massachusetts; and (ii) by further accessing CDMC's computers, including certain proprietary databases for purposes of misappropriating CDMC's Trade Secrets in Massachusetts.

86.     Belesimo breached his duties not to disclose or to use CDMC's Trade Secrets and Defendants have willfully and knowingly continued to unlawfully use CDMC's Trade Secrets.

87.     CDMC has not expressly or impliedly consented to Defendants' use or disclosure of CDMC's Trade Secrets in any way.

88.     As a direct and proximate result of Defendants misappropriation of CDMC's Trade Secrets, CDMC has suffered and will continue to suffer damages, in an amount to be determined at trial.

13706122.1

89.     Defendants' continuing misappropriation of CDMC's Trade Secrets was and continues to be knowing and willful and, therefore, CDMC should be awarded double the damages CDMC is awarded at trial plus its attorneys' fees and costs incurred in this action.

## COUNT III
### (Interference with Contractual and Business Relations, Against Callan)

90.     CDMC incorporates by reference paragraphs 1 through 89 of this complaint, as if set forth fully herein.

91.     Belesimo had actual, existing and enforceable contractual and fiduciary obligations not to misappropriate CDMC's Trade Secrets.

92.     Upon information and belief, Callan was aware of and had actual knowledge of, or should have had actual knowledge of the Belesimo's contractual and fiduciary obligations not to misappropriate CDMC's Trade Secrets and Callan was and remains an outsider to Belesimo's contractual and fiduciary obligation not to misappropriate CDMC's Trade Secrets.

93.     Callan through its unlawful conduct described herein, has intentionally induced or persuaded Belesimo to breach his contractual and fiduciary obligations to CDMC and Belesimo has, in fact, misappropriated the Trade Secrets for Callan's benefit and to CDMC tremendous detriment.

94.     Callan's conduct, as described herein, was improper in motives and/or means, and was malicious, wrongful, without legal justification and in willful disregard of CDMC's contractual and fiduciary rights that run clearly, directly and uniquely to CDMC's benefit.

95.     As a direct and proximate result of Callan's conduct, CDMC has suffered and will continue to suffer damages, in an amount to be determined at trial.

**COUNT IV**
**(Breach of Fiduciary Duty, Against Belesimo)**

96.     CDMC incorporates by reference paragraphs 1 through 95 of this complaint as if set forth fully herein.

97.     As described more fully above, at all times material hereto, Belesimo served as the Executive Vice President of CDMC.  In his role as CDMC's Executive Vice President, Belesimo sought and received a position of the highest trust, confidence and influence with CDMC.  Therefore, Belesimo, as an officer and senior-management level employee of CDMC, owed CDMC duties of utmost loyalty and good faith, including both duties of care and duties of loyalty.

98.     CDMC is a closely-held, private company.

99.     Belesimo's  conduct described  more fully  above, including without limitation: (i) misappropriation of CDMC's Trade Secrets; (ii) his unauthorized and surreptitious copying, transferring and then deleting of the computer data and files contained on CDMC electronic devices and CDMC's computer network; and (iii) damage to CDMC's relationship with IHC constitute breaches of his fiduciary duties to CDMC, including his duties of loyalty and care.

100.     As a direct and proximate result of Belesimo's breach of his fiduciary duties to CDMC, CDMC has suffered and will continue to suffer damages, in an amount to be determined at trial, including but not limited to: (a) the value of the Trade Secrets including (i) Bids Estimating Data, (ii) the Market Survey data, (iii) the Specifications and (iv) the IHC design documents for the new shallow draft hopper dredge; (b) CDMC's loss in enterprise value;  (c) the damage to CDMC's relationship with IHC; and (d) CDMC is entitled to receive back from Belesimo all compensation paid either directly or indirectly by CDMC to Belesimo from the date of Belesimo's breaches of his fiduciary duties, including his duty of loyalty, to CDMC.

13706122.1

101.    Prior to Belesimo's above-described breach of his fiduciary duties to CDMC,

CDMC had an enterprise value of approximately one hundred and seventy million dollars

($170,000,000).  Belesimo's breach of his fiduciary duties to CDMC has substantially

diminished CDMC's enterprise value and stolen that value for himself and his new employer,

Callan Marine. As a direct and proximate result of Belesimo's conduct, CDMC has suffered and

will continue to suffer damages, in an amount to be determined at trial.

### COUNT V
### <u>(Aiding and Abetting Breach of Fiduciary Duty, Against Callan)</u>

102.    CDMC incorporates by reference Paragraphs 1 through 101 of this complaint, as

if set forth fully herein.

