UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CASHMAN DREDGING AND MARINE CONTRACTING CO., LLC, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Civil Action No. 1:21-cv-11398-DJC ) |
| FRANK BELESIMO and CALLAN MARINE, LTD., | ) ) ) ) |
| Defendants. | ) ) ) |

**PLAINTIFF'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION**

Dated:  August 31, 2021

Respectfully Submitted,

CASHMAN DREDGING AND
MARINE CONTRACTING CO., LLC

By its attorneys,

*/s/ Jeffrey E. Francis*
Jeffrey E. Francis, BBO No. 639944
jfrancis@pierceatwood.com
Melanie A. Conroy, BBO No. 568830
mconroy@pierceatwood.com
PIERCE ATWOOD LLP
100 Summer Street
Boston, Massachusetts 02110
Tel: (617) 488-8100
Facsimile: (617) 824-2020

## INTRODUCTION

Plaintiff Cashman Dredging and Marine Contracting Co., LLC ( "CDMC" or "Plaintiff")
hereby moves this Court for an Order mandating that Defendants Frank Belesimo ("Belesimo")
and Callan Marine, Ltd. ("Callan" collectively, "Defendants") (1) must return stolen trade secrets
and intellectual property that Belesimo stole from CDMC's computer systems with inducement
by Defendant Callan; (2) must submit all drives, devices, and media on which the trade secrets
are currently, ever have been, or may have been stored, transported, or transferred (whether
owned, controlled, or maintained by Belesimo or Callan) for a forensic examination by an expert
of CDMC's selection within ten (10) days of entry of the order, with all costs to be borne by
Defendants; and (3) are henceforth enjoined from retaining, accessing, examining, copying,
modifying, transferring, disclosing, or disseminating CDMC's trade secrets.

Belesimo, while still employed by CDMC, was entrusted with access to and use of for
purposes of his work for CDMC, CDMC's confidential and proprietary information concerning,
including but not limited to CDMC's (i) Bid Estimating Data, (ii) Market Survey Data, (iii)
Specifications and (iv) IHC design documents for the new shallow draft hopper dredge (the
"Trade Secrets").[1] Belesimo betrayed the trust placed in him by CDMC to steal more than
30,000 computer files including the Trade Secrets that CDMC expended millions of dollars to
develop during Belesimo's tenure with CDMC.

While CDMC has uncovered incontrovertible proof that Belesimo stole this massive
volume of Trade Secrets, many on the day of his resignation, Belesimo's actions to conceal his
theft have greatly increased the time, effort and difficulty necessary to conduct a full accounting
of the identity and volume of the files that were taken. However, CDMC has confirmed that

---

[1] The capitalized terms will be more fully defined below.

1

Belesimo stole CDMC's Trade Secrets including: (i) CDMC's strategic project bidding data and methodologies, critical inside information that in the hands of a competitor could be a devastating to CDMC's ability to win bidding contests for future project contracts; and (ii) market survey data and dredge specifications and designs, the loss of which to a competitor will destroy years of work and millions of dollars of investment by CDMC.

Through its sworn affidavits, as described below, CDMC has established a substantial likelihood of success on each of its asserted claims. Defendants' unlawful conduct is certain to cause significant and irreparable harm to CDMC by their continued possession of CDMC's proprietary, confidential information. The stolen Trade Secrets are crucial to CDMC to maintain its competitiveness, to win future projects in the dredging industry, and to reap the results of its significant investment in a new dredge design based on extensive market research and analysis. If unchecked, Belesimo and Callan's unfettered access to CDMC's most valuable Trade Secrets would devastate its business. The balance of harms in this case could not be more extreme: while CDMC's future is on the line, there is no harm to Defendants if the requested relief is granted. The relief that CDMC requests would both prevent catastrophic harm to itself and would promote public confidence in intellectual property rights and deter future corporate theft.

## FACTUAL BACKGROUND[2]

CDMC provides dredging services, specializing in navigation, beach renourishment, environmental dredging and coastal resiliency. Pyatt Aff. ¶ 1; Cashman Aff. ¶ 1. It also specializes in a wide range of marine contracting services including pier construction, jetty and revetment construction, and bulkhead construction. Pyatt Aff. ¶ 1; Cashman Aff. ¶ 2. CDMC

---

[2] The facts here are derived from the Affidavit of David Sun ("Sun Aff."), attached hereto as Exhibit 1, and the Affidavit of Dale Pyatt ("Pyatt Aff.") and Affidavit of Jay Cashman ("Cashman Aff."), attached to the Complaint as Exhibits 3 and 4, respectively.

operates a variety of specialized dredges and attendant plant to maintain its strategic advantage in the highly competitive dredging industry. Pyatt Aff. ¶ 3; Cashman Aff. ¶ 13. The confidential Bid Estimating Data, including equipment operating costs, dredge production rates, and historical company performance, is necessary to prepare for and to successfully bid on and perform dredging projects. Id.

