UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| CASHMAN DREDGING AND MARINE CONTRACTING CO., LLC, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No. 1:21-cv-11398-DJC |
| FRANK BELESIMO and CALLAN MARINE, LTD., | ) ) ) ) | |
| Defendants. | ) ) ) | |

**CDMC's OPPOSITION TO DEFENDANT BELESIMO'S
MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

I.      INTRODUCTION ....................................................................................................1

II.     STANDARD OF REVIEW ......................................................................................2

III.    STATEMENT OF FACTS ........................................................................................3

IV.     ARGUMENT ...........................................................................................................3

        A.      The Undisputed Evidence Establishes Belesimo Misappropriated CDMC's
                Trade Secrets And Thus Belesimo Cannot Prevail On Counts I And II................ 3

                i.      CDMC Has Identified the Trade Secrets that Belesimo Stole with
                        Specificity. ................................................................................ 3

                ii.     Belesimo Misappropriated CDMC's Trade Secrets by Improper
                        Means and Used Them for His and Callan's Benefit. ............................... 6

                iii.    CDMC Took Reasonable Measures to Protect its Trade Secrets. ............ 11

                iv.     CDMC Has Established Recoverable Damages. ..................................... 15

        B.      The Undisputed Evidence Establishes Belesimo Breached his Fiduciary
                Duties to Callan........................................................................................... 16

        C.      The Undisputed Evidence Establishes Belesimo's Liability under the
                Computer Fraud and Abuse Act. ...................................................................... 17

        D.      The Undisputed Evidence Establishes Belesimo's Unfair and Deceptive
                Conduct in Violation of Chapter 93A. ................................................................ 19

V.      CONCLUSION .......................................................................................................20

CERTIFICATE OF SERVICE ..........................................................................................21

i

## TABLE OF AUTHORITIES

**CASES**

*Advanced Micro Devices, Inc. v. Feldstein*,
    951 F. Supp. 2d 212 (D. Mass. 2013) ............................................................. 16

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ...................................................................................... 2

*Aponte-Santiago v. Lopez-Rivera*,
    957 F.2d 40 (1st Cir. 1992) ..................................................................... 10, 11

*Bruno Int'l Ltd. v. Vicor Corp.*,
    No. CV 14-10037-DPW, 2015 WL 5447652 (D. Mass. Sept. 16, 2015) ......... 13

*Campbell v. Gen. Dynamics Gov't Sys. Corp.*,
    407 F.3d 546 (1st Cir. 2005) ......................................................................... 9

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ...................................................................................... 3

*DB Riley, Inc. v. AB Eng'g Corp.*,
    977 F. Supp. 84 (D. Mass. 1997) ................................................................. 11

*DUSA Pharms., Inc. v. Biofrontera Inc.*,
    No. CV 18-10568-RGS, 2020 WL 5995979 (D. Mass. Oct. 9, 2020) ............ 15

*Foster–Miller, Inc. v. Babcock & Wilcox Canada*,
    210 F.3d 1 (1st Cir. 2000) ........................................................................... 13

*Governo L. Firm LLC v. Bergeron*,
    487 Mass. 188 (2021) .................................................................................. 20

*Guest-Tek Interactive Entm't, Inc. v. Pullen*,
    665 F. Supp. 2d 42 (D. Mass. 2009) ............................................................ 18

*J.T. Healy & Son v. James A. Murphy & Son, Inc.*,
    357 Mass. 728 (1970) .............................................................................. 13, 14

*Jackson v. Action for Boston Cmty. Dev., Inc.*,
    403 Mass. 8, 525 N.E.2d 411 (1988) ............................................................. 8

Jet Spray Cooler v. Crampton,
    361 Mass. 835 (1972) .............................................................................. 8, 16

*Koch Acton, Inc. v. Koller*,
    No. CV 21-10374-FDS, 2024 WL 1093001 (D. Mass. Mar. 13, 2024) .......... 13

*LBF Travel Mgmt. Corp. et al., v. Derosa*,
    No. 20-CV-2404-MMA-SBC, 2024 WL 1298001 (S.D. Cal. Mar. 26, 2024) ................ 16

*Magee v. United States*,
    121 F.3d 1 (1st Cir. 1997) ................................................................................................ 19

*Mavel, A.S. v. Rye Dev., LLC*,
    No. 21-11759-FDS, 2022 WL 4084289 (D. Mass. Sept. 6, 2022) ................................. 11

*Mktg. All., Inc. v. First Am. Ins. Underwriters, Inc.*,
    2006 WL 8458338 (D. Mass. Jan. 25, 2006) .................................................................. 13

*Physiotherapy Assocs., Inc. v. ATI Holdings, LLC*,
    592 F. Supp. 3d 1032 (N.D. Ala. 2022) ......................................................................... 13

*Reeves v. Sanderson Plumbing Prods., Inc.*,
    530 U.S. 133 (2000) .......................................................................................................... 2

*Repat, Inc. v. IndieWhip, LLC*,
    281 F. Supp. 3d 221 (D. Mass 2017) .............................................................................. 13

*Rivera-Colon v. Mills*,
    635 F.3d 9 (1st Cir. 2011) .................................................................................................. 3

*Rodney v. United Masters*,
    2023 WL 2184865 (E.D.N.Y. Feb. 10, 2023) ................................................................ 13

*Sterling Research, Inc. v. Pietrobono*,
    2005 WL 3116758 (D. Mass. 2005) ............................................................................... 16

*T.H. Glennon Co., Inc. v. Monday*,
    No. CV 18-30120-WGY, 2020 WL 1270970 (D. Mass. Mar. 17, 2020) ....................... 19

*TouchPoint Sols., Inc. v. Eastman Kodak Co.*,
    345 F. Supp. 2d 23 (D. Mass. 2004) .............................................................................. 12

*Uncle Henry's, Inc. v. Plant Consulting Co.*,
    399 F.3d 33 (1st Cir. 2005) ................................................................................................ 2

*United States v. Coloplast Corp.*,
    327 F. Supp. 3d 300 (D. Mass. 2018) .............................................................................. 3

*USM Corp. v. Marson Fastener Corp.*,
    379 Mass. 90 (1979) ........................................................................................................ 11