103.    As described more fully above, at all times material hereto, Belesimo served as

the Executive Vice President of CDMC.  In his role as CDMC's Executive Vice President,

Belesimo sought and received a position of the highest trust, confidence and influence with

CDMC.  Therefore, Belesimo, as an officer and senior-management level employee of CDMC,

owed CDMC duties of utmost loyalty and good faith, including both duties of care and duties

of loyalty.

104.    Belesimo's conduct described more fully above, including without limitation:

(i) misappropriation of CDMC's Trade Secrets; (ii) his unauthorized and surreptitious copying,

transferring and then deleting of the computer data and files contained on CDMC electronic

devices and CDMC's computer network; and (iii) damage to CDMC's relationship with IHC

constitute breaches of his fiduciary duties to CDMC, including his duties of loyalty and care.

105.    Upon information and belief, Callan knew and/or had knowledge of such facts

that Callan could not reasonably be held to have acted in good faith in not knowing that

Belesimo was an officer and employee of CDMC and owed fiduciary duties, including both

duties of care and duties of loyalty, to CDMC such that Belesimo's actions with Callan and on behalf of Callan would be in breach of Belesimo's fiduciary duties to CDMC.

106.    As a direct and proximate result of Callan's aiding and abetting Belesimo's breach of his fiduciary duties to CDMC, CDMC has suffered and will continue to suffer damages, in an amount to be determined at trial, including but not limited to: (a) the value of the Trade Secrets including (i) Bids Estimating Data, (ii) the Market Survey data, (iii) the Specifications and (iv) the IHC design documents for the new shallow draft hopper dredge; (b) CDMC's loss in enterprise value; (c) the damage to CDMC's relationship with IHC; and (d) CDMC is entitled to receive back from Belesimo all compensation paid either directly or indirectly by CDMC to Belesimo from the date of Belesimo's breaches of his fiduciary duties, including his duty of loyalty, to CDMC.

107.    Prior to Callan's aiding and abetting Belesimo's breach of his fiduciary duties to CDMC, CDMC had an enterprise value of approximately one hundred and seventy million dollars ($170,000,000).  Belesimo's breach of his fiduciary duties to CDMC has substantially diminished CDMC's enterprise value and stolen that value for himself and his new employer, Callan. As a direct and proximate result of Callan's conduct, CDMC has suffered and will continue to suffer damages, in an amount to be determined at trial.

13706122.1

**COUNT VI**
**(Violation of the Federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030, et seq.,**
**Against Both Defendants)**

108.    CDMC incorporates by reference paragraphs 1 through 107 of this complaint, as if fully set forth herein.

109.    CDMC's computers are involved in interstate commerce and communication and are protected under 18 U.S.C. § 1030(e)(2).

110.    Upon information and belief, Defendants knowingly and intentionally accessed and induced another to access on their behalf, CDMC's computers without authorization and/or in excess of authorization.

111.    Upon information and belief, after gaining access to CDMC's computers and network in Massachusetts, Defendants obtained and used valuable information from CDMC's protected computers in transactions involving interstate communications.  This information included a massive amount of data consisting of the Trade Secrets that had been in Belesimo's CDMC electronic devices, laptop, hard drives and computer network, which data was transferred, copied and /or deleted without authorization and/or in excess of authorization from CDMC's computers and network such that Defendants could transfer the Trade Secrets to any other computer network of Defendants' choosing, including, upon information and belief, Callan's.

112.    The stolen data from Belesimo's CDMC employee electronic devices, laptop, hard drives and computer network contained CDMC's confidential and Trade Secret including concerning its (i) Bids Estimating Data, (ii) the Market Survey data, (iii) the Specifications, and (iv) the IHC design documents for the new shallow draft hopper dredge.

113.    Belesimo, unbeknownst to CDMC and without or in excess of authorization from CDMC, deleted tens of thousands of computer files and surreptitiously transferred files to undisclosed external storage devices that Belesimo, without or in excess of authorization from CDMC, connected to CDMC's computers and/or network and then without or in excess of authorization from CDMC retained these external storage devices.

114.    All of Belesimo's above-described actions in connection with Belesimo's CDMC electronic devices were done without the authorization or knowledge of CDMC.

115.    Upon information and belief, the above-described actions in connection with Belesimo's CDMC electronic devices were done with the intention to cover-up, to further an unlawful scheme and to destroy evidence of Belesimo's unlawful activities while he was still the Executive Vice President of CDMC.