CDMC takes substantial steps to protect its confidential information, including but not limited to: (i) maintaining data on password-protected programs and systems; (ii) restricting access to key employees; and (iii) having clear employee manual provisions that: (a) CDMC's information about "the Company, its subcontractors, joint venture partners, suppliers, clients and fellow employees . . ." is proprietary and confidential; (b) prohibiting, as a condition of employment, the improper use or disclosure of this proprietary and confidential information; and (c) providing, as a condition of employment, all employees "must take proper precaution, exercise care, and use good judgment to avoid any breach of privacy, release and/or disclosure of confidential information . . . protect such information and ensure its appropriate use . . . in responsible exercise of the Company' s business . . ." Pyatt Aff. ¶ 27, Ex. A.

### *Frank Belesimo and His Role at CDMC and Access to CDMC's Trade Secrets*

In May of 2007, CDMC hired Belesimo as CDMC's Vice President and he was promoted to Executive Vice President in or about 2010. Pyatt Aff. ¶ 4, Cashman Aff. ¶ 3. Belesimo was a long-time, key employee and officer of CDMC and was highly compensated for his work. Cashman Aff. ¶ 3. Upon hiring Belesimo, his job responsibilities included bid estimating, project management and engineering for CDMC projects. Pyatt Aff. ¶ 4, Cashman Aff. ¶ 4. In his role as an officer and employee of CDMC, Belesimo sought and received a position of the highest trust, confidence and influence. Pyatt Aff. ¶ 14; Cashman Aff. ¶ 3.

In December 2019, Belesimo was passed over for a promotion to the position of Chief Operating Officer. Pyatt Aff. ¶ 5; Cashman Aff. ¶ 5. Belesimo expressed his unhappiness after the decision. Id. To address Belesimo's unhappiness, Belesimo was placed in charge of CDMC's project to develop, design and, ultimately, construct a new hopper dredge (the "Project"). Pyatt Aff. ¶ 6, Cashman Aff. ¶ 6. This Project is one of, if not the, largest internal undertakings in CDMC's history. Id. There are very few private hopper dredges in the United States and the Project is a key strategic undertaking in maintaining CDMC's competitiveness. Pyatt Aff. ¶ 6.

The first step of the Project, the concept process, required Belesimo to lead a team of CDMC employees to conduct a market survey to determine what dredge performance characteristics were most in demand including the size, market capacity, and historic utilization and capability of existing hopper dredges in the market. Cashman Aff. ¶ 7; Pyatt Aff. ¶ 7. For the survey, Belesimo and the CDMC team, over thousands of work-hours, submitted between 300 and 400 Freedom of Information Act requests to the U.S. Army Corps of Engineers concerning hundreds of dredging projects to gather a mountain of data and then to glean and evaluate, in combination with CDMC's own historical data, the dredge characteristics required for larger, more profitable projects (the "Market Survey Data"). Id. Based on the Market Survey Data and CDMC's internal know how in determining costs of operations and dredge production rates, CDMC developed hopper dredge specifications addressing, among other things, vessel criteria for capacity, speed, and on board power requirements (the "Specifications"). Pyatt Aff. ¶ 7. The Specifications were developed for the design and construction of a shallow draft hopper dredge that strategically met the needs of the current and forecasted marketplace. Id.

The second step of the Project involves the design and construction of the shallow draft hopper dredge based on the Specifications. Pyatt Aff. ¶ 8; Cashman Aff. ¶ 8. It is expected that

when completed that this project will cost CDMC as much as one hundred million dollars ($100,000,000.00). By 2021, CDMC had already committed more than four million dollars ($4,000,000.00) to the Project. Cashman Aff. ¶ 16. As part of Belesimo's new responsibilities for the Project, Belesimo, with the assistance of CDMC's in-house counsel, negotiated a design contract with IHC America, Inc. ("IHC") for a new 6500 cubic yard trailing suction hopper dredge. Pyatt Aff. ¶ 9; Cashman Aff. ¶ 9. As CDMC's Executive Vice President, Belesimo executed the agreement with IHC on December 17, 2020 (the "IHC Agreement"). Id. The IHC Agreement places an affirmative obligation on CDMC to keep design documents confidential. Cashman Aff. ¶ 16. On January 21, 2021, CDMC issued a press release announcing the IHC Agreement to design "one of the most technologically advanced dredges in the country." Cashman Aff. ¶ 10, Ex. B. On January 29, 2021, Waterways Journal Weekly quoted Belesimo stating that the new dredge's design will "distinguish it from many of the hopper dredges in the U.S. market." Cashman Aff. ¶ 11, Ex. C.