*Van Buren v. United States*,
    141 S. Ct. 1648 (2021) .................................................................................................... 18

**STATUTES**

18 U.S.C. § 1030, et seq. ........................................................................ 17, 18, 19

G.L. ch. 93, § 42 ................................................................................................ 11

G.L. ch. 93A, § 1, et seq. .................................................................................. 19

G.L. ch. 93A, § 11 ............................................................................................. 20

**RULES**

Fed. R. Civ. P. 56(c) ........................................................................................... 2

**OTHER AUTHORITIES**

Roger M. Milgram, Milgram on Trade Secrets § 1.04 (1993) ...................... 15

## I.     INTRODUCTION

Plaintiff Cashman Dredging and Marine Contracting, Co., LLC ("CDMC") files this opposition to the motion for summary judgment filed by Frank Belesimo ("Belesimo") (ECF Nos. 131, 132). Frank Belesimo's motion for summary judgment is a radical denial of the evidentiary record. In the face of uncontested facts that he funneled CDMC's proprietary Market Study, dredge Specifications, and strategic Bid Estimating information to Callan for his own benefit and utilized dozens of undisclosed devices to make surreptitious copies of CDMC Trade Secrets that he then deleted from CDMC's systems and retained long after his resignation, Belesimo now argues there is "no evidence" that he misappropriated CDMC's Trade Secrets, breached his fiduciary duties to CDMC, exceeded his authority on CDMC's computer systems, or engaged in unfair and deceptive practices. Belesimo ignores that, as the movant, he bears the burden to show that, on the undisputed facts, no reasonable jury could determine he is liable for his theft and sabotage. Without offering any evidence that would excuse or exculpate his theft of hundreds of thousands of CDMC files, Belesimo urges the Court to find in his favor based on unsupported and conclusory statements that he engaged in no wrongdoing of any kind.

Belesimo's entire argument rests on counter-factual assertions that defy logic as well as the uncontested factual record, namely that: it has been "proven" that he has surrendered all stolen CDMC files, that he and Callan never accessed or used the stolen Trade Secrets, that Callan and CDMC are not competitors (and Callan could never make use of the stolen information), that CDMC has suffered no harm (and he and Callan have received no benefit), that he neither owed duties to CDMC nor violated any that may have existed, and that he did not exceed his authority to use CDMC's computer systems. As CDMC demonstrated in its own motion for summary judgment against Belesimo and supporting memorandum of law (ECF Nos. 121, 122), each of these claims is utterly false and plainly contradicted by the uncontested facts. It is telling that, in support of each of his sweeping claims about

what CDMC has purportedly not proven, Belesimo cites no actual evidence, despite what Belesimo and Callan themselves have admitted and what the independent examiner has determined.

Belesimo completely ignores the burden he carries as the movant for summary judgment, under which he must demonstrate that there is no genuine dispute as to any material fact and explain how the uncontested evidence precludes CDMC from recovering on the claims asserted. Instead, Belesimo only makes arguments as to weight and credibility, claiming that CDMC's evidence is not sufficiently persuasive or should be re-interpreted in an innocent light. But at the summary judgment stage, the record is construed in light most favorable to the *non-movant*, and the court draws reasonable inferences in the non-moving party's favor without respect to weight or credibility. At a minimum, Belesimo's motion should be denied for failure to meet his burden. In addition, CDMC has presented uncontested evidence—including admissions by Belesimo—that establish the elements of claims asserted against him and thus Belesimo's liability thereunder. For these reasons, Belesimo's motion should be denied and CDMC's separate motion for summary judgment should be granted.

## II.    STANDARD OF REVIEW

Summary judgment is warranted if the record evidence shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Uncle Henry's, Inc. v. Plant Consulting Co.*, 399 F.3d 33, 41 (1st Cir. 2005) (quoting Fed. R. Civ. P. 56(c)). A fact is material so long as it "might affect the outcome of the suit under the governing law" and summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In reviewing the evidence, this Court must "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at

249. As the party moving for summary judgment, Belesimo bears the burden of demonstrating the absence of a genuine issue of material fact and that he is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Belesimo may not rely on "[u]nsupported allegations and speculation" to "demonstrate either entitlement of summary judgment or the existence of a genuine issue of material fact." *Rivera-Colon v. Mills*, 635 F.3d 9, 12 (1st Cir. 2011). Belesimo's motion for summary judgment must be denied if the Court determines CDMC has presented "definite, competent evidence to rebut the motion." *United States v. Coloplast Corp.*, 327 F. Supp. 3d 300, 306 (D. Mass. 2018) (citation omitted).

## III.   STATEMENT OF FACTS

For a complete recitation of the relevant and material uncontested facts, CDMC respectfully refers the Court to its motion for summary judgment against Belesimo at ECF No. 122. Where Belesimo's motion fails to address or mischaracterizes a material fact, CDMC provides clarification in the context of its argument section, by reference its CDMC's statement of material facts.

## IV.   ARGUMENT

### A.   <u>The Undisputed Evidence Establishes Belesimo Misappropriated CDMC's Trade Secrets And Thus Belesimo Cannot Prevail On Counts I And II.</u>

#### i.   <u>CDMC Has Identified the Trade Secrets that Belesimo Stole with Specificity.</u>

The parties agree that governing law requires a plaintiff to identify trade secret with sufficient particularity to provide notice to defendant of what he is accused of misappropriating. Belesimo Mem. at 11. In this case, CDMC has specifically identified thousands of files by name and there can be no question that Belesimo is and has been on notice of precisely what he stole.[1] CDMC has repeatedly identified categories of information that was stolen, and, with the assistance of a forensic examiner,

---

[1] Belesimo was also on notice of CDMC data in his possession by virtue of his *own actions*, specifically his practice of "backing up" important CDMC information, which he then kept at his home, and had secretly been doing since 2008. Belesimo Dep. (ECF No. 114-3) at 73:17-7.

also identified specific examples among hundreds of thousands of files found on Belesimo's own devices and/or in Belesimo's possession following his resignation from CDMC. *See e.g.*, CDMC SMF (ECF No. 128) ¶¶ 120, 126, and Exs. 2 and 3. Belesimo devotes his entire argument to reciting the legal standard for a misappropriation claim but never actually applies it to the facts of the case. Instead, after a page of case law, he simply states that "CDMC's identification of the alleged trade secrets is not sufficiently definitive to satisfy its burden." Belesimo includes no support for this conclusion other than to reference the *entire* factual background section of his memorandum. Belesimo Mem. at 11-12. This circular argument is undercut, however, by the fact that Belesimo's memorandum discusses categories of stolen files identified by CDMC and disputes whether those files are, in fact, protected Trade Secrets. Belesimo Mem. at 7-9. This section contains no facts or analysis to argue that the documents discussed (or any others alleged) are not identified with sufficient particularity and, as obvious as it is to say, Belesimo is able to devote almost two pages to this discussion precisely *because* CDMC identified the Trade Secrets with sufficient particularity.