116.    Defendants knowingly, willfully and with an intent to defraud accessed and/or induced Belesimo to access on their behalf, CDMC's computers without authorization and/or in excess of authorization in order to and did, in fact, obtain valuable Trade Secret information from CDMC's computers that, upon information and belief, Defendants have used and will continue to use to obtain something of value.

117.    Defendants' conduct has caused a loss to CDMC during a one-year period far in excess of $5,000.

118.    CDMC has been damaged by Defendants' actions, including being forced to expend substantial resources to investigate the unauthorized access and abuse of its computer network and electronic devices.  CDMC seeks compensatory and other equitable relief under 18 U.S.C. § 1030, et seq. in an amount to be determined at trial.

## COUNT VII
## (M.G.L. Ch. 93A – Unfair and Deceptive Trade Practices, Against Both Defendants)

119.    CDMC incorporates by reference paragraphs 1 through 118 of this complaint, as if fully set forth herein.

120.    At all times relevant hereto, CDMC and Defendants have been engaged in trade or commerce within the meaning of M.G.L. ch. 93A, § 1, et seq.  The relevant events herein have occurred primarily and substantially in the Commonwealth of Massachusetts.

121.    Defendants have willfully and knowingly violated, in whole or in part, the provisions of M.G.L. ch. 93A, § 2 that declares unlawful unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.

122.    Defendants actions as described more fully above including, but not limited to Belesimo's  conduct and Callan's either participation in or inducement of Belesimo's unlawful conduct, all as described more fully above, including without limitation: (i) misappropriation of CDMC's Trade Secrets; (ii) Belesimo's unauthorized and surreptitious copying, transferring and then deleting of the computer data and files contained on CDMC electronic devices and CDMC's computer network; and (iii) damage to CDMC's relationship with IHC and all while Belesimo was still employed as an officer of CDMC constitute unfair and deceptive acts and practices in the conduct of trade or commerce in violation of M.G.L. ch. 93A, § 2, and are actionable under M.G.L. ch. 93A, § 11.

123.    As a direct and proximate result of such unfair and deceptive acts and practices, CDMC has suffered and continues to suffer damages in an amount to be determined at trial. CDMC is further entitled to multiple, including up to treble, damages and reasonable attorneys' fees in an amount to be determined at trial.

13706122.1

## REQUESTS FOR RELIEF

WHEREFORE, CDMC requests the following relief:

1.      Judgment for CDMC on all counts of this complaint;

2.      CDMC have and recover judgments against Defendants, jointly and severally, for all compensatory damage plus interest as permitted by law including but not limited to for the substantial damage to, diminishment of and theft of CDMC's prior enterprise value of approximately one hundred and seventy million dollars ($170,000,000);

3.      Multiple damages and attorney's fees for willful trade secret misappropriation against all Defendants pursuant to the Defend Trade Secrets Act 18 U.S.C. § 1836, et seq.;

4.      Multiple damages and attorney's fees against all Defendants pursuant to Chapter 93, § 42;

5.      Multiple damages and attorney's fees against all Defendants pursuant to Chapter 93A, § 1, et seq.;

6.      CDMC have and recover judgment against Defendants for punitive damages in an amount to be determined at trial, plus interest as permitted by law;

7.      Belesimo be ordered to return to CDMC any and all compensation, of any kind, that Belesimo received from CDMC since the date of his breaches of his fiduciary duties of loyalty to CDMC;

8.      CDMC be awarded preliminary and permeant injunctive relief prohibiting Defendants from using, retaining or accessing CDMC's Trade Secrets;

9.      That Defendants be ordered to permit a computer forensics firm engaged by and directed by CDMC, but at Defendants' cost,  to copy and search Defendants' computers,

13706122.1

networks and all other electronic devices for any of CDMC's Trade Secrets and that CDMC's

Trade Secrets be entirely deleted from their computers, networks and all other electronic devices;

10. The costs of this action including an award of attorneys' fees as permitted by law

to be taxes against Defendants, jointly and severally; and

11. CDMC have and recover such further and additional relief as the Court deems just

and proper.

<u>PLAINTIFF DEMANDS TRIAL BY JURY ON ALL ISSUES SO TRIABLE</u>

Respectfully submitted,

CASHMAN DREDGING AND
MARINE CONTRACTING, CO., LLC,

By its counsel,

*/s/ Jeffrey E. Francis*
Jeffrey E. Francis (BBO No. 639944)
jfrancis@pierceatwood.com
Melanie A. Conroy (BBO No. 568830)
mconroy@pierceatwood.com
PIERCE ATWOOD LLP
100 Summer Street
Boston, Massachusetts 02110
Phone: (617) 488-8136

Dated: August 25, 2021

29