In addition to his Project responsibilities, Belesimo worked on CDMC's bid estimating and had access to CDMC's proprietary and confidential information, including, among other things, information gathered over many years and many projects related to CDMC's costs, equipment specifications and capabilities, dredge pumping and hydraulic flow data, subcontractor relationships and customer relationships, historical project performance data, dredge production rates, operating costs, vessel schematics, and historic profit margins (the "Bid Estimating Data"). Pyatt Aff. ¶ 12; Cashman Aff. ¶ 14. The confidential Bid Estimating Data is crucial to CDMC maintaining its competitiveness to win future projects in the dredging industry. A substantial part of CDMC's value is based on maintaining the confidentiality of the Bid Estimating Data and on the Bid Estimating Data itself. Pyatt Aff. ¶ 13.

*Belesimo's Departure from CDMC*

In early April 2021, Belesimo told Jay Cashman, co-manager of CDMC ("Cashman"), that he had been visiting Callan's offices to visit former colleagues and asked Cashman if he was interested in selling CDMC to Callan. Cashman Aff. ¶ 19. Cashman replied no, but expressed a willingness to discuss a joint venture. Id. In May 2021, during Belesimo's annual review, Cashman asked Belesimo whether he planned to leave. Cashman Aff. ¶ 21. Belesimo's response was noncommittal. Id. Because this raised concerns, Cashman spoke with Dale Pyatt ("Pyatt"), co-manager of CDMC, and instructed Pyatt to have a computer forensics firm make a backup copy of Belesimo's work files from his CDMC electronic devices. Id. ¶ 22, Sun Aff. ¶ 7.

On July 14, 2021, Jay Cashman received a text message from Belesimo seeking a private meeting. Cashman Aff. ¶ 23. In Belesimo's office, Belesimo first told Cashman he was considering leaving CDMC, but then on questioning from Cashman admitted he was, in fact, leaving. Id. Cashman wished him well and then repeatedly reminded Belesimo that all of his work product from his time at CDMC, including but not limited to all of his computer files and engineering resources and designs, including the Project data and designs that CDMC had spent millions of dollars developing, are CDMC property that he was prohibited from taking. Cashman Aff. ¶¶ 23-25. Belesimo stated he knew this and that he would never steal files or materials from CDMC and would only take personal photographs and dredge photographs collected from public sources. Id. ¶¶ 23-26. At the end of the discussion, although Belesimo offered to stay for additional weeks, Cashman informed Belesimo it would be best if he left CDMC that day. Cashman Aff. ¶ 27. Cashman told him he should meet with Pyatt to plan an orderly exit. Id. In closing, Cashman reminded Belesimo he could not take anything from CDMC. Id. In an approximately fifteen minute conversation, Cashman reminded Belesimo at least three times that

6

he could not take anything from CDMC when he left and, at least three times, Belesimo promised that he would not take any information, files, designs or data of any kind from CDMC. Cashman Aff. ¶ 29.

Thereafter Belesimo met with Pyatt. Pyatt Aff. ¶ 18. Pyatt reminded Belesimo he could not take any CDMC information, data, designs or files. Id. Belesimo responded he would never do so, and the only computer files he had taken were his master's thesis and personal photographs. Id. Pyatt also granted Belesimo's request to take a collection of stock, public domain photographs of dredges but reminded Belesimo he could not take company materials. Id.

About an hour and half after observing Belesimo leave CDMC's offices, during Pyatt's drive home that evening, Pyatt received a call from Belesimo's home phone. Pyatt Aff. ¶ 22. Belesimo told Pyatt he was looking for the stock photographs of dredges in Dropbox files and, in the process, had found drawings related to the Project that he should not have. Id. Pyatt had no idea what Dropbox Belesimo was referencing. Id. Pyatt asked him if there was anything else in this Dropbox and Belesimo responded there were some old bid documents, implying they were insignificant and of no value to CDMC. Id.  Belesimo claimed since he could get the public domain dredge photographs another way, he decided to delete the entire contents of the Dropbox. Id. Pyatt was concerned by Belesimo's unilateral decision to delete company files without CDMC having had an opportunity to inspect what was in the Dropbox.  Id. At the end of the call, during which Pyatt let Belesimo do almost all of the talking, Belesimo added: "I [Belesimo] don't want you and Jay to ever think that I would steal anything from Cashman.  I hope you believe me." Id. Pyatt responded he hoped Belesimo was telling the truth.  Id. After the call ended, Pyatt suspected it was part of a ruse for Belesimo to abscond with CDMC's information that Belesimo was repeatedly told not to take. Pyatt Aff. ¶ 23.

7

***Belesimo and Callan's Scheme to Steal CDMC's Trade Secrets***

Unbeknownst to CDMC, Belesimo had received and accepted an employment offer from Callan on or about July 12, 2021 and, thereafter, set out on his scheme to surreptitiously steal CDMC's Trade Secrets, while still employed by CDMC, and bring them to Callan. Cashman Aff. ¶ 32, Ex. D. Belesimo's scheme was uncovered by CDMC's retained computer forensics consultant, Clifton Larson Allen, LLC ("CLA"), which copied the files on Belesimo's CDMC electronic devices. Cashman Aff. ¶ 31; Sun Aff. ¶¶ 7-8. In addition, CLA had installed certain monitoring software on Belesimo's CDMC computer so, despite Belesimo's efforts to delete his tracks, CLA was able to determine over the weeks since Belesimo's departure that Belesimo took CDMC's data, computer files, and Trade Secrets. Cashman Aff. ¶ 31; Sun Aff. ¶ 9.