But even looking to that section, the facts presented by Belesimo do not support his argument that CDMC has failed to identify its Trade Secrets with sufficient particularity and in fact, it demonstrates that CDMC has and has such that CMDC is entitled to summary judgment. For example, in discussing the "File Listing" of more than 5,000 files on Belesimo's backup drives, Belesimo's primary argument is that they have not been accessed since 2019 and because they were turned over to StoneTurn, they were not in Belesimo's possession after his resignation and never could have been in Callan's possession. Belesimo Mem. at 8. Belesimo's argument finds no support in the record. First, Belesimo cites to Callan's statement of fact, which claims that the drives in the File Listing "have not been accessed and have not been in the possession of Belesimo since 2019." Belesimo Mem. at 8 (citing Callan SUF, ECF No. 129, ¶ 127). Aside from the logical impossibility that Belesimo did not possess after 2019 devices and files he surrendered in 2021, Callan's citation on

which Belesimo relies is only a single page from a StoneTurn report that lists the device names and serial numbers but no dates or other information as its record support. Callan SUF ¶ 127, citing Ex. 57. Second, *most of the devices listed in that single-page exhibit were not surrendered by Belesimo until October 12, 2021, more than three months after leaving CDMC and joining Callan, almost two months after the start of this litigation*. CDMC SMF ¶ 119. Further, one of the devices listed was found to have been connected to Belesimo's computer on July 31, 2021, a full two weeks after his resignation from CDMC. And, there are two additional devices that were connected to Belesimo's computer after his resignation, on July 28, 2021 and October 10, 2021. *Id*. Belesimo likewise fails to acknowledge that not included in the cited exhibit are the *more than a dozen devices StoneTurn could not analyze because they are still missing or were intentionally destroyed by Belesimo thereby preventing their examination and inspection and despite, at least one additional device, also still not surrendered, having been connected to his computer in October 2021*. CDMC SMF ¶¶ 122-124.

Belesimo also dismisses documents identified in CDMC's Interrogatory Responses, characterizing them as internal Callan emails and not identical copies of CDMC documents on Callan's system. Belesimo Mem. at 8. But this misses the point: these sufficiently identified emails document and memorialize Belesimo giving over CDMC's Trade Secret information to Callan. This ignores that *information*, not only cloned versions of whole documents, are protected. And this is exactly what the record shows—that Belesimo shared CDMC's Trade Secret information with Callan both before and after he was hired. CDMC SMF ¶¶ 53-63, 96, 112.

Belesimo's motion ignores that CDMC presented an exceedingly specific and conservative accounting of the files and information that Belesimo stole for his use at Callan, identifying 5,459 files that Belesimo stole along with emails documenting his sharing of stolen information with Callan. CDMC SMF ¶¶ 122, 126. This is an extremely restrictive listing of the Trade Secret files stolen by Belesimo that includes only those documents related to the same information he conveyed to Callan,

rather than the more than 220,000 total files that Belesimo stole from CDMC's computer systems, including more than 13,000 that he stole on his last day of employment alone. *Id.* at ¶¶ 81, 120, 125. Belesimo's ability to assert arguments about the files that CDMC identified conclusively shows CDMC's identification provided sufficient notice.

      ii.  <u>Belesimo Misappropriated CDMC's Trade Secrets by Improper Means and Used Them for His and Callan's Benefit.</u>

Without a single example of what information he claims does not warrant protection, Belesimo argues that Massachusetts law permitted him to carry away from CDMC "general skill or knowledge" retained "in his head." Belesimo Mem. at 15. While CDMC does not challenge Belesimo's ability to access general know-how or experience, that is not what happened here. CDMC has identified thousands of files that Belesimo copied (many within hours of his resignation), retained after joining Callan, and failed to disclose until compelled to do so by Court order. CDMC SMF ¶¶ 77-95, 113-126. It is simply impossible that Belesimo could have remembered or retained the thousands of files of CDMC data he stole or the highly detailed and specialized information contained within (for which CDMC has provided evidence of Callan's use), and Belesimo never explains why, if his memory was indeed so prolific, he found it necessary to painstakingly select thousands of files to copy on his final day of employment and to then retain them in undisclosed storage devices in his home. *Id.* at 94.

Belesimo ignores the dozens of other storage devices identified in his possession and that remain unaccounted for and argues only that the hard drives located in his home were used for an innocent purpose. In a stunning and unsupported claim, Belesimo argues: "CDMC points to the hard drives that Belesimo historically used to back up the files on his computer, which it was aware of, and which Belesimo was authorized to access, while he was employed at CDMC." Belesimo Mem. at 15. Belesimo furnishes not a single citation to the factual record to support this claim, each portion of which is contrary to the undisputed facts and, therefore, false. ***CDMC was not aware of, prohibited,***