CLA found evidence of numerous undisclosed and unauthorized external data storage devices that Belesimo connected to his CDMC laptop and used to transfer Trade Secrets, including relating to the Bid Estimating Data, the Market Survey Data, the Specifications, and the IHC design documents for the new shallow draft hopper dredge. Sun Aff. ¶¶ 8, 18-20, Ex. H. Belesimo did not disclose these external data storage devices to CDMC. Pyatt Aff. ¶ 25. CLA determined that, on his last day, Belesimo attempted numerous times to delete 53,856 files from his portable USB hard drives (USB1 and USB2), which drives Belesimo did leave in his office upon departing CDMC on July 14, 2021. Sun Aff. ¶ 14. Again, the vast majority of these files were CDMC's business files Belesimo had no legitimate reason to delete at the time of his departure from CDMC. Id.

Also on that same day, Belesimo connected an undisclosed USB thumb drive to his CDMC computer and transferred additional files, including CDMC's Trade Secrets. Sun Aff. ¶¶ 18-20. Although Belesimo retained the USB thumb drive (and thus CDMC has no record of the

entirety of what Belesimo transferred), there is a record on his CDMC laptop of some of the files opened from that thumb drive while it was connected to the CDMC laptop, showing confidential and proprietary dredge pumping and hydraulic flow data. Sun Aff. ¶ 18, Ex. G. CLA's examination of Belesimo's computer activity shows he transferred CDMC files to various external data storage devices, including design, specification, and cost estimate data for the Project (including a folder of files titled "Cashman 6500 yard hopper dredge"), files that are among CDMC's most sensitive Trade Secrets. Id. ¶¶ 19-20, Ex. I. Belesimo did not disclose these data storage devices to CDMC nor did he provide these data storage devices to CDMC when he left CDMC for employment with Callan. Id.

CLA also learned Belesimo had taken steps re-register a Dropbox that had previously been registered to a Cashman e-mail address, and could be accessed by CDMC, to his personal email address so CDMC could no longer access this Dropbox.  Sun Aff. ¶ 11, Ex. A. CLA's forensic analysis shows Belesimo routinely stored as many as 19,740 files in the Dropbox, the vast majority related to CDMC business. Sun Aff. ¶ 12, Ex. B. The monitoring software installed by CLA also recorded Belesimo, on the day of his departure, uploading 13,234 additional files to the Drobox after he had transferred control to his personal email. Id. In one of many CLA screen captures from that day, Belesimo viewed a progress indicator showing 11,527 files uploading to Dropbox.  Id., Ex. C. After uploading additional files, Belesimo uninstalled Dropbox and deleted all files previously stored in Dropbox from his CDMC computer. Sun Aff. ¶ 15. Doing so would not have removed the files from the Dropbox account but hid his use of Dropbox and details about which files were stored there. Id. To date, CLA has identified 32,974 files that Belesimo stored in Dropbox, which remains under Belesimo's control. Id.

In addition, CLA's review of Belesimo's CDMC laptop showed he maintained an Apple iCloud account where he stored 857 files and folders, a significant number of which are CDMC documents. Sun Aff. ¶ 13, Ex. D. iCloud is a cloud storage service similar to Dropbox and documents kept in iCloud can be accessed later from a different device. Id. As he did with Dropbox, Belesimo deleted the iCloud files and folders stored locally on his computer, in an attempt to obscure his use of the service and the identity of the files stored there. Sun Aff. ¶ 15.

In total, CLA was able to identify 30,133 files and folders that were removed from Belesimo's CDMC laptop between June 9, 2021 and his departure on July 14, 2021. Sun Aff. ¶ 16, Exs. B, D, F. The vast majority of these were CDMC files that Belesimo had no legitimate reason to delete at the time of his departure. Sun Aff. ¶ 12. Along with deleting files, CLA's review of the monitoring software captured Belesimo purging evidence of his computer activities. Sun Aff. ¶ 17. For example, CLA captured an image showing Belesimo deleting his Internet browsing history and other activity. Id. CLA captured a further image that shows Belesimo deleting System Restore and Shadow Copies of the laptop. Id. System Restore and Shadow Copies are features in the Microsoft Windows operating system that help preserve previous states of the computer and files allowing a user to revert to a previous state in the event data is lost, deleted or corrupted. Id. In short, this would have made it difficult to discover changes and deletions on this computer prior to Belesimo's departure and to recover the deleted information without a forensic examination. Id.