***and never authorized Belesimo to copy its Trade Secrets to the hard drives and other devices that Belesimo kept in his home***.[2] CDMC SMF ¶ 50. Belesimo never disclosed these devices, and they were not uncovered until the independent forensic examiner took possession of them. *Id*. ¶¶ 119, 121. Belesimo did not even provide a full and accurate accounting of the devices with CDMC information in his possession under the original order issued by this Court. *Id*. ¶¶ 117, 124, Ex. 8. In addition, ***the copies of CDMC's files on these hard drives and other devices were not created or maintained for CDMC's benefit***, and Belesimo's nonsensical claims to the contrary are based in pure fiction. Despite acknowledging that this was important CDMC information and valuable enough to warrant safe-keeping, Belesimo does not explain why, if such copies were made CDMC's benefit, he unilaterally deleted tens of thousands of files (by his own expert's estimation) without verifying CDMC had backup copies, failed to disclose or surrendered them to CDMC for continuity of safe-keeping (and concealed their existence until months after his resignation when the forensic examiner made its collection), and still cannot account for certain of the devices. *Id*. ¶¶ 89, 93, 121-125. Belesimo also has no explanation for why he violently destroyed one of the devices (rather than return it to CDMC) before confirming that CDMC had its own copies of the contents, and how his unsecured and unilateral home storage of CDMC's Trade Secrets did not make CDMC's information more – and not less – vulnerable to misappropriation. *Id*. ¶ 89. In fact, when asked why he thought CDMC's data was safer on his hard drives than on the network, Belesimo responded: "I don't know that I had specifically those thoughts that they were safer in one place or another." *See Id*. ¶ 92.

"Protection from loss" is a transparently bad faith justification reverse-engineered by Belesimo after being caught, made impossible by the fact he never disclosed these storage devices

---

[2] Belesimo inexplicably expects CDMC and this Court to likewise be unable to distinguish between the two external hard drives he used and kept *in his CDMC office* and the numerous other devices he kept *in his home*, out of sight from and wholly unknown to any CDMC personnel. *See* Callan SUF ¶ 38 (which similarly fails to make this distinction, noting similarly that Callan was aware of Belesimo's practices yet cites in support only testimony from Belesimo *as to the two devices in his office*).

and copies to CDMC IT and actively concealed their existence long after his resignation. It is even more unbelievable given that Belesimo's "historical" backing up of files was rendered completely unnecessary by the introduction of CDMC's cloud-based backup system around 2016.[3] CDMC SMF ¶ 52; Dep. of Tim Mannering (ECF No. 116-79) at 43:5-44:20, 47:7-23; Dep. of Jordan Rebello (ECF No. 116-43) at 11:7-13; Dep. of Frank Belesimo (ECF No. 114-3) at 78:1-15. In reality, **CDMC has never had a data loss incident**; at most, CDMC has experienced power outages during which Belesimo may have temporarily lacked *access* to his files, but any "loss" of data that could conceivably necessitate the steps taken by Belesimo to "keep information safe" is a figment of his imagination and any such rationale certainly failed to exist after this upgrade. *Id.*

It is likewise not accurate, and finds no support in the factual record, that Belesimo last accessed the stolen information while still a CDMC employee and had no affirmative obligation to return files to CDMC upon his resignation. It is telling that Belesimo cites not a single piece of evidence in support of those contentions. Belesimo was a senior executive with fiduciary duties who received a copy of an Employee Handbook that specified the terms of his employment and was clear that their violation was grounds for discharge. CDMC SMF ¶ 50. **Belesimo's argument is essentially that, unless an employee signs a contract agreeing not to steal, any theft is lawful and permitted.** The cases that Belesimo cites do not support this position, nor does any logical reading of Massachusetts law. *See e.g., Jet Spray Cooler v. Crampton*, 361 Mass. 835, 839 (1972) (Under Massachusetts law, certain employees have a duty to protect confidential information obtained at work).[4] This argument is particularly unconvincing where the record is clear that Belesimo stole

---

[3] After confirming his understanding of ShareSync as a program that backed up the computer, Belesimo was asked why he continued using backup hard drives after its implementation at CDMC and responded: "I don't recall." Dep. of Frank Belesimo (ECF No. 114-3) at 77:24-78:15.

[4] Similarly, *Jackson v. Action for Boston Cmty. Dev., Inc.* analyzed an *employment contract*, not an employee handbook, as is the case here, and there the plaintiff was seeking recovery for breach of contract, which is not a claim asserted by CDMC against Belesimo in this case. 403 Mass. 8, 525 N.E.2d 411 (1988).

CDMC's files and immediately leveraged the information contained therein for his new employer's benefit, a direct competitor.[5]

Belesimo invokes a case wherein an email announcement of a new policy was insufficient to put an employee on notice that the terms of that policy were binding. *See* Mem. at 16-17, n. 37 (citing *Campbell v. Gen. Dynamics Gov't Sys. Corp.*, 407 F.3d 546, 559 (1st Cir. 2005)). That case stands into sharp contrast CDMC's Employee Handbook, which is explicit that it presents the binding terms of employment to all CDMC employees and that continued employment is expressly conditioned on compliance therewith, with a consequence for violation being termination:

> Employees who fail to comply with this Policy will be subject to appropriate disciplinary action, up to and including dismissal and/or prosecution, for knowingly or unknowingly destroying, copying, retaining, forwarding, disseminating, and revealing information that pertains to Company information or business.

CDMC SMF ¶ 50. Belesimo also ignores that he was not a rank-and-file employee but rather a senior Executive Vice President of the company, an officer entrusted not just with complying with these terms, but also setting and enforcing them. He likewise ignores the repeated assurances he provided to CDMC that he would not take any files that were not personal academic work or photographs and his own acknowledgement that to do so would be "wrong." *Id.* ¶¶ 69, 72. These facts, at a minimum, defeat Belesimo's motion and also establish why CDMC is entitled to the summary judgment that it separately seeks.