The full extent of Belesimo's misuse of CDMC devices and theft of intellectual property is still under review. Nonetheless, based on the information uncovered so far, Belesimo continues to maintain control of a significant amount of CDMC's Trade Secrets and proprietary files including Bid Estimating Data, Market Survey Data, and documents concerning the Project.

*Irreparable Harm*

The Trade Secrets, of which the Bid Estimating Data is a primary part, are a substantial part of CDMC's enterprise value.  Prior to the theft of the Trade Secrets, CDMC had an enterprise value of approximately one hundred and seventy million dollars ($170,000,000). Belesimo's theft of CDMC's Trade Secrets has substantially diminished CDMC's enterprise value and stolen that value for himself and his new employer, Callan. It is extremely doubtful Callan and Belesimo would ever have the means to make CDMC whole for all the damage their actions threaten to do to CDMC's enterprise value and it is thus in all parties' interests to stop as much of this potential harm as possible before it is irreparably inflicted upon CDMC.

If the Market Survey Data, Bid Estimating Data, and dredge design and Specifications for the Project are not returned to CDMC's sole possession and control, the effect on CDMC's future market position and enterprise value would be catastrophic and irreparable.  The magnitude of the threat posed by Belesimo's theft and the uncertainty clouding CDMC's operations from Belesimo's tampering with and/or deleting computer system records underscores the critical need for a full forensic investigation. Time is of the essence because Belesimo is now poised to use the stolen Trade Secrets in concert with CDMC's competitor, Callan.

## ARGUMENT

***CDMC is Entitled to a Preliminary Injunction to Halt the Theft of its Trade Secrets***

To obtain a preliminary injunction, CDMC must show: "(i) the movant's likelihood of success on the merits of its claims; (ii) whether and to what extent the movant will suffer irreparable harm if the injunction is withheld; (iii) the balance of hardships as between the parties; and (iv) the effect, if any, that an injunction (or the withholding of one) may have on the public interest." Corp. Techs., Inc. v. Harnett, 731 F.3d 6, 9 (1st Cir. 2013). Of these factors, likelihood of success on the merits "normally weighs heaviest in the decisional scales." Coquico,

11

Inc. v. Rodriguez-Miranda, 562 F.3d 62, 66 (1st Cir. 2009). CDMC may rely on, and the Court

may accept as true, "well-pleaded allegations [in the complaint] and uncontroverted affidavits."

Rohm & Haas Elec. Materials, LLC v. Elec. Circuits, 759 F. Supp. 2d 110, 114, n.2 (D. Mass.

2010) (quotation omitted). Here, all factors strongly favor CDMC.

### A.      CDMC Has a High Likelihood of Success on the Merits

"Likelihood of success is the main bearing wall of the four-factor framework." Ross-

Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 16 (1st Cir. 1996). A court, "at the

preliminary injunction stage, need not predict the eventual outcome on the merits with absolute

assurance." Id. Instead, "a court's conclusions as to the merits of the issues presented on

preliminary injunction are to be understood as statements of probable outcomes." Narragansett

Indian Tribe v. Guilbert, 934 F.2d 4, 6 (1st Cir. 1991). CDMC carries its burden to establish

there is a strong likelihood it will ultimately prevail in its claims against Defendants.

The affidavits and exhibits submitted by CDMC demonstrate Defendants' wrongdoing.

The Complaint asserts claims against Defendants for: (i) violation of the Defend Trade Secrets

Act of 2016, 18 U.S. Code § 1836 et seq. ("DTSA"), and the Massachusetts Uniform Trade

Secret Act, M.G.L. c.93, § 42A ("MUTSA"); (ii) breach of the duty of loyalty and aiding and

abetting of the same; (iii) tortious interference with contractual and advantageous business

relations; (iv) violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA"); and

(v) unfair and deceptive trade practices in violation of M.G.L. c.93A, § 11. See Complaint (ECF

No. 1), Counts I-VII.  CDMC has established a high likelihood of success for each claim.

*1.   CDMC Is Likely To Succeed On Its Claim That Defendants Violated Trade Secret Laws*

CDMC is likely to prevail on its claims against Defendants under both the DTSA and the

MUTSA, which are nearly equivalent. Allscripts Healthcare, LLC v. DR/Decision Resources,

LLC, 386 F. Supp. 3d 89, 94 (D. Mass. 2019); compare 18 U.S. Code § 1836 et seq. with M.G.L.

c.93, § 42A. To establish a claim for misappropriation of trade secrets under either statute, a plaintiff must show: (1) the information at issue qualifies as a trade secret, (2) it "took reasonable steps to preserve the secrecy of the information," and (3) "the defendant used improper means, in breach of a confidential relationship, to acquire and use the trade secret." Incase Inc. v. Timex Corp., 488 F.3d 46, 52 (1st Cir. 2007). The DTSA also requires the trade secret be "used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1).