Similarly, without a single factual citation, Belesimo argues he "destroyed and/or returned all CDMC information in his possession after he discovered his inadvertent retention, and StoneTurn

---

[5] Belesimo makes a counter-factual claim what he stole cannot benefit Callan due to "critical differences between the fleet, capabilities, and geographic scope of Callan and CDMC." Belesimo Mem. at 18, n.41. This is directly contradicted by the undisputed facts, including that Callan directly used CDMC's information as conveyed by Belesimo to dramatically change its own TSHD plans and incorporated CDMC's data into its pro forma financials. CDMC SMF ¶¶ 8, 53-65, 96-112. It is also counter-factual that CDMC's information is not of use to Callan, as it is uncontested their vessels can compete to perform the same work, they bid for work in the same geographic region, and Callan still publicly touts its plans to more directly compete with CDMC with a TSHD. *Id.*

found that none of the files on the Hard Drives had been accessed since 2019." Belesimo Mem. at 17. ***This is categorically false, as indicated by the surrender date of the devices provided to StoneTurn, many of which were not handed over until October 2021 as well as Belesimo's own signed affidavit***, in which he states: "I am unaware of the location, or the circumstances surrounding the transfer, of the devices . . . that are not included in the preceding chart." CDMC SMF ¶ 89, Ex. 8. ***One of these devices was accessed the day of StoneTurn's collection in October 2021 and yet was not surrendered***, and Belesimo has offered no explanation for where it is now located. Because these devices remain missing, there is no way to determine how the files were opened or used. In turn, any attempt to argue that Belesimo did not access the devices containing CDMC data during the relevant period is unavailing because of the confirmation of these exact activities by independent examiner StoneTurn and expert witnesses, specifically that Belesimo connected external storage devices following his resignation and that he destroyed or mislocated evidence, which has limited CDMC's ability to locate critical evidence in this matter. Belesimo should not be entitled to a favorable inference based on a purported lack of evidence due to information that is missing, concealed or destroyed by his own actions.

Belesimo finally resorts to an argument that he did not "use or inten[d] to use" the stolen Trade Secrets. Belesimo Mem. at 17. Setting aside that intent is not an element of trade secret misappropriation, Belesimo claims that there is no "actual evidence that Belesimo has used, let alone disclosed to Callan, any of the alleged trade secrets" despite smoking gun emails where Belesimo provides such information. CDMC SMF ¶ 53. Because Belesimo relies on Callan's motion for summary judgment in support of its argument, CDMC refers to its opposition thereto for the reasons why this argument must fail. And, to the extent that Belesimo relies on arguments concerning his intent, while CDMC urges the Court to reject them as not relevant, these are questions of fact that cannot be resolved at summary judgment. *See Aponte-Santiago v. Lopez-Rivera*, 957 F.2d 40, 43 (1st

Cir. 1992) (Intent was a factual issue that "should have prevented the district court from resolving this matter by way of summary judgment").

###### iii. CDMC Took Reasonable Measures to Protect its Trade Secrets.

While the parties agree that an element of trade secret misappropriation includes the plaintiff's reasonable efforts to protect its information, Belesimo fails to show that CDMC did not adequately protect its Trade Secrets. Belesimo Mem. at 12-15. Belesimo instead sets an impossible standard whereby CDMC should have made its Trade Secrets even inaccessible to Belesimo himself—the very executive officer who was entrusted with utilizing and developing them to perform his responsibilities for CDMC as its Executive Vice President. Belesimo ignores that courts "do not require the possessor of a trade secret to take heroic measures to preserve its secrecy," *USM Corp. v. Marson Fastener Corp.*, 379 Mass. 90, 101 (1979), but consider multiple factors to assess whether the trade secret owner took reasonable steps to preserve the secrecy of the trade secret, including:

> (1) the existence or absence of an express agreement restricting disclosure; (2) the nature and extent of security precautions taken by the possessor to prevent acquisition of the information by unauthorized third parties; (3) the circumstance under which the information was disclosed . . . to the extent they give rise to a reasonable inference that further disclosure, without the consent of the possessor, is prohibited; and (4) the degree to which the information has been placed in the public domain or rendered 'readily ascertainable.'

*DB Riley, Inc. v. AB Eng'g Corp.*, 977 F. Supp. 84, 90 (D. Mass. 1997).[6] Belesimo's argument confines the Court to considering only four factors in determining whether a company has taken sufficient protective measures, despite also describing them as "factors *relevant*," conceding that these are not *exclusive* considerations. Belesimo Mem. at 12. Nonetheless, the balance of these factors alone demonstrates that CDMC, not Belesimo, is entitled to summary judgment.

---

[6] The analysis is nearly equivalent under the Defend Trade Secrets Act. *Mavel, A.S. v. Rye Dev., LLC*, No. 21-11759-FDS, 2022 WL 4084289, at *5 (D. Mass. Sept. 6, 2022) ("Since its enactment in 2016, the First Circuit has not spoken as to what constitutes 'reasonable measures' under the DTSA. However, it has addressed what constitutes 'reasonable measures' under Mass. Gen. Laws ch. 93, § 42, and the Massachusetts trade secret law is nearly equivalent to the DTSA.") (internal citation omitted).

Belesimo's key arguments against CDMC's protection of its Trade Secrets is that it did not have Belesimo execute a confidentiality agreement, that the software implemented by David Sun only monitored but did not prevent Belesimo from absconding with CDMC's information, that CDMC employees *could* send confidential information via email, that use of hard drives was not restricted, and that CDMC employees used the garbage cans in their offices. Belesimo Mem. at 13-14. While effectively arguing that CDMC should have treated Belesimo as the security and business threat that he ended up being, and that CDMC erred by placing the trust in Belesimo that he had sought from CDMC these claims inject a far higher standard of unrealistic and perfect protection than the "reasonableness" that courts truly require. *TouchPoint Sols., Inc. v. Eastman Kodak Co.*, 345 F. Supp. 2d 23, 30 (D. Mass. 2004). Further, Belesimo argues that an IT assessment *from 2016* somehow proves the state of affairs and accurately measures of CDMC's security posture *in 2021* despite being based on an inapplicable assessment from five years prior, the undisputed evidence that CDMC did adopt many of the recommended measures, and that other suggested measures became obsolete in the face of adapting technology. Instead, Belesimo falsely asserts that "CDMC did not implement any meaningfully changes to protect its alleged trade secrets from 2016 up to Belesimo's departure in 2021," and isolates only the purported flaws in its systems outlined above. Callan SUF ¶¶ 92-104. In doing so, he ignores one of the most critical updates to CDMC's systems, the adoption of a cloud-based backup system, the implementation of which negated the need for Belesimo to continue his own, private backing up of important CDMC information. Mannering Dep. of Tim Mannering (ECF No. 116-79) at 43:5-44:20; 47:7-23; Dep. of Jordan Rebello (ECF No. 116-43) at 11:7-13.