A trade secret is any confidential information used in the plaintiff's business that "gives [the owner] an opportunity to obtain an advantage over competitors who do not know or use the secret." Optos, Inc. v. Topcon Medical Systems, Inc., 777 F. Supp. 2d 217, 238 (D. Mass. 2011) (quotation omitted). Here, there is no question the Trade Secrets stolen by Belesimo confer on Defendants an unfair advantage. CDMC's Market Survey Data, Bid Estimating Data, Specifications, and IHC design documents for the Project took CDMC many years and millions of dollars to develop. Permitting Defendants to short-circuit a costly research and development process by utilizing stolen Trade Secrets will distort the market with unfair competition, unjustly hampering CDMC's business. The confidential Bid Estimating Data is crucial to CDMC maintaining its competitiveness to win future projects in the dredging industry and is a basis for a substantial part of CDMC's enterprise value. The loss of the Bid Estimating Data is an existential threat to CDMC and its ability to ever win another bid contest for a new project.

There is an uncontroverted record the Trade Secrets were closely guarded and appropriately maintained as confidential by CDMC. See, e.g., Mktg. All., Inc. v. First Am. Ins. Underwriters, Inc., 2006 WL 8458338, at *4 (D. Mass. Jan. 25, 2006), citing J.T. Healy & Son, 357 Mass. at 738 (confidentiality agreements, restrictions on access to information, and password-protections were "proper and reasonable steps" to protect trade secrets); Bruno Int'l

13

Ltd. v. Vicor Corp., No. CV 14-10037-DPW, 2015 WL 5447652, at *12 (D. Mass. Sept. 16, 2015) ("[Plaintiff's] specific request that [defendant] keep the information confidential is sufficient, on the pleadings, to allege that [plaintiff] took reasonable, affirmative steps to protect its trade secrets."). CDMC's protections were circumvented through sabotage and subterfuge by Belesimo, who exceeded his authorized use of CDMC's computer systems, lied to CDMC colleagues, and surreptitiously transferred files for his personal use in contravention of CDMC policies. Belesimo violated a position of trust and confidence with CDMC to accomplish his theft to unfairly compete with CDMC in the interstate and international markets for dredging and marine construction. See Netcracker Tech. Corp. v. Laliberte, No. CV 20-11054-RGS, 2020 WL 6384312, at *4 (D. Mass. Oct. 30, 2020) ("As a matter of law, an individual who breaches a confidentiality agreement in accessing and appropriating trade secrets has used improper means."). For these reasons, CDMC is likely to prevail on its DTSA and MUTSA claims against Belesimo, and on its related aiding and abetting claim against Callan, which clearly conspired to orchestrate and benefitted from Belesimo's theft of CDMC's Trade Secrets.

2.    *CDMC Is Likely To Succeed On Its Breach of Duty of Loyalty Claim Against Defendants*

A duty of loyalty attaches to employees who occupy positions of trust and confidence, including corporate officers, executives, directors, and certain rank and file employees with access to confidential information, such as law firm associates. TalentBurst, Inc. v. Collabera, Inc., 567 F.Supp.2d 261, 265-66 (D. Mass. 2008). An individual with a duty of loyalty to a corporation is prohibited, by the corporate opportunity doctrine, from "taking, for personal benefit, an opportunity or advantage that belongs to the corporation." Demoulas v. Demoulas Super Markets, Inc., 424 Mass. 501, 529, 677 N.E.2d 159 (1997). An employee owes a duty of loyalty to his employer when he is "occupying a position of trust and confidence." Chelsea

Industries, Inc. v. Gaffney, 389 Mass. 1, 11, 449 N.E.2d 320 (1983). Executives are invariably found to be "trusted employees," see Geller v. Allied-Lyons PLC, 42 Mass. App. Ct. 120, 123, 674 N.E.2d 1334 (1997). Access to in-depth proprietary client information and access to confidential business intellectual property are two important indicia of such "trust." See id.; Meehan v. Shaughnessy, 404 Mass. 419, 438, 535 N.E.2d 1255 (1989).

Belesimo, prior to his resignation, had authorized access to the Trade Secrets, as well as to other CDMC proprietary information and intellectual property, which establishes that he occupied a position of trust, confidence and influence and therefore owed CDMC a duty of loyalty. See T.H. Glennon Co., Inc. v. Monday, No. CV 18-30120-WGY, 2020 WL 1270970, at *18 (D. Mass. Mar. 17, 2020). As a longstanding senior officer and employee, Belesimo also owed CDMC a duty of loyalty arising out of his terms of employment. This duty of loyalty, as well as the terms of his employment (spelled out in the Employee Handbook; Pyatt Aff. Exh. A), required Belesimo to keep CDMC's Trade Secrets confidential and to use them only in the course of his work for CDMC. Belesimo breached that duty when he willfully stole CDMC's Trade Secrets to unfairly compete with CDMC in concert with Callan. See KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC, No. 4:21-CV-10572-TSH, 2021 WL 2982866, at *19 (D. Mass. July 15, 2021).