CDMC also directed its employees to maintain the confidentiality of its proprietary information and emphasized that such information was the exclusive property of CDMC through multiple channels, including through its Employee Handbook and verbal instructions delivered directly to Belesimo. CDMC SMF ¶¶ 50, 68, 71. While Belesimo did not execute a confidentiality

agreement (a fact that is by no means fatal to a trade secret misappropriation claim),[7] CMDC provided clear and binding terms governing his employment that prohibited the actions he took (of which he was reminded multiple times on the day of his resignation), and he cannot plausibly deny that the terms of his employment, his fiduciary duties to CDMC and express instructions from Cashman and Pyatt barred the use of CDMC's Trade Secrets outside of CDMC.[8]

CDMC took several other reasonable security measures to protect its Trade Secrets, such as password protections, access restrictions that varied based on an employee's job title and work portfolio, secure cloud storage, investments in IT systems updates and increased IT staff, prior litigation, and FOIA challenges to prevent disclosure of its information to others in the dredging industry by virtue of public records requests.[9] CDMC SMF ¶¶ 49-52, 62, 77. *See Mktg. All., Inc. v. First Am. Ins. Underwriters, Inc.*, 2006 WL 8458338, at *4 (D. Mass. Jan. 25, 2006), citing *J.T. Healy & Son v. James A. Murphy & Son, Inc.*, 357 Mass. 728, 738 (1970) (confidentiality agreements, restrictions on access to information, and password-protections were "proper and reasonable steps" to protect trade secrets). Belesimo also himself negotiated and executed on behalf of CDMC a contract that obligated third-parties and CDMC to keep the design Specifications for the TSHD confidential.

---

[7] Belesimo cites *Koch Acton, Inc. v. Koller*, No. CV 21-10374-FDS, 2024 WL 1093001 (D. Mass. Mar. 13, 2024), for this faulty proposition, but ignores that in that case, the plaintiff employer did not even "inform [employees] to keep any files confidential" and the court also found that "the other precautions taken by plaintiff were minimal." *Id.* at *9. On these distinguishing facts, *Koch* supports the conclusion that CDMC's measures were adequate and reasonable.

[8] *Repat, Inc. v. IndieWhip, LLC*, 281 F. Supp. 3d 221, 229 (D. Mass 2017) ("While the existence (or nonexistence) of an agreement to hold business information in confidence is an important factor in assessing the reasonableness of a party's actions, *see Foster–Miller, Inc. v. Babcock & Wilcox Canada*, 210 F.3d 1, 11 (1st Cir. 2000), the law does not 'define the scope of a confidential relationship by looking exclusively to the parties' express agreements.") (citations omitted). *See also Bruno Int'l Ltd. v. Vicor Corp.*, No. CV 14-10037-DPW, 2015 WL 5447652, at *12 (D. Mass. Sept. 16, 2015) ("[Plaintiff's] specific request that [defendant] keep the information confidential is sufficient, on the pleadings, to allege that [plaintiff] took reasonable, affirmative steps to protect its trade secrets.").

[9] *Compare Rodney v. United Masters*, 2023 WL 2184865, at *5 (E.D.N.Y. Feb. 10, 2023), where Plaintiff cited only to the use of "'passwords [and] security' [and] limited disclosure of the information," which did not suffice without explanation of how the measures protected the trade secrets and *Physiotherapy Assocs., Inc. v. ATI Holdings, LLC*, 592 F. Supp. 3d 1032, 1041 (N.D. Ala. 2022), in which password-protected servers were only reasonable" when paired with other substantial efforts"), with the facts here, where there is evidence multiple of reasonable measures and substantial efforts taken by CDMC to protect its information, the operations and benefits of which are thoroughly explained.

CDMC SMF ¶¶ 40-41. Belesimo also ignores that CDMC also terminated Belesimo's access to its computer systems the day he resigned, despite Belesimo's offer to continue working for the company. CDMC SMF ¶ 70. As noted by Belesimo, CDMC also placed surveillance software on Belesimo's company computer during his final week of employment because, at the time, they were trying to ascertain his conduct without disrupting business operations. And, it is only due to this monitoring, CDMC was able to gain insight into Belesimo's theft.[10]

Belesimo throws around conclusory assertions like "CMDC was lackadaisical with its information," Belesimo Mem. at 13, but points to no specific, *reasonable* measure CDMC failed to adopt that could have prevented Belesimo's theft.[11] Every measure Belesimo proposes is one that would have prevented CDMC employees from doing their jobs: inability to send emails, use CDMC USB drives, save documents locally, print documents, use the trash receptacles in their offices, and utilize cloud storage. These functions describe the modern office and, if they would result in the forfeiture of trade secret protection, would result in no protection for any company. Yet Belesimo dramatically describes CDMC as *purposefully* lacking a reasonable security environment, instead absurdly accusing CDMC as intentionally "create[ing] an opportunity for its data to be misappropriated in the hope it could recover millions and millions of dollars." Belesimo Mem. at 14. Because he cannot argue CDMC has failed to adopt reasonable security measures, Belesimo's motion resorts to wild speculation, which cannot support summary judgment.

At a minimum, the reasonableness of the measures taken by CDMC to protect its information creates a question of fact for the jury and requires denial of Belesimo's motion for summary judgment.

---

[10] In arguing that monitoring was insufficient, *Belesimo compares himself to a robber*, claiming that allowing him to access files on his last day of employment was "like going out of town and leaving your front door unlocked, thinking the video captured by your Ring doorbell will prevent someone from robbing your house." Belesimo Mem. at 14.

[11] Belesimo cites to *J.T. Healy & Sons*, which calls for "eternal vigilance" and "constant warnings to all persons to whom the trade secret has become known and obtaining from each an agreement, *preferably* in writing, acknowledging its secrecy and promising to respect it.") (emphasis added to highlight the *preference*, not requirement, of a writing).