Belesimo stole the Trade Secrets in an attempt to divert corporate opportunities away from CDMC to his new employer, Callan. Callan knew or had knowledge of Belesimo's theft and Callan cannot reasonably be held to have acted in good faith. Callan knew Belesimo was an officer and employee of CDMC who owed fiduciary duties to CDMC. Callan thus induced and aided and abetted Belesimo's theft, and Callan's ongoing employment of Belesimo is a continued endorsement of, and benefit from, Belesimo's breach of loyalty.

3.   *CDMC Is Likely To Succeed On Its Claim for Tortious Interference Against Callan*

CDMC will prevail in its claim against Callan for tortious interference with CDMC's contractual and business relationships. Under Massachusetts law, a claim for tortious interference with contractual relations requires a plaintiff to show: "(1) he had a contract with a third party; (2) the defendant knowingly interfered with that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions." Harrison v. NetCentric Corp., 433 Mass. 465, 476 (2001). "The elements of the tort of interference with an advantageous relationship that a plaintiff must prove are (1) a business relationship or contemplated contract of economic benefit; (2) the defendant's knowledge of such relationship; (3) the defendant's intentional and malicious interference with it; (4) the plaintiff's loss of advantage directly resulting from the defendant's conduct." Comey v. Hill, 387 Mass. 11, 19, 438 N.E.2d 811 (1982) (quotations omitted).

CDMC had a contractual and business relationship with Belesimo, and Callan was fully aware it was governed by the terms of Belesimo's employment. With a purposeful and improper intent, Callan interfered with CDMC's employment relationship with Belesimo, in particular by inducing Belesimo's breach of duty and Trade Secret theft. CDMC has been deprived of the advantages of its business and contractual relationship with Belesimo, including its confidentiality rights and Trade Secrets protections, as a direct result of Callan's wrongful actions. For these reasons, CDMC will prevail on its tortious interference claims against Callan.

4.   _CDMC Is Likely To Succeed On Its CFAA Claim Against Defendants_

CDMC has established a clear likelihood of success for its civil claim against Belesimo

under the CFAA against Defendants, which requires a plaintiff to prove the defendant accessed

the Trade Secrets (1) on a protected computer, (2) without authorization or in excess of his

authorization, with intent, (3) to further the intended fraud and obtain something of value worth

at least $5,000. 18 U.S.C. § 1030(a)(4). CMDC has demonstrated it will satisfy each element.

A "protected computer" under the CFAA is one "which is used in or affecting interstate

or foreign commerce or communication." 18 U.S.C. § 1030(e)1(B). CDMC's computer systems

were used in providing dredging services worldwide and in as many as 35 states. Cashman Aff.

¶¶ 1-2. The CFAA also requires an individual access data in a manner that "exceeds authorized

access" or "without authorization." 18 U.S.C. § 1030(a)(4). "[T]he CFAA covers any kind of

unauthorized access of information on a computer, whether through technical, social, or other

means." T.H. Glennon Co., Inc. v. Monday, No. CV 18-30120-WGY, 2020 WL 1270970, at *10

(D. Mass. Mar. 17, 2020). To "exceed authorized access" is to obtain or alter information in the

computer in a manner that the accessor is not entitled. 18 U.S.C. § 1030(e)(6). Courts construe

"exceeds authorized access" to include when a user is authorized to access a computer system for

certain purposes but goes beyond those limits. See Pulte Homes, Inc. v. Laborers' Int'l Union of

N. Am., 648 F.3d 295, 304 (6th Cir. 2011), LVRC Holdings LLC v. Brekka, 581 F.3d 1127,

1133 (9th Cir. 2009); United States v. Nosal, 676 F.3d 854, 859 (9th Cir. 2012). CDMC

maintained the Trade Secrets on computer systems owned by CDMC, with limited access

granted to its employees on a condition of compliance with employment terms and

confidentiality obligations. Belesimo accessed the Trade Secrets after he was no longer

authorized to do so, and then transferred the Trade Secrets to unauthorized cloud storage and

17

external media devices for his use with a new employer. As this Court has held, the CFAA should be read broadly to include an employee who (like Belesimo) accesses his employer's computer system, without the employer's knowledge, to acquire an interest adverse to his employer. Guest-Tek Interactive Entm't, Inc. v. Pullen, 665 F. Supp. 2d 42, 45 (D. Mass. 2009).