*See DUSA Pharms., Inc. v. Biofrontera Inc.*, No. CV 18-10568-RGS, 2020 WL 5995979, at *3 (D. Mass. Oct. 9, 2020) ("In light of the relative balance of power between the competing factual scenarios, the court agrees with DUSA that the reasonableness of its steps to protect its trade secrets is ultimately a question for the finder of fact.").[12]

### iv.    CDMC Has Established Recoverable Damages.

Resting on a single logical fallacy, Belesimo argues that, because "CDMC's value has actually increased since Belesimo's departure," CDMC must not have been damaged by Belesimo's unlawful conduct, and therefore where there is no harm, his theft is excused. Belesimo Mem. at 17. First, CDMC's profitability *despite Belesimo's theft* is not in any way inconsistent with the damage Belesimo has caused to CDMC and does not preclude the Court from determining that, but-for Belesimo's conduct, CDMC's profits would have been higher.[13] In addition, courts recognize the cost of remediation following a theft of Trade Secrets—including forensic costs and the expense of prosecuting to protect intellectual property—to be recoverable damages, which CDMC has clearly incurred here.

Belesimo's illogic also continues when he states that his theft of CDMC's Trade Secrets cannot result in damages because of the counter-factual argument Callan has not used the Trade Secrets, CDMC still retains its own copies of the Trade Secrets, and the preliminary injunction remains in place. CDMC has demonstrated that, despite entry of the protective order, Belesimo conveyed CDMC's Trade Secrets to Callan, on which Callan relied to avoid losses and costs. Belesimo ignores that this loss of secrecy and control over trade secrets, and possession of those trade

---

[12] *See also* Roger M. Milgram, Milgram on Trade Secrets § 1.04 (1993) ("Courts can be expected to be reluctant to find an absence of safeguards as a matter of law.").

[13] CDMC offers expert evidence of damages based on a cost of development model rather than a lost profits model, but seeks the recovery of its fees and costs incurred in prosecuting this action to protect its Trade Secrets, which are costs CDMC would not have incurred but-for Belesimo's theft and, without such expenses, would have resulted in even higher net profits. *See, generally*, CDMC SMF Exs. 2 and 4 (Expert Reports of Kimberley Train, ECF Nos. 128-2, 128-4).

secrets by a competitor, is in and of itself harm to CDMC and a transfer of value to Callan. Belesimo

cites to *LBF Travel Mgmt. Corp. et al., v. Derosa* as a case where there was no recovery due to lack

of evidence regarding actual use. Belesimo Mem. at 18 n.40. The plaintiff in that case, however,

conceded both "that they have no evidence regarding 'use' and that their theory of misappropriation

is only based on improper acquisition." No. 20-CV-2404-MMA-SBC, 2024 WL 1298001, at *12

(S.D. Cal. Mar. 26, 2024). In contrast, CDMC has marshaled ample evidence of use of the trade

secrets, not just of acquisition, and summary judgment must be denied for Belesimo on this basis.

### B.    The Undisputed Evidence Establishes Belesimo Breached his Fiduciary Duties to Callan.

Belesimo devotes just three sentences to the claim against him for breach of fiduciary duties

he owed to CDMC as a senior executive officer (Count IV). In essence, Belesimo argues that the

breach of fiduciary duty claim against him should fail for the same (but unspecified) reasons that he

argues CDMC's claims for misappropriation of trade secrets should fail. Belesimo Mem. at 19. Under

Massachusetts law, certain employees have a duty to protect confidential information obtained at

work. *See Jet Spray Cooler v. Crampton*, 361 Mass. 835, 839 (1972); *Advanced Micro Devices, Inc.

v. Feldstein*, 951 F. Supp. 2d 212, 220 (D. Mass. 2013). Specifically, employees who occupy positions

of trust and confidence, including officers, directors, and executives, owe a duty of loyalty to their

employer and must protect the employer's interests. *Sterling Research, Inc. v. Pietrobono*, 2005 WL

3116758, at *10 (D. Mass. 2005). Belesimo completely fails to acknowledge his status as a trusted

senior executive of CDMC who owed fiduciary duties to CDMC but nonetheless breached his

position of trust for personal advantage. He does not cite a single undisputed material fact in support

of this truncated, conclusory, three-line argument and fails to meet his burden of citing evidence, not

just conclusory statements, in support. Belesimo Mem. at 19. Further, the material facts cited by

CDMC in support of its motion for summary judgment establish that Belesimo owed duties of loyalty

to CDMC that he violated by stealing and destroying CDMC's intellectual property for personal gain.

*See* CDMC SMF ¶¶ 20-21, 26, 53-65, 77-95. These material facts preclude a finding that Belesimo is entitled to judgment on CDMC's breach of fiduciary duty claim.

Not only should Belesimo's motion for summary judgment on Count III be denied, CDMC has demonstrated that it should be granted summary judgment on its breach of fiduciary duty claim against Belesimo based on the uncontested record. CDMC incorporates by reference the arguments and evidence set forth in support of its motion for summary judgment against Belesimo (ECF No. 122 at 17-18). For these reasons, the Court deny Belesimo's motion and grant summary judgment in favor of CDMC on its claim for breach of fiduciary duty against Belesimo.

### C.  The Undisputed Evidence Establishes Belesimo's Liability under the Computer Fraud and Abuse Act.

Belesimo argues that he should prevail on CDMC's claim against him for violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, et seq. (Count VI), because he purportedly only "accessed and copied CDMC's data during his employment (i.e. when he was authorized to access that information)" and "a CFAA claim can only stand against someone who accesses electronic information they were not authorized to." Mem. at 20. Yet again, Belesimo does not cite a single uncontested fact in the record, despite his burden on summary judgment to present proof that the record entitles him to judgment on this claim. For this reason, Belesimo's motion with regard to Count VI should be denied.

Belesimo ignores that the uncontested evidence is clear that, even while still employed by CDMC, he exceeded his authority and accessed CDMC's computer system in unauthorized ways. On his final day of employment, Belesimo only had authority to retain copies of a narrow category of non-CDMC personal files but exceeded that authority when he transferred tens of thousands of other files to personal accounts and devices. *See* CDMC SMF ¶¶ 69, 72, 81-85, 88. Belesimo also accessed, transferred, and deleted records files after he was no longer authorized to do so despite clear Company

prohibitions. *Id*. ¶¶ 50, 74, 77-95. Belesimo frames CDMC's CFAA claim as wholly based on Belesimo's misappropriation of trade secrets but ignores that CDMC has also proven that Belesimo also exceeded his authority when he engaged in the unauthorized, unilateral systematic deletion of CDMC files for which the company was deprived of all opportunity to verify it had sufficient backups. *Id*. ¶¶ 74-75, 82, 92-95.