The term "further the intended fraud and obtain anything of value" is defined broadly to include the actions that resulted in the acquisition of any kind of proprietary, useful data, including confidential information. See Viken Detection Corp. v. Videray Tech. Inc., 384 F. Supp. 3d 168, 178 (D. Mass. 2019) (Gorton, J.). CDMC has demonstrated a reasonable likelihood Belesimo stole the Trade Secrets for use by his new employer, Callan, in a manner that is adverse to the interests of CDMC and in violation of his obligations to CDMC. A similar "data dump" from an employer's computer system has been found to violate the CFAA, especially where that employee attempted to conceal the actions by deleting a record of the transfer activity, which was "indicative of consciousness of guilt." T.H. Glennon Co., Inc. v. Monday, No. CV 18-30120-WGY, 2020 WL 1270970, at *10 (D. Mass. Mar. 17, 2020) (granting judgment in favor of plaintiff based, in part, on CFAA claim where "[t]he presence of the files on [the former employee's] computer speak for themselves."). CDMC has thus established all the elements of its CFAA claim with a strong likelihood of success.

5.  *CDMC Is Likely To Succeed On Its Chapter 93A Claim Against Defendants*

CDMC has demonstrated a likelihood of prevailing on its Chapter 93A claim against Defendants. Chapter 93A proscribes those engaged in trade or commerce from employing "unfair methods of competition and unfair or deceptive acts or practices" and authorizes businesses to sue one another for engaging in such practices. M.G.L. c. 93A, §§ 2, 11. Callan actively recruited and hired a CDMC Executive Vice President who stole protected Trade Secrets and transferred them to Callan for use in competing against CDMC. Callan did so while

actively aiding and abetting violations of, among other laws, the DTSA and the MUTSA. CDMC and Defendants are engaged in trade or commerce within the meaning of Chapter 93A, and Callan's recruitment of Belesimo and Belesimo's theft of the Trade Secrets occurred primarily and substantially in Massachusetts.

Callan's acquisition of the stolen Trade Secrets through Belesimo is in and of itself an act of unfair competition. Defendants are armed with an unfair commercial advantage obtained through deception by Belesimo's unauthorized and surreptitious copying, transferring and deleting of the computer data and files contained on CDMC electronic devices and CDMC's computer network, constituted an act of corporate theft and sabotage. These acts represent the apex of unfair trade practices, and CDMC is likely to prove its Chapter 93A claim.

**B.**     **CDMC Will Suffer Irreparable Harm Absent Injunctive Relief**

If the requested preliminary relief is not granted, CDMC will be irreparably harmed by the theft of its Trade Secrets that it invested time and resources in developing and deprived of the opportunity to fairly compete in the market. The greater the likelihood of success on the merits, the less required showing of irreparable harm. Vaqueria Tres Monjitas, Inc. v. Irizarry, 587 F.3d 464, 485 (1st Cir. 2009) ("[W]hen the likelihood of success on the merits is great, a movant can show somewhat less in the way of irreparable harm and still garner preliminary injunctive relief."); Gately v. Massachusetts, 2 F.3d 1221, 1232 (1st Cir. 1993) ("[I]rreparable harm is subject to a sliding scale analysis… .").

Harm is irreparable only if no adequate legal remedy exists. Foxboro Co. v. Arabian Am. Oil Co., 805 F.2d 34, 36 (1st Cir. 1986) ("We do not find irreparable injury where only money is at stake. . . ."); see also Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 19 (1st Cir. 1996) (an injury is "irreparable" if it is "not accurately measurable or adequately compensable by money damages . . . ."). In this case, any ex post facto attempt to compensate CDMC for the

19

damage caused by Belesimo's theft and Callan's unfair competition with stolen Trade Secrets will be wholly inadequate. The undisputed facts demonstrate that if Defendants are not enjoined from retaining and using the stolen Trade Secrets, CDMC will be deprived of the benefit of millions of dollars and years of investment. With CDMC's Bid Estimating Data in hand, Callan is armed to prevail in any competitive bidding process against CDMC, having the data and methodologies to anticipate CDMC's bid and undercut it by razor-thin margins. The proprietary information, designs, bid estimating data, and market intelligence painstakingly developed by CDMC are stolen property now in Defendants' possession, and if they are permitted to unfairly compete against CDMC, there will be no way to undo that commercial damage. Defendants must be enjoined from devastating CDMC's business through use of the stolen Trade Secrets.

### C.      The Balance of Harms and Public Interest Weigh Heavily in Favor of Granting CDMC the Requested Injunctive Relief

The balance of harm tips heavily in CDMC's favor. If Defendants are permitted to proceed unfettered with their blatant corporate theft of the Trade Secrets, CDMC will likely be left without a meaningful remedy. Defendants, on the other hand, will suffer virtually no harm from being enjoined from unfairly competing with stolen Trade Secrets. Under the circumstances of this case, this Court's exercise of its equity powers would serve the public interest to prevent the open and unrepentant violation of trade secret laws and theft of CDMC's intellectual property. The public benefits from the robust enforcement of property rights and the prevention of market distortion through illicit activity.

### CONCLUSION

CDMC respectfully requests the Court grant the Motion and issue its requested relief and additional relief as the Court deems just and proper.