Belesimo also ignores precedent from this district establishing that employees may be liable under the CFAA for information they access and steal in excess of their authority. *See e.g.*, *Guest-Tek Interactive Entm't, Inc. v. Pullen*, 665 F. Supp. 2d 42, 45 (D. Mass. 2009) (in which an employee who had "full and unrestricted access to all of the information at issue" violated the CFAA when he surreptitiously copied company files onto his personal USB device and conspired with one of Guest-Tek's competitors to launch a new company). Belesimo cites a single case, *Van Buren v. United States*, 141 S. Ct. 1648 (2021), but that case only supports a finding of Belesimo's liability. In *Van Buren*, a former police sergeant ran a license plate search in a law enforcement computer database in exchange for money; the Supreme Court parsed whether CFAA liability would attach where an employee accessed information to which he was granted access with an improper purpose. *Id*. at 1652. The Supreme Court determined that CFAA liability turned on whether the employee exceeded his authorized access, and not on whether the employee abided by permitted access with an improper intent. *Id*. at 1656. Here, the record is clear that Belesimo was expressly forbidden from accessing and copying CDMC proprietary information after resigning; Belesimo only sought—and was only granted—access for the express and limited purpose of identifying and copying his personal files. CDMC SMF ¶¶ 69, 72. Belesimo exceeded that permission by making improper and unauthorized copies of CDMC proprietary files to a Dropbox account he transferred to his personal email, failing to return CDMC data he already copied, and conducting a mass-deletion of CDMC data, conduct which was strictly forbidden by the CDMC Employee Handbook. CDMC SMF ¶¶ 50, 73-74, 89-90.

18

In fact, Belesimo's conduct is more similar to the facts in *T.H. Glennon Co., Inc. v. Monday*, in which the Court granted summary judgment in favor of the plaintiff-employer on its CFAA claims, finding that "[t]he presence of the files on [the former employee's] computer speak for themselves" and constituted compelling evidence of that former employee's liability. No. CV 18-30120-WGY, 2020 WL 1270970, at *10 (D. Mass. Mar. 17, 2020). Because CDMC has established Belesimo's liability under the CFAA on the uncontested record, not only should Belesimo's motion be denied, but CDMC should be granted summary judgment.

### D.    The Undisputed Evidence Establishes Belesimo's Unfair and Deceptive Conduct in Violation of Chapter 93A.

Belesimo argues he is entitled to summary judgment on his Chapter 93A claim but again fails to cite a single piece of uncontested evidence that supports his incorrect, conclusory assertion that he is entitled to judgment because CDMC cannot establish his liability under M.G.L. ch. 93A, § 1, et seq. (Count VII). Belesimo instead makes the sweeping, counter-factual claim "there is no evidence Belesimo engaged in unfair practices or used misused [sic] CDMC's information." Belesimo Mem. at 20. A party cannot rely on conclusory statements to meet its burden of proof at summary judgment, and, for this failure alone, Belesimo's motion for summary judgment on Count VII should be denied. *See Magee v. United States*, 121 F.3d 1, 3 (1st Cir. 1997) ("Neither party may rely on conclusory allegations or unsubstantiated denials, but must identify specific facts derived from the pleadings, depositions, answers to interrogatories, admissions and affidavits to demonstrate either the existence or absence of an issue of fact"). In addition, the motion disregards the uncontested evidence that ***Belesimo did disclose and misuse CDMC's confidential and Trade Secret information in order to unfairly compete with CDMC***. Belesimo engaged in hallmark unfair competition by a former employee by exploiting his access to proprietary information, funneling it to a competing new employer, and reaping financial rewards.

19

While siphoning CDMC's confidential information to Callan, Belesimo sought an internship for his son at Callan and secured an extremely generous compensation package and the promise that he would eventually succeed McGuire as Callan's CEO. Before he was even employed by Callan, Belesimo supplied information that Callan celebrated as 'already helping without getting paid' and then, once formally employed, provided input on matters outside the scope of his job responsibilities using CDMC's data to provide Callan an unearned competitive advantage.

Belesimo argues that "Chapter 93A does not protect against the unauthorized use of any information" that "does not rise to the level of protected intellectual property," an assertion that is not applicable here, where Belesimo disclosed information that it is uncontested was both confidential and owned by CDMC. CDMC SMF ¶ 38. In fact, it is this very same information that Callan itself designated as attorneys' eyes only throughout this litigation and claimed was highly protected – schematics for its TSHD and its historical bidding information. Because Belesimo stole CDMC's Trade Secrets and used them for his gain and for Callan's benefit, he has engaged in unfair competition in the marine dredging marketplace. Belesimo's ongoing possession of this information gives him a unique advantage in the industry, an advantage he can continue to exploit for his own benefit at Callan or any other employer. *See Governo L. Firm LLC v. Bergeron*, 487 Mass. 188, 195– 96 (2021) ("Where an employee misappropriates his or her employer's proprietary materials . . . it comprises a marketplace transaction that may give rise to a claim under G. L. c. 93A, § 11.").

**V.    CONCLUSION**

For the foregoing reasons, the Court should deny Belesimo's motion for summary judgment.

Respectfully submitted,

CASHMAN DREDGING AND
MARINE CONTRACTING, CO., LLC,

By its counsel,


/s/ Melanie A. Conroy
Jeffrey E. Francis (BBO No. 639944)
jfrancis@pierceatwood.com
Melanie A. Conroy (BBO No. 568830)
mconroy@pierceatwood.com
Sarah R. Remes (BBO No. 698720)
sremes@pierceatwood.com
PIERCE ATWOOD LLP
100 Summer Street
Boston, Massachusetts 02110
Phone: (617) 488-8136

Dated: May 15, 2024



## CERTIFICATE OF SERVICE

I, Melanie A. Conroy, certify that this document, filed through the Electronic Case Filing
(ECF) system on May 15, 2024, will be sent electronically to the registered participants as identified
on the Notice of Electronic Filing (NEF).

/s/ Melanie A. Conroy
Melanie A. Conroy (BBO No. 568830)

21