**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **CASHMAN DREDGING AND MARINE CONTRACTING CO., LLC,** | ) ) ) ) ) |
| **Plaintiff,** | ) ) |
| **v.** | ) ) ) |
| **FRANK BELESIMO and CALLAN MARINE, LTD.,** | ) ) ) |
| **Defendants.** | ) ) ) ) |

**Case No. 21-cv-11398-DJC**

**MEMORANDUM AND ORDER**

CASPER, J.                                                                    November 26, 2024

## I.    Introduction

Plaintiff Cashman Dredging and Marine Contracting Co., LLC, ("CDMC") has filed this lawsuit against Defendants Frank Belesimo ("Belesimo") and Callan Marine, LTD., ("Callan") (collectively, "Defendants") asserting claims against both for misappropriation of trade secrets in violation of the Defend Trade Secrets Act, ("DTSA"), 18 U.S.C. § 1836 and Massachusetts Uniform Trade Secrets Act, ("MUTSA"), Mass. Gen. L. c. 93 § 42 (Counts I and II), violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030 (Count VI) and unfair and deceptive trade practices in violation of Mass. Gen. L. c. 93A (Count VII) as well as a claim for breach of fiduciary duty against Belesimo (Count IV) and claims for aiding and abetting that breach (Count V) and interference with contractual and business relations (Count III) against Callan.  D. 1.  CDMC and Belesimo have both moved for summary judgment as to all claims

1

against Belesimo.  D. 121; D. 131.  CDMC has also moved for summary judgment against Callan as to Counts I-II, V and VII, D. 123, and Callan has moved for summary judgment as to all claims, D. 126.  Defendants have also moved to exclude the testimony of CDMC's proffered expert witnesses, David Sun and Kimberly Train, under Fed. R. Evid. 702.  D. 115; D. 119.  For the reasons stated below, the Court DENIES CDMC's motion for summary judgment against Belesimo, D. 121, and ALLOWS in part and DENIES in part Belesimo's motion for summary judgment, D. 131.  The Court DENIES CDMC's motion for summary judgment against Callan, D. 123, and ALLOWS Callan's motion for summary judgment, D. 126.  The Court ALLOWS in part and DENIES in part Defendants' motion to preclude the testimony of David Sun, D. 115, and ALLOWS in part the motion to preclude the testimony of Kimberly Train and otherwise reserves on the admissibility of her opinion at trial, D. 119.

In sum, this case has suffered from CDMC's lack of clarity in its identification of which of its trade secrets, if any, ever came in the possession of Callan.  Now at this motion for summary judgment stage and after the completion of discovery, the Court concludes that CDMC has failed to show a disputed issue of material fact as to its claims against Callan.  The Court, however, comes to a different conclusion as to the trade secret misappropriation and breach of fiduciary duty claims as to its former employee, Belesimo.

## II.    Factual Background

The Court draws the following facts from the parties' statements of undisputed facts and accompanying exhibits, D. 128-9; D. 134; D. 152-1; D. 155.  Unless otherwise noted, all of these facts are undisputed.

### A.    CDMC and Callan's Dredging Business

CDMC is a dredging and marine contracting company, based in Quincy, Massachusetts that performs work along the East Coast and Gulf Coast of the United States and Puerto Rico.  D. 128-9 ¶¶ 3-4; D. 155 ¶¶ 3-4; D. 134 ¶ 1; D. 152-1 ¶ 1.  Callan is a dredging and marine construction contracting company based in Galveston, Texas and operates in the coastal areas of the Gulf of Mexico.  D. 128-9 ¶ 5; D. 155 ¶ 5; D. 134 ¶¶ 9, 14; D. 152-1 ¶¶ 9, 14.  Both companies have considered and investigated building a trailing suction hopper dredge (a "TSHD") to add to their fleet.  See D. 128-9 ¶ 6, 25; D. 155 ¶¶ 6, 25; D. 134 ¶¶ 15-16; D. 152-1 ¶¶ 15-16.  Beginning in 2013, Callan began considering building a TSHD and contracted with a company in the Netherlands to study TSHDs and initially considered varying potential dredge designs ranging from 4,000 to 15,000 cubic yards.  D. 128-9 ¶ 96; D. 155 ¶ 96; D. 134 ¶¶ 19, 23; D. 152-1 ¶¶ 19, 23.  Callan initially pursued a 16,000 cubic yard TSHD and estimates for that type of bid exceeded $200 million.  D. 128-9 ¶ 99; D. 155 ¶ 99; D. 134 ¶¶ 24, 26; D. 152-1 ¶¶ 24, 26.  Callan publicly announced the release of a tender package for construction of such a dredge on June 22, 2021.  D. 128-9 ¶ 101; D. 155 ¶ 101.  Callan  moved from planning to build a 16,000 cubic yard TSHD and planned to build a smaller dredge.  See D. 128-9 ¶ 102; D. 155 ¶ 102; D. 134 ¶ 27; D. 152-1 ¶ 27.

In October 2020, CDMC disclosed that it was planning to build a 6,500 cubic yard TSHD at a dredging meeting attended by ten to twenty companies.  D. 134 ¶ 8; D. 152-1 ¶ 8; see D. 127-15 at 3.  In December 2020, CDMC negotiated an agreement with IHC Designs to design a 6,500

cubic yard TSHD.  D. 128-9 ¶¶ 40; D. 155 ¶ 40; D. 134 ¶ 6; D. 152-1 ¶ 6.  That agreement requires CDMC to keep the design confidential.  D. 128-9 ¶ 41; D. 155 ¶ 41.  On January 19, 2021, Callan indicated that Belesimo had shared that CDMC would be announcing that it would be building a 6,500 cubic yard TSHD.  D. 114-7 at 311.  Two days later, on January 21, 2021, CDMC publicly announced the design contract with IHC for a 6,500 cubic yard TSHD.  D. 128-9 ¶ 42; D. 155 ¶ 42; D. 134 ¶ 7; D. 152-1 ¶ 7.

### B.     Belesimo's Employment and Job Responsibilities at CDMC

In May 2007, CDMC hired Belesimo as a Vice President and he was promoted to Executive Vice President around 2010.  D. 128-9 ¶ 20; D. 155 ¶ 20; D. 134 ¶ 31; D. 152-1 ¶ 31.  As an executive, Belesimo had access to the "highest levels of CDMC's information and computer systems."  D. 128-9 ¶ 21; D. 155 ¶ 21.  Belesimo did not sign an employment agreement or non-competition agreement with CDMC.  D. 134 ¶ 66; D. 152-1 ¶ 66; see D. 127-26 at 4; D. 127-23 at 6.  At CDMC, Belesimo's job responsibilities included bid estimating, project management and engineering for CDMC projects.  D. 128-9 ¶ 22; D. 155 ¶ 22; D. 134 ¶ 32; D. 152-1 ¶ 32.  Belesimo oversaw CDMC's project to develop, design and ultimately construct a TSHD (the "TSHD Project").  D. 128-9 ¶ 24; D. 155 ¶ 24; see D. 134 ¶ 33; D. 152-1 ¶ 33.  In addition to the TSHD Project, Belesimo oversaw CDMC's bid estimating and had access to CDMC's past bid data, including equipment specifications and capabilities, dredge production rates and historic profit margins.  D. 128-9 ¶ 44; D. 155 ¶ 44; D. 134 ¶ 33; D. 152-1 ¶ 33.  Belesimo also had access to a Market Study that CDMC conducted, which included market research and vessel design work, to determine that the TSHD 6,500 cubic yard would offer long-term market advantages.  D. 128-9 ¶¶ 26-27, 38; D. 155 ¶¶ 26-27, 38.

### C.     Belesimo's Decision to Leave CDMC and Join Callan

Callan and Belesimo had discussed a potential role at Callan in early June 2021.  D. 128-9 ¶ 63; D. 155 ¶ 63; D. 134 ¶ 62; D. 152-1 ¶ 62.  During these discussions, Belesimo disclosed that CDMC had conducted a market study for the TSHD.  D. 128-9 ¶ 63; D. 155 ¶ 63.

On July 14, 2021, Belesimo resigned from CDMC.  D. 128-9 ¶ 67; D. 155 ¶ 67; see D. 134 ¶ 41; D. 152-1 ¶ 41.  That same day, Belesimo signed his offer of employment with Callan.  D. 128-9 ¶ 66; D. 155 ¶ 66;  D. 134 ¶ 64; D. 152-1 ¶ 64; D. 127-25.  Also that day, after Belesimo told Jay Cashman ("Cashman"), CDMC's founder and President, he was resigning, Cashman reminded Belesimo of his obligation not to retain any CDMC property.   D. 128-9 ¶¶ 67-68.  Belesimo mentioned to Cashman during this conversation that he had uploaded personal files to his Dropbox earlier that day, such as his thesis and photographs of dredges that he had accumulated.  D. 134 ¶ 42; D. 152-1 ¶ 42; see D. 128-9 ¶ 69.  After speaking with Cashman, Belesimo also met with Dale Pyatt ("Pyatt"), co-manager of CDMC, who also reminded Belesimo of his obligation not to take CDMC confidential information.  D. 128-9 ¶ 71; D. 155 ¶ 71; D. 134 ¶ 47; D. 152-1 ¶ 47.  Belesimo also asked Pyatt if he could take certain files off his computer, including his thesis, personal photographs and stock photographs of dredges and he received permission to do so.  D. 128-9 ¶ 72; D. 155 ¶ 72; D. 134 ¶ 47; D. 152-1 ¶ 47.

After Belesimo left CDMC, he called Pyatt the same evening and reported that, as he was looking at his Dropbox folder, he found CDMC files.  D. 128-9 ¶ 73; D. 155 ¶ 73; D. 134 ¶¶ 52, 54; D. 152-1 ¶ 52, 54.  Belesimo deleted the contents of the two Dropbox accounts and told Pyatt he had deleted the contents.  D. 128-9 ¶ 74; D. 155 ¶ 74; D. 134 ¶¶ 53-54; D. 152-1 ¶¶ 53-54.  Belesimo also smashed a USB thumb drive that he had used to download information that potentially contained CDMC data.  D. 128-9 ¶ 89; D. 155 ¶ 89; D. 134 ¶ 55; D. 152-1 ¶ 55.

### D.    Belesimo's Data Retention and Conduct on his Last Day at CDMC

Prior to Belesimo's departure from CDMC, in May 2021, Cashman came to believe that Belesimo might leave CDMC.  D. 128-9 ¶ 61; D. 155 ¶ 61.  Following this discussion, CDMC had monitoring software installed on Belesimo's CDMC computer that captured his activity beginning around July 2021.[1]  D. 128-9 ¶ 77; D. 155 ¶ 77; D. 134 ¶¶ 105, 107; D. 152-1 ¶¶ 105, 107; see D. 116-131 at 85-87; 116-123.  A copy was also made of Belesimo's computer and USB drives.  D. 134 ¶ 107; D. 152-1 ¶ 107; see D. 116-131 at 87-89.  Belesimo had routinely backed up and stored CDMC information on external hard drives and a Dropbox account, which, given his "local administrative privileges," the CDMC system did not block him from doing.  D. 134 ¶¶ 35, 40; D. 152-1 ¶¶ 35, 40.  Belesimo also utilized iCloud for storage, which, given his "local administrative privileges," the CDMC system did not block him from doing.  D. 134 ¶ 40; D. 152-1 ¶ 40 see D. 128-9 ¶ 84; D. 155 ¶ 84.

On July 14, 2021, the day of his departure from CDMC, Belesimo uploaded over 13,000 files to Dropbox.[2]  D. 128-9 ¶ 81; D. 155 ¶ 81.  Belesimo subsequently uninstalled Dropbox and deleted all files previously stored in Dropbox from his CDMC computer.[3]  D. 128-9 ¶ 82; D. 155 ¶ 82; see D. 134 ¶ 126; D. 152-1 ¶ 126.  Belesimo also attempted to delete thousands of files from two USB devices that he had in his office.[4]  D. 128-9 ¶¶ 92, 125; D. 155 ¶¶ 92, 125.  Belesimo had

---

[1] The monitoring software was installed in early July 2021 but was only recording Belesimo's activity as of July 13, 2021.  See D. 116-83 at 125; D. 116-131 at 116-123.

[2] Defendants' rebuttal expert, Daniel O'Day ("O'Day") disputes the number of files that CDMC's expert, David Sun ("Sun") identified as being uploaded but does not provide a different count of the files uploaded to Dropbox.  See D. 127-22 ¶ 67(C).

[3] Defendants' expert, O'Day, does not dispute that upon review of the Dropbox activity logs, he observed a "mass deletion of files on July 14, 2021."  See D. 128-5 ¶ 49.

[4] There is a dispute concerning how many files were deleted from the USB drives on July 14, 2021 with CDMC's expert, Sun, opining that 53,856 files were deleted, whereas O'Day

stored information on an iCloud account, which he also deleted on his last day at CDMC.[5] D. 128-9 ¶ 84; D. 155 ¶ 84. Belesimo also had connected a number of USB devices to his CDMC laptop while at CDMC that he used to download CDMC information, including on his last day.[6] D. 128-9 ¶¶ 85-86; D. 155 ¶¶ 85-86. Belesimo also had deleted over 20,000 files between June 9, 2021 and his last day on July 14, 2021. D. 128-9 ¶ 91; D. 155 ¶ 91; D. 128-5 ¶ 45.

### E. CDMC Data Protection Policies

CDMC maintained password-protected programs and restricted access to certain documents for certain employees. D. 128-9 ¶ 49; D. 155 ¶ 49. CDMC had an Employee Handbook which required individuals to keep information confidential, but some executives did not sign confidentiality agreements aside from any general provisions in the Employee Handbook. D. 128-9 ¶ 50; D. 155 ¶ 50; D. 134 ¶¶ 66, 92; D. 152-1 ¶¶ 66, 92; see D. 116-104 at 49. The Employee Handbook provided that all confidential information must be returned upon an employee's termination. D. 128-9 ¶ 50; D. 155 ¶ 50. As of July 14, 2021, CDMC did not have a restriction on an employee's use of external devices, ability to save documents locally or email documents to oneself; i.e., "CDMC users with permissions to view certain documents could share those documents at their discretion." D. 134 ¶ 96; D. 152-1 ¶ 96. Some CDMC employees kept schematics for the TSHD design in the open in the office and some confidential information, such as bid estimates, were disposed of in the garbage can. D. 134 ¶¶ 99, 101; D. 152-1 ¶¶ 99, 101.

---

contends that a more accurate count is 47,912 files, D. 128-5 ¶ 44; D. 128-7 ¶ 29, but the difference is not material.

[5] Although O'Day appears to dispute the number of files in the iCloud account, he does not appear to dispute that documents were deleted. See D. 128-5 ¶ 43.

[6] O'Day disputes the number of USB devices that were connected to Belesimo's computer in the months leading up to Belesimo's departure, but does not dispute that multiple USB devices were connected at some point. D. 128-5 ¶¶ 28-29; D. 128-6 ¶ 12.

CDMC had conducted a review of its IT systems in 2016 done by a third-party in which it concluded that CDMC at the time had a "heavily flawed" IT system and its intellectual property was "exposed to significant risk" because CDMC had an inadequate IT policy.  D. 134 ¶¶ 86, 89-90.

### F.     **StoneTurn Investigation**

After CDMC initiated this action, the parties entered a stipulation, D. 17, by which the parties agreed that they would engage StoneTurn, a third-party forensic examiner, to search Belesimo's and Callan's data sources.  D. 128-9 ¶¶ 115-16; D. 155 ¶¶ 115-16; D. 134 ¶¶ 67-68; D. 152-1 ¶¶ 67-68.  StoneTurn reviewed the devices provided and produced hundreds of thousands of files for counsel for CDMC to review, including files in Belesimo's possession that matched the same name as CDMC files.[7]  D. 128-9 ¶ 120; D. 155 ¶ 120; D. 134 ¶¶ 71-72; D. 152-1 ¶¶ 71-72; see D. 127-32.  As to Callan, StoneTurn reviewed files on Callan's system based upon the agreed-to protocol that CDMC claims contain its alleged trade secrets, D. 128-9 ¶ 126; D. 155 ¶ 126, but as discussed below, that universe is now comprised of fourteen emails.  D. 124-5.

## III.   **Procedural History**

CDMC initiated this action on August 25, 2021, D. 1, and CDMC moved for a preliminary injunction shortly thereafter.  D. 8.  The parties reached a stipulation regarding injunctive relief on September 29, 2021.  D. 16.  The Court approved the stipulation, D. 17, and granted the preliminary injunctive relief to which the parties agreed.  D. 18.  CDMC has now moved for summary judgment against Belesimo on all counts, D. 121, and against Callan as to Counts I-II, V and VII, D. 123.  Belesimo and Callan have also moved for summary judgment as to all counts, D. 126; D. 131.

---

[7] CDMC continues to maintain that Belesimo did not turn over every device that was connected to his computer, D. 128-9 ¶¶ 117-18, but Belesimo has attested that there are no other devices in his possession, D. 128-8; D. 155 ¶ 117-18.

Defendants have also moved to exclude the testimony of CDMC's two proffered expert witnesses under Fed. R. Evid. 702, D. 115; D. 119. The Court heard the parties on the pending motions and took these matters under advisement. D. 168.

## IV.    Discussion

### A.    <u>Standard of Review</u>

The Court grants summary judgment where there is no genuine dispute as to any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A fact is material if it carries with it the potential to affect the outcome of the suit under applicable law." <u>Santiago–Ramos v. Centennial P.R. Wireless Corp.</u>, 217 F.3d 46, 52 (1st Cir. 2000). The movant bears the burden of demonstrating the absence of a genuine issue of material fact. <u>Carmona v. Toledo</u>, 215 F.3d 124, 132 (1st Cir. 2000); <u>see</u> <u>Celotex v. Catrett</u>, 477 U.S. 317, 323 (1986). If the movant meets its burden, the non-moving party may not rest on the allegations or denials in its pleadings, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986), but must come forward with specific admissible facts showing that there is a genuine issue for trial. <u>Borges ex rel. S.M.B.W. v. Serrano–Isern</u>, 605 F.3d 1, 5 (1st Cir. 2010). The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." <u>Noonan v. Staples, Inc.</u>, 556 F.3d 20, 25 (1st Cir. 2009). "When deciding cross-motions for summary judgment, the court must consider each motion separately, drawing inferences against each movant in turn." <u>Reich v. John Alden Life Ins. Co.</u>, 126 F.3d 1, 6 (1st Cir. 1997) (citation omitted).

### B.    <u>Trade Secret Misappropriation (Counts I and II)</u>

Defendants argue that summary judgment is warranted as to Counts I and II (claims of trade secret misappropriation under federal and state law, respectively) because no reasonable jury

could find that:  (1) there are trade secrets at issue, (2) that CDMC took reasonable measures to protect their trade secrets, (3) the trade secrets were not taken by improper means, (4) there is no evidence of use or intent to use the alleged trade secrets and (5) CDMC cannot establish that they have suffered any damages.  D. 132 at 15-23; D. 133 at 14-21; D. 153 at 16-22; D. 154 at 17-22. The Court agrees that summary judgment is appropriate as to Callan because CDMC's trade secret misappropriation claims suffer from at least two deficiencies: (1) CDMC has not sufficiently identified any trade secrets that Callan allegedly acquired and, even assuming it had, (2) no reasonable jury could find that Callan misappropriated any purported trade secrets.  The Court comes to a different conclusion as to Belesimo where there remains a genuine dispute of material fact concerning whether Belesimo acquired CDMC's trade secrets by improper means.

### 1.    Standards for MUTSA and DTSA Claims

A MUTSA misappropriation claim requires that a plaintiff demonstrate "1) the existence of a trade secret; 2) reasonable steps taken by the plaintiff to preserve the secrecy of its trade secret; and 3) the defendant's use of improper means in breach of its confidential relationship with the plaintiff to acquire and use the trade secret." Sutra, Inc. v. Iceland Express, ehf, No. 04-cv-11360-DPW, 2008 WL 2705580, at *3 (D. Mass. July 10, 2008) (citing cases).

A DTSA cause of action is "nearly equivalent" to the Massachusetts trade secret law. Allscripts Healthcare, LLC v. DR/Decision Res., LLC, 386 F. Supp. 3d 89, 94–95 (D. Mass. 2019) (citation omitted).  It requires a plaintiff (i.e., the "owner of a trade secret that has been misappropriated") to show that (1) it took reasonable measures to keep such information secret and (2) the information derives independent economic value.  Id. at 94 (citing 18 U.S.C. §§ 1836(b)(1) and 1839(3)).  The DTSA defines misappropriation as the "disclosure or use of a trade secret of another without express or implied consent by a person who . . . at the time of disclosure

or use, knew or had reason to know that the knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret." Id. at 94 (citing 18 U.S.C. § 1839(5)(B)).

2.    *Whether CDMC Has Adequately Identified its Trade Secrets in Possession of Callan*

A trade secret is "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." J. T. Healy & Son, Inc. v. James A. Murphy & Son, Inc., 357 Mass. 728, 736 (1970) (citing Restatement of Torts, § 757, comment b). A plaintiff's description of its alleged trade secrets "must be made with clarity that can be understood by a lay person . . . and distinguish what is protectable from that which is not." Sutra, Inc., 2008 WL 2705580, at *4 (internal quotation marks and citation omitted). To determine whether a proposed description is adequate, "courts have required specificity, although that specificity is highly fact dependent." Id. "The crucial issue to be determined in cases involving trade secrets . . . is whether the information is sought to be protected is, in fact and in law, confidential." T.H. Glennon Co. v. Monday, No. 18-cv-30120-WGY, 2020 WL 1270970, at *14 (D. Mass. Mar. 17, 2020) (quoting Jet Spray Cooler, Inc. v. Crampton, 361 Mass. 835, 840 (1972)). To determine whether an item is a trade secret, under Massachusetts law, a court should consider: "(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." Jet Spray Cooler, Inc., 361 Mass. at 840.

11

CDMC has identified four groups of trade secrets that it alleges Belesimo and Callan misappropriated: (1) a Market Study, (2) Specifications, (3) IHC Designs and (4) Bid Estimates. See D. 1 ¶ 24; D. 122-3 at 3; D. 124-3 at 5. CDMC alleges that these trade secrets were found in fourteen emails of Callan's and that Belesimo copied and retained approximately 5,445 files that contained such trade secrets. See D. 122-2 (Demonstrative B as to Belesimo); D. 122-3 at 14; D. 124-3 at 18; 124-5 (Demonstrative C as to Callan).

The onus is on CDMC to show that its alleged trade secrets identified are bona fide trade secrets. Cynosure, LLC v. Reveal Lasers LLC, No. 22-cv-11176-PBS, 2023 WL 8880346, at *3 (D. Mass. Dec. 22, 2023) (recognizing that plaintiffs will be bound by their definitions of the trade secrets and "[i]f any of those definitions proves to be too broad to constitute a trade secret, then [the plaintiff] cannot prevail as to that definition") (internal quotation marks and citation omitted).

As an initial matter, CDMC cannot assert trade secret protection over the IHC Designs. As to the IHC Designs, Callan and Belesimo argue that IHC owns the design and, therefore, CDMC cannot assert trade secret protection over these claims. See D. 153 at 20-21; D. 154 at 20-21. CDMC negotiated a design contract with IHC that met the Specifications for the TSHD. See D. 122-3 at 5; D. 124-3 at 7. CDMC was obligated under the agreement to keep the design confidential. See D. 122-3 at 5; D. 124-3 at 7; D. 114-10 at 138. Although CDMC states that the IHC Design contract was based on its Specifications, and it was required to keep the information confidential, D. 122-3 at 5; D. 124-3 at 7, the contract allocates ownership of "all items created under or arising out of the CONTRACT" to IHC, except for "Technical Information" developed outside of the contract which is defined as "any such information provided by or caused to be provided by [CDMC] pursuant to the CONTRACT." See D. 114-10 at 118, 134. CDMC has not adduced any evidence of ownership of the IHC Design and, therefore, cannot assert trade secret

protection over the IHC Design.  See 18 U.S.C. § 1836(b)(1) (providing that "[a]n owner of a trade secret that is misappropriated may bring a civil action"); Viken Detection Corp. v. Videray Techs. Inc., 384 F. Supp. 3d 168, 177-78 (D. Mass. 2019) (reasoning that a particular technology was not plaintiff's trade secret because it was supplied by a third-party manufacturer).

The other three categories, the Specifications, Market Study and Bid Estimates are trade secrets, but the scope of the claimed Specifications is not as broad as CDMC claims.  As to the Specifications, CDMC contends that it utilized the results of the Market Study to provide the Specifications for the TSHD design elements, including "vessel criteria capacity, speed or board power requirements, and draft depth, could minimize the cost of operation, maximize production rates, and align with anticipated market needs" to optimize CDMC's TSHD.  See D. 122-3 at 4-5; D. 124-3 at 6.  Specifically, CDMC asserts that its Specifications consisted of a "6,500 cubic yard dredge with a shallow 20-22' draft, three 16v250 engines to reduce the need to have a booster pump, and pump sizes that strategically met forecasted project needs."  D. 124-3 at 7.  Defendants challenge CDMC's assertion that the Specifications are secret as the undisputed record shows that CDMC publicly disclosed that it was planning to build a 6,500 cubic yard TSHD both at a "dredging meeting" attended by ten to twelve companies in October 2020 and then issued a press release about the same plans on January 21, 2021.  See D. 153 at 9; D. 154 at 9; D. 128-9 ¶ 42; D. 155 ¶ 42; D. 134 ¶¶ 7-8; D. 152-1 ¶¶ 7-8; see also D. 116-108 at 135; D. 127-5; D. 127-15 at 3.  It is well-established that "[m]atters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret."  J. T. Healy & Son, Inc., 357 Mass. at 736 (internal citation and quotation marks omitted).  To the extent, that CDMC is claiming that the 6,500 cubic yard TSHD is a trade secret, that claim fails as it is undisputed that the information was publicly

disclosed as early as October 2020.  <u>See</u> D. 134 ¶ 8; D. 152-1 ¶ 8; <u>see</u> D. 116-108 at 135; D. 127-15 at 3.

As to the Market Study, CDMC asserts that its Market Study is a "comprehensive survey of the hopper dredge characteristics most in demand, including size, equipment, capacity, and historic utilization rates for existing hopper dredges in the market" that served to aid CDMC in determining what projects would most likely be available and profitable for a TSHD in the future. <u>See</u> D. 122-3 at 4; D. 124-3 at 6.  In conducting the Market Study, CDMC submitted between 300 to 400 Freedom of Information Act Requests ("FOIA") concerning public dredging projects and to ensure access to public information after the government entity's obligations to retain them expired.  D. 122-3 at 4; D. 124-3 at 6.  CDMC also accessed, via a paid subscription, satellite global positioning system information from the Automated Information Service ("AIS") that provides geolocation data for registered dredges around the world.  D. 122-3 at 4; D. 124-3 at 6. CDMC asserts that it dedicated a team to review and compile daily data from AIS over hundreds of days from thirteen vessels and extrapolated productivity, occupation rates, and time lost to service or latency for competitor vessels.  D. 122-3 at 4; D. 124-3 at 6.  The Market Study also included data from hundreds of CDMC projects from 2008 to 2021 that was not publicly available, that included price and cost information, production rates for equipment and CDMC's bid outcomes.  D. 122-3 at 4; D. 124-3 at 6.  CDMC and Belesimo considered the Market Study CDMC's proprietary information.  <u>See</u> D. 128-9 ¶ 38; D. 114-9 at 162.  The Court agrees that "the fact that compiling the information, even from public sources, would be difficult and time-consuming weighs in favor of a finding of trade secret status."  <u>Allstate Ins. Co. v. Fougere</u>, No. 16-cv-11652-JGD, 2019 WL 4776986, at *22 (D. Mass. Sept. 30, 2019); <u>T.H. Glennon Co.</u>, 2020 WL 1270970, at *15 (noting that "though some of the information in the . . . database was public,

most of that public information would have been laborious to compile, and much of it contained internal records" in analyzing whether the database was a trade secret).

As to the Bid Estimates, CDMC asserts that its Bid Estimates are proprietary as they contain information about hundreds of CDMC projects including "equipment specifications and capabilities, dredge pumping and hydraulic flow data, subcontractor and customer relationships, project performance, dredge production rates, operating costs, vessel schematics, and historic profit margins." See D. 122-3 at 5; D. 124-3 at 7. CDMC states that compiling Bid Estimates is a time-intensive process that require consulting historical data and internal models to prepare private and public submissions. See D. 122-3 at 5; D. 124-3 at 7. The Court agrees that Bid Estimates qualify as trade secrets. G&L Plumbing, Inc. v. Kibbe, 699 F. Supp. 3d 96, 106 (D. Mass. 2023) (reasoning that pricing projections and estimating formulas were likely trade secrets because "no party has offered any evidence or argument that this information was known outside" of plaintiff's business, the information is highly valuable to the business, and plaintiff spent years cultivating the information and therefore it could not be easily duplicated).

The Court concludes that CDMC has not sufficiently identified its trade secrets in the possession of Callan. The Court notes that CDMC already has revised its identification of its purported trade secrets several times. On January 18, 2023, this Court granted Defendants' motion to compel and ordered CDMC to further supplement its interrogatory response to identify its trade secrets in Callan's data sources. D. 95 (Boal, J). CDMC supplemented its interrogatory disclosures on February 17, 2023, that provided additional information pertaining to its trade secrets and identified approximately twenty-five Callan emails or attachments allegedly constituting CDMC trade secrets. See D. 133 at 12-13; D. 127-41. As to Belesimo's files, CDMC has already once revised its file listing based on contentions that the files identified as trade secrets

contained non-trade secret information.  See D. 133 at 12-14; D. 127-34.  CDMC supplemented this disclosure with another file listing, which Defendants continue to contend contains public information.  See D. 133 at 14; D. 127-35.

Now at summary judgment, CDMC points to Demonstrative B (a listing of file location and names) to identify its trade secrets in Belesimo's possession,  D. 122-2; see D. 122-3 at 14, and to Demonstrative C to identify fourteen emails (six with attachments) in Callan's files.  D. 124-5; see D. 124-3 at 15.  Demonstrative C purports to provide an overview of the fourteen emails and attachments and CDMC has labeled what purported trade secret was found in each document, by denoting "Bid Estimates Data" "Market Study," or "Specifications."  See D. 124-5.

a)  File Listing of Trade Secrets Allegedly in Belesimo's Possession – Demonstrative B

As to Belesimo's files, CDMC does not address the fact that some of the file listing contains publicly available information or images, but contends that it has sufficiently identified its trade secrets because it has specifically identified each file.  See D. 149 at 10-11.  Although CDMC has denoted thousands of files downloaded by Belesimo, there remains a difficulty for the Court in discerning the bounds of CDMC's trade secrets based on the file listing.  Cf. TouchPoint Sols., Inc. v. Eastman Kodak Co., 345 F. Supp. 2d 23, 28 (D. Mass. 2004) (recognizing that "a court is not required to sift through technical data to distill out a trade secret, but rather that the plaintiff must be clear about what information is protectable").  Although the identification of the trade secrets is not a model of clarity, there are over five thousand documents identified that were in Belesimo's files and CDMC has purported to identity the types of documents, such as, "Pricing— Mechanical Env" and the file names relate to, for example, bid estimates and pricing, which can qualify as trade secrets. D. 122-2; D. 127-35; see, e.g., D. 127-35 at 2-3, 160-86; G&L Plumbing, Inc., 699 F. Supp. 3d at 106.  Belesimo does not contest that some of the identified files contain

16

trade secrets, D. 132 at 11-12, instead challenging the claims against him on other grounds (discussed below), and, therefore, the Court will accept that CDMC has sufficiently identified trade secrets as to Belesimo.

b)    <u>Callan Emails – Demonstrative C</u>

Even on this fully developed record, however, CDMC's identification of fourteen internal Callan emails in Demonstrative C does not sufficiently identify its trade secrets in Callan's possession.  At least some of the emails identified are not CDMC's trade secrets as they are public information.  For example, CDMC employee, William Hussin ("Hussin"), confirmed that the August 25, 2021 email titled "Past bids" with the attachment titled "USACE Dredging Awards FY 2017" was public information, and therefore, is not CDMC's trade secret.  <u>See</u> D. 124-5 at 1; D. 116-105 at 170-72; <u>see also</u> D. 127-47; D. 151-4.  Hussin also confirmed that the August 26, 2021 email and attachment tiled "USACE Award Data FY 1993" did not contain CDMC confidential information and was not CDMC's trade secrets.  <u>See</u> D. 127-14 at 14-15; D. 116-105 at 171-72; <u>see also</u> D. 151-5.  CDMC also included a January 20, 2021 email that purports to disclose CDMC's trade secret of the 6,500 cubic yard TSHD as evidence of Belesimo's disclosure of trade secrets to Callan based on reference in that email that "he's already helping, but not getting paid." <u>See</u> D. 150-1 at 14; D. 151-2 at 2.  The email, however, does not indicate that this phrase is referring to Belesimo and the author of the email, Maxie McGuire, testified that the phrase referred to another individual, Ancil, referenced in the same email chain.  D. 114-7 at 103-06.  Moreover, the undisputed evidence is that this information concerning the TSHD size was publicly disclosed in October 2020 at a meeting and then widely disseminated on January 21, 2021.  <u>See</u> D. 127-5; D. 127-43 at 2; D. 127-15 at 3.  Although the email reflects Belesimo sharing some features of the TSHD that CDMC would publicly announce days later ("6500 [cubic yards], diesel electric, cab

aft with sufficient power on board for 'long distance pump-out' projects without an additional booster"), D. 151-2 at 2, the email does not reveal CDMC's Specifications or any other trade secrets. See D. 127-5; D. 151-2 at 2. Similarly, CDMC has not sufficiently identified how the October 1, 2021 Belesimo's redlines on a draft document of Callan's preliminary 8,000 yd trailer suction hopper dredge constituted CDMC's trade secret. D. 151-6; D. 151-7. Accordingly, CDMC has not met its burden of showing that these emails constitute its trade secrets.

For another example, Pyatt, could not identify any of CDMC's trade secrets in the October 29, 2021 email that purported to contain trade secrets relating to Bid Estimating Data. See D. 124-5 at 1; D. 127-26 at 13; D. 116-115 at 186; D. 151-8. Pyatt could not specify why Belesimo determining that an estimate was twenty-percent higher constituted CDMC's Bid Estimating trade secret and justified the identification of the November 1, 2021 email by stating "[t]hat's the way I see it" in regard to Belesimo's access to CDMC's data. See D. 124-5 at 1; D. 116-115 at 191; D. 151-9. The October 29, 2021 and November 1, 2021 are not sufficiently identified as CDMC's trade secrets.

As to the remaining emails that run through end of October 2021 through December 2021 and concern Callan's internal communications about developing their design of a 8,500 cubic yards TSHD, D. 151-10 to D. 151-17, CDMC, again, has not sufficiently identified how any of these communications contain its trade secrets. CDMC's contention appears to be that since aspects of Callan's plan to build a TSHD (which it later decided not to build, D. 133 at 120) contained some, but not all design elements of CDMC's Specifications, that this shows Callan's acquisition and use of its trade secrets. On this record, even after discovery, no reasonable jury could draw that conclusion where it is undisputed, among other things, that Callan began its consideration of the design process with IHC long before Belesimo joined Callan, which involved

its own dredge study and CDMC's 6,500 cubic yard TSHD was publicly announced before Belesimo joined Callan.

### 3.    Whether CDMC Took Reasonable Measures to Protect its Trade Secrets

The Defendants also contest whether CDMC has taken reasonable measures to protect its purported trade secrets.  There are four factors relevant to this inquiry:  "(1) the existence or absence of a [confidentiality agreement], (2) the nature and extent of precautions taken, (3) the circumstances under which the information was disclosed and (4) the degree to which the information has been placed in the public domain or rendered readily ascertainable."  See Allstate Ins. Co. v. Fougere, 79 F.4th 172, 192 (1st Cir. 2023) (internal quotation marks and citation omitted).

Here, it is undisputed that Belesimo did not sign a confidentiality or non-disclosure agreement.  D. 134 ¶ 66; D. 152-1 ¶ 66; see D. 127-26 at 4; D. 127-23 at 6.  Although the absence of a confidentiality agreement is not determinative, "[f]ailure to enter into nondisclosure or confidentiality agreements often dooms trade secret claims."  Koch Acton, Inc. v. Koller, No. 21-cv-10374-FDS, 2024 WL 1093001, at *8–9 (D. Mass. Mar. 13, 2024) (internal quotation marks and citation omitted).  Defendants have also adduced evidence that other employees at CDMC similarly did not sign confidentiality agreements, which also weighs against trade secret protection.  See D. 134 ¶ 92; D. 152-1 ¶ 92; D. 116-104 at 49.  In response, CDMC points to its Employee Handbook in which it states that requires its employees to keep the information confidential.  D. 128-9 ¶ 50; D. 155 ¶ 50.

CDMC has pointed to other measures it has taken to protect its trade secrets including maintaining password-protected programs and systems and restricting access to certain documents for key employees.  See D. 128-9 ¶ 49; D. 155 ¶ 49.  CDMC also reminded Belesimo on his last

day that the information was confidential and CDMC's information.  D. 128-9 ¶ 71; D. 155 ¶ 71.

Defendants, however, have adduced evidence that undermines CDMC's security measures by

pointing to the fact that CDMC executive, Pyatt, would throw away documents relating to the Bid

Estimating trade secrets in his trash can, schematics for the 6,500 TSHD were kept out in the open

in employees' offices, there was no restriction on CDMC employees' use of external hard drives,

documents could be sent via email (if they had permission to view those documents), D. 134 ¶ 96;

D. 152-1 ¶ 96 and CDMC's IT manager did not have conversations with CDMC employees about

confidential information.  See D. 127-23 at 9.  On this record, there is a genuine dispute concerning

whether CDMC took reasonable measures to protect its trade secrets.  See Magnesium Elektron

N. Am., Inc. v. Applied Chemistries, Inc., No. 18-cv-40207-MGM, 2019 WL 13251080, at *4-5

(D. Mass. Apr. 23, 2019) (reasoning that plaintiff had not shown it had engaged in reasonable

measures to protect its trade secrets because plaintiff was unable to prove that the employees had

signed confidentiality agreements, there was no training provided to employees and multiple

copies of the purported trade secret formula were kept out in the open while other employees were

working); but see TouchPoint Sols., Inc., 345 F. Supp. 2d at 30–31 (reasoning that because the

standard is "reasonableness, not perfection" there was evidence the plaintiff had taken reasonable

security measures by requiring password protection and monitoring the flow of confidential

information).

> 4.    *There Remains a Disputed Issue of Fact as to Whether Belesimo Used*
>        *Improper Means to Obtain Trade Secrets, But There is No Such Disputed*
>        *Issue as to Callan*

There is no genuine dispute that CDMC has failed to adduce sufficient evidence of

acquisition, use or disclosure through improper means as required by the MUTSA and DTSA as

to Callan, but there remains a genuine dispute of material facts as to whether Belesimo used

improper means to acquire and retain CDMC's trade secrets.  See 18 U.S.C. § 1839(5); Mass. Gen.
L. c. 93, § 42(1)–(2).

a)    Whether Belesimo's Use of Improper Means to Obtain and/or
Disclose CDMC's Trade Secrets

"Misappropriation requires the acquisition or disclosure of a trade secret with knowledge
that the trade secret was acquired by improper means."  Wash. Tr. Advisors, Inc. v. Arnold, 646
F. Supp. 3d 210, 217 (D. Mass. 2022).  CDMC maintains that it has sufficiently adduced evidence
of Belesimo acquiring and using its trade secrets by improper means because Belesimo failed to
return all confidential information, there is adequate evidence that Belesimo possessed CDMC
confidential information and Belesimo failed to provide a complete and accurate accounting of his
possession of devices as there are, according to CDMC, devices still unaccounted for.  See D. 122-
3 at 16-17.  As an initial matter, it is undisputed that Belesimo deleted thousands of files from the
Dropbox folder, which was analyzed by StoneTurn,  see 128-9 ¶ 82; D. 155 ¶ 82; D. 134 ¶ 126;
D. 152-1 ¶ 126, and was confirmed by Defendants' own expert O'Day.  See D. 128-5 ¶ 49.  There
is a dispute, however, whether Belesimo copied new files prior to his departure, as CDMC's
proffered expert, Sun opines.  See D. D. 152-1 ¶ 126; D. 128-6 ¶¶ 18-20, 24 (noting that the
Dropbox log does not contain all activities and therefore may not show that Belesimo had copied
the files).

To prove misappropriation, although some courts have recognized that mere possession is
insufficient, Take it Away, Inc. v. Home Depot, Inc., No. 05-cv-12484-DPW, 2009 WL 458552,
at *7 (D. Mass. Feb. 6, 2009) (granting summary judgment because plaintiff could not sufficiently
show use of a trade secret); DUSA Pharms., Inc. v. Biofrontera Inc., No. 18-cv-10568-RGS, 2020
WL 5995979, at *3 (D. Mass. Oct. 9, 2020) (granting summary judgment on a subset of documents
were it was evident that there was no use or misuse based on when the documents were last

21

accessed); see also Ranger Env't Servs. LLC v. Foehl, No. 23-cv-00297-KDM, 2023 WL 6931336, at *21 (S.D. Ala. Oct. 19, 2023) (noting that while plaintiff had shown that defendant possessed confidential information on a hard drive, plaintiff failed to substantiate that defendant had used or disclosed such information), the DTSA does identify three theories of misappropriation:  "(1) acquisition, (2) disclosure, or (3) use."  Onyx Renewable Partners L.P. v. Kao, No. 22-cv-3720 (RA), 2023 WL 405019, at *4 (S.D.N.Y. Jan. 25, 2023) (internal quotation marks and citation omitted).

Here, although it is undisputed that CDMC did not bar its employees from copying files to external hard drives, there still are disputed issues of fact regarding when Belesimo last accessed the file listing in relation to when he left CDMC.  CDMC maintains that Belesimo only turned in files in October 2021, and that Belesimo still is in possession of USB devices that he never turned over based on a review of devices connected to Belesimo's computer by CDMC's expert, Sun. See D. 122-3 at 9-10.  In response, Belesimo maintains that he has turned over all files and submitted an affidavit stating that he is unaware of the identified devices that Sun has stated were not disclosed.  D. 128-8.  Belesimo also cites his expert, O'Day, who states that Sun has overestimated the number of devices connected to Belesimo's computer, and who concludes that only five to six USB devices were connected to Belesimo's computer between March 2021 and July 2021 when Belesimo left CDMC.  See D. 128-5 ¶ 29.  O'Day further states that of these devices, only three or four appear to have user-generated documents associated with Belesimo, Belesimo left two of the devices on his desk, and the CDMC computer does not contain reliable time stamps indicating when the majority of the USB drives were last connected.  See id. ¶ 30.

Even so, CDMC has shown a genuine dispute as to whether Belesimo improperly obtained and retained trade secrets upon and after his departure from CDMC.[8]

> b)    There is No Disputed Issue of Material Fact that Callan Did Not Acquire or Use CDMC's Trade Secrets

Callan asserts that summary judgment is warranted because CDMC has adduced no evidence of acquisition or use of its trade secrets. D. 133 at 15-17. CDMC argues that it has adduced evidenced of use because (1) Callan pivoted to deciding to build an 8,500 cubic yard TSHD that included some specifications that aligned with CDMC's TSHD after Callan had publicly committed to building a 16,000 cubic dredge in June 2021 and Belesimo had joined the company, and Callan had conducted no market study of its own to determine that dredge size and (2) Belesimo provided input on Callan's proforma design that used numbers that were close to CDMC's trade secrets. See D. 124-3 at 18-20; D. 150-1 at 9-16. Neither argument is availing.

First, no reasonable jury could find that Callan planning to build an 8,500 cubic dredge is sufficient evidence of use of CDMC's trade secrets where it is undisputed that CDMC had publicly announced its decision to build a 6,500 TSHD months earlier and Callan's plan to build a TSHD had begun before even Belesimo allegedly divulged CDMC's trade secrets. See D. 154 at 9; D. 134 ¶ 8; D. 152-1 ¶ 8; D. 127-15 at 3. CDMC claims that Belesimo disclosed, and Callan used its trade secrets based on emails reflecting that Callan increased the number of engines from two to three 16v250 engines, modified its design by increasing the hopping coming and splash screens, and modified the design to achieve a shallow 24' draft. See D. 124-3 at 10. CDMC relies upon

---

[8] CDMC has not shown a disputed issue of material of fact that Callan had knowledge of Belesimo's retention of the file listing. See D. 133 at 20-21; D. 150-1 at 15-16. Although CDMC claims that Callan "induced" Belesimo to disclose the trade secrets, the record evidence that CDMC points to does not provide support that Callan knew Belesimo had retained files when he left CDMC. See D. 150-1 at 16.

several internal emails relating to Callan's discussion of a TSHD based on a different designer, the Weeks Marine's Magdalen, to show improper use. D. 133 at 19; D. 153 at 19-20. As discussed above, the Callan emails to which CDMC points for this contention do not contain CDMC's purported trade secrets. For example, the October 1, 2021 email reflecting Belesimo's input on a draft for a TSHD design do not reflect CDMC's Specifications and CDMC has not adduced any evidence how the comments Belesimo did make are CDMC's trade secrets. See D. 124-5 at 1-2; D. 151-6; D. 151-7. Although CDMC also points to several internal Callan emails on November 8, 2021, December 6, 2021, December 27, 2021, December 28, 2021 and December 29, 2021, in which Callan does discuss certain features of a TSHD, namely draft depth, screen design and the number of engines, they are in conjunction with the Weeks Magdalen hopper. See D. 124-5 at 2; D. 151-10; D. 151-11; D. 151-12; D. 151-13; D. 151-14; D. 151-15. Further, Callan had already received proposals from third parties that included some of these features as early as January 4, 2021. See D. 114-8 at 315, 319. Moreover, although CDMC argues that these emails show Callan's discussion of some, but not all of the features of the Specifications, such as increasing the engine sizes from two to three 16v250 engines which aligns with CDMC's design, D. 124-3 at 10, these features alone (and/or in conjunction with features not in the Specifications) are not the same as the Specifications or any trade secret of CDMC.[9] See D. 124-3 at 7; see, e.g., Welter, 2023 WL 2988627, at *17 (reasoning that plaintiff had not adduced evidence of trade secret misappropriation because there was no evidence that defendant had ever accessed its compiled list of customers even though defendant had learned the names of two customers on that list).

---

[9] For one example, the Court notes that when CDMC initially defined its Specifications, it did not include a splash screen and it defines its draft depth as 20-22' draft, D. 124-3 at 7, which is different than the 24' draft that Callan was contemplating using. See D. 151-11 at 5.

Second, that Callan acquired and used CDMC's trade secrets is based upon speculation not supported by the developed record. For example, CDMC purports that a December 14, 2021 email in which Belesimo provided input on Callan's 8,500 TSHD proforma specifications contains CDMC trade secrets because Belesimo projected a TSHD occupancy of 85% and knew an 83-85% occupancy was reasonable which is "remarkably close to CDMC's market average of 82%." <u>See</u> D. 127-41 at 8; D. 151-17 at 2. CDMC further stated that Callan's determination that a project type ratio was approximately 70% new projects and 30% maintenance was very close to CDMC's market study showing a project versus maintenance ratio of 63% new projects to 37% for maintenance projects. D. 127-41 at 8. CDMC further claimed that Belesimo disclosed financial data by referencing an email where Belesimo determined a price per cubic yard of $10/cubic yard for new projects and $4.15/cubic yard for maintenance project as it was "remarkably similar" to CDMC's determination of $12.97/cubic yard for new projects and $3.81/cubic yard for maintenance projects. <u>See</u> D. 127-41 at 8; D. 151-17 at 3. That Belesimo, not bound by a non-compete with CDMC, would take his expertise in the field and applied it to work for his new employer, i.e., Callan, for estimating cubic yardage for new projects and maintenance is not evidence that he divulged trade secrets to Callan or that Callan acquired or used them. At summary judgment, mere speculation is insufficient to establish acquisition and use. <u>Repat, Inc. v. IndieWhip, LLC</u>, 281 F. Supp. 3d 221, 230-31 (D. Mass. 2017) (granting summary judgment because plaintiff had not adduced sufficient evidence of use of trade secrets even when there was some overlap of keywords in a marketing campaign); <u>Take it Away, Inc.</u>, 2009 WL 458552, at *7 (granting summary judgment because a comparison of plaintiff's and defendant's plans did not demonstrate defendant used the purported trade secrets). Defendants are also "not required to

demonstrate a negative—that it has not used a competitor's trade secret." See Repat, Inc., 281 F.
Supp. 3d at 231.

Finally, at least some of the emails CDMC points to as use of its trade secrets pre-date
Belesimo joining CDMC. D. 153 at 19. For example, CDMC points to a January 28, 2021 email
as reflecting Belesimo's disclosure of CDMC's analysis on expected price per cubic yard but the
email, which does not include Belesimo, states that Callan changed that rate based on the "Panama
City Bid" results. See D. 124-5 at 3; D. 151-3 at 2. CDMC has adduced no evidence that this
change in January 2021 was based on information from Belesimo, let alone CDMC's trade secret
information, aside from speculation. See D. 127-41 at 8, 13. CDMC also claims that a June 3,
2021 communication, which is an internal Callan email discussing bidding on projects for Equinor
and Houston, reflect Belesimo's disclosure of CDMC's planned bids on the same projects. See D.
124-5 at 1; D. 127-41 at 3-4; D. 151-1 at 2. Belesimo is not included in the email exchange and
CDMC has adduced no other evidence, aside from speculation, that Belesimo disclosed CDMC's
planned bids. D. 151-1 at 2.

CDMC further contends Belesimo was disclosing CDMC's trade secrets prior to joining
Callan by pointing to a conversation Belesimo had with Callan in June 2021 in which Belesimo
disclosed that CDMC had conducted a Market Study. D. 124-3 at 9. Even assuming that the mere
existence of CDMC's Market Study was a trade secret, CDMC has adduced no evidence that
Belesimo disclosed the substance of the Market Study. On this point, the record is undisputed that
Belesimo rather stated that "I couldn't share any of that information from . . . Cashman Dredging

26

with Callan Marine . . . [b]ecause Cashman Dredging own[s] that information." See D. 114-9 at 162.[10]

On this record, no reasonable jury could find that Callan misappropriated CDMC's purported trade secrets. See Zoppas Indus. de Mexico v. Backer EHP Inc., No. 18-cv-1693-GBW, 2022 WL 10341384, at *5 (D. Del. Oct. 3, 2022) (granting summary judgment because plaintiff's claim that defendant must have acquired its trade secret to improve a product feature was purely speculative and "[s]peculation cannot sustain a trade secret misappropriation claim at summary judgment"). Accordingly, for all these reasons, summary judgment is warranted for Callan and denied as to CDMC as to Counts I and II.

> 5.    *There Remains a Disputed Issue of Material Fact as to Whether CDMC Has Shown Recoverable Damages as to Belesimo*

Belesimo argues that summary judgment is otherwise warranted on the trade secret misappropriation claim because CDMC cannot show recoverable damages from the alleged misappropriation. Specifically, Belesimo contends that CDMC cannot show lost profits or sales and CDMC's value has increased since Belesimo's departure. D. 132 at 21-22. The DTSA authorizes three separate measures of damages: (1) "damages for actual loss caused by the misappropriation of the trade secret;" and (2) "damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss;" or (3) "in lieu of damages measured by any other methods, the damages caused by the misappropriation measured by imposition of liability for a reasonable royalty for the misappropriator's unauthorized disclosure or use of the trade secret." 18 U.S.C. § 1836(b)(3)(B).

---

[10] Given the Court's conclusion that Sun's proffered opinion regarding Callan's possession of CDMC's files is excluded, as discussed below, that opinion does not aid CDMC in this analysis.

Belesimo's argument focuses on any purported use and benefit that could have been acquired by Callan. D. 132 at 22. It is a very close question of whether CDMC can show damages as against Belesimo in the absence of the undisputed record showing no acquisition or use by Callan. That having been said, CDMC is also seeking damages for the cost of development of its trade secrets and Belesimo's acquisition and retention of them. <u>See</u> D. 149 at 20 n.13. As discussed further below, this Court has not yet precluded the entirety of Train's expert opinion concerning the value of the trade secrets to assess any potential damages, and the Court cannot conclude, at this juncture, that CDMC has not suffered recoverable damages.[11] Accordingly, for all these reasons, summary judgment is denied as to CDMC and Belesimo on Counts I and II against Belesimo.

### C.    CDMC's and Belesimo's Cross-Motions for Summary Judgment on Counts IV, VI and VIII

#### 1.    *Breach of Fiduciary Duty (Count IV)*

CDMC and Belesimo have both moved for summary judgment as to CDMC's claim against Belesimo for breach of fiduciary duty. "A claim for breach of fiduciary duty requires proof of four elements: (1) existence of a fiduciary duty, (2) breach of that duty, (3) damages, and (4) a causal relationship between the breach and the damages." <u>Koch Acton, Inc.</u>, 2024 WL 1093001, at *10 (citation omitted). Employees who occupy positions of trust and confidence, such as officers, directors, executives, or partners, owe a duty of loyalty to their employer and must protect the employer's interests. <u>Id.</u> "[W]hether there was a confidentiality agreement does not weigh as

---

[11] Belesimo's reliance upon <u>LBF Travel Mgmt. Corp. v. DeRosa</u>, No. 20-cv-2404-MMA-SBC, 2024 WL 1298001, at *12 (S.D. Cal. Mar. 26, 2024), to contend CDMC has a lack of recoverable damages is inapposite, D. 132 at 22 n.40, because in that case, the court granted summary judgment only to the extent the plaintiff was seeking unjust enrichment damages based upon the defendant's use of its trade secrets.

decisively in determining a claim of misappropriation of confidential information.  The duty to maintain confidential information derives from the relationship rather than any specific agreement."  Id. at 11.  Such information need not rise to the level of a trade secret to qualify as confidential information.  Id. at 10.

Here, it is undisputed that Belesimo was in an executive position within CDMC and, therefore, occupied a position of trust that gave rise to a duty of loyalty.  D. 128-9 ¶ 20; D. 155 ¶ 20; D. 134 ¶ 31; D. 152-1 ¶ 31.  There is a dispute of material fact, however, whether Belesimo breached his fiduciary duties to CDMC.  CDMC alleges Belesimo's breach of fiduciary duty on Belesimo's misappropriation of trade secrets and removal and destruction of CDMC intellectual property.[12]  D. 122-3 at 18.  To the extent CDMC's claim is based on a misappropriation of trade secrets, summary judgment is denied because the Court has already held that there remains a dispute of material fact concerning misappropriation to substantiate that claim against Belesimo.  See Koch Acton, Inc., 2024 WL 1093001, at *11.

To the extent, CDMC bases it breach of fiduciary duty claim on Belesimo's deletion of its files, however, there also remains a disputed issue as to this matter as well regarding the allegation that Belesimo took and then deleted thousands of files upon his departure.  See D. 122-3 at 10; D. 154 at 22-23.  The Employee Handbook does provide that the "failure to return all Company property, records, and confidential information is considered theft."  D. 128-9 ¶ 50; D. 155 ¶ 50.  The Employee Handbook requires a signed acknowledgement that the employee cannot "alter,

---

[12] The Court notes that CDMC pled their breach of fiduciary duty claim based upon:  (1) trade secret misappropriation, (2) copying, transferring and deleting of computer data and files and (3) damage to CDMC's relationship with IHC.  D. 1 ¶ 99.  It appears that CDMC is abandoning its claim to the extent it is based on damage to CDMC's relationship with IHC as CDMC makes no argument as to this basis.  See D. 122-3 at 18-19.  Accordingly, the Court did not consider this basis in consideration of the summary judgment motions.

change, or destroy any records or any confidential information," but neither party has adduced evidence that Belesimo signed any such acknowledgement. As the breach of duty only extends to confidential information, there is a genuine dispute concerning whether the information copied and deleted was confidential to CDMC. See Koch Acton, Inc., 2024 WL 1093001, at *11 (reasoning that summary judgment on the breach of fiduciary duty claim was inappropriate because there was a genuine dispute concerning whether the defendants had misappropriated confidential information). For example, CDMC has adduced evidence that Belesimo deleted both personal and some CDMC files but has not established that the CDMC files deleted contained confidential information. See D. 128-7 ¶¶ 33-34; D. 114-9 at 268-69.

Even assuming *arguendo* that the files were confidential, there also remains a dispute (as there does with the trade secrets misappropriation claim) about whether Belesimo's deletion resulted in damage to CDMC. CDMC's damages expert, Train, does not appear to offer an opinion as to those deleted files as opposed to the alleged acquisition and use of the trade secrets. See D. 120-10. Sun has also opined that CDMC was able to remediate and prevent the loss of some of this information but does not quantify how much information was able to be saved. D. 128-6 ¶ 28. As damages is an essential element of CDMC's breach of fiduciary duty claim, summary judgment is denied in either party's favor on Count IV. See Kuchera v. Parexel Int'l Corp., 719 F. Supp. 2d 121, 130 (D. Mass. 2010) (denying cross-motions for summary judgment on breach of fiduciary duty claim because there was some evidence of breach even though there were imprecise allegations concerning damages); Augat, Inc. v. Aegis, Inc., 409 Mass. 165, 175 (1991) (reasoning that a "plaintiff must show that the defendant's breach of duty caused some harm for which the law provides redress because there can be no liability in the absence of causation").

2.    *CFAA (Count VI)*

CDMC and Belesimo also both move for summary judgment as to CDMC's claim of violation of the CFAA by Belesimo, 18 U.S.C. § 1030.  The CFAA requires a plaintiff to prove the defendant accessed data (1) on a protected computer, (2) without authorization or in excess of his authorization, with intent, (3) to further the intended fraud and obtain something of value worth at least $5,000.  18 U.S.C. § 1030(a)(4).  CDMC argues that Belesimo violated the CFAA because he exceeded his authority when on his last day, he transferred thousands of files to personal devices, and transferred records after he was no longer authorized to do so as well as deleted files that he did not have permission to delete in contravention of CDMC policies.  D. 122-3 at 20; D. 149 at 23-24.

As the Supreme Court clarified in Van Buren v. United States, 593 U.S. 374, 378 (2021), a violation of the CFAA, "covers those who obtain information from particular areas in the computer—such as files, folders, or databases—to which their computer access does not extend. It does not cover those who, like [plaintiff] have improper motives for obtaining information that is otherwise available to them."  Id.  That is, the "exceeds authorized access" clause "prohibits only unlawful information access," not downstream information misuse.  Id. at 395-96 (internal quotation marks omitted).  Van Buren addressed a split among circuit courts interpreting this provision in which the Supreme Court rejected a broader reading of the "exceeds authorized access" provision on which circuit courts, including the First Circuit, had relied.  Id. at 381 & n.2.

CDMC's argument, and at least some of cases cited in support, is based on a broad reading of the "exceeds authorized use" clause and relies upon cases that preceded Van Buren.  See, e.g., Guest-Tek Interactive Ent., Inc. v. Pullen, 665 F. Supp. 2d 42, 45 (D. Mass. 2009) (denying motion to dismiss CFAA claim and reasoning that the First Circuit has "favored a broader reading of the

CFAA than that which the defendants now urge" which support the narrower view that the CFAA applies only to those lacking initial authorization). In fact, more recently, another session of this Court has recognized that the Supreme Court's decision in <u>Van Buren</u> rejected the notion that one may violate the CFAA simply by "using a computer network in a way contrary to what your job or policy prohibits" and "alleged misuse of accessible data in violation of other (non-CFAA) laws or duties no longer makes out a viable CFAA claim." <u>Welter</u>, 2023 WL 2988627, at *7 (citing <u>Van Buren</u>, 593 U.S. at 380-81).

Here, there is no dispute that Belesimo had unrestricted access to his computer and CDMC's proprietary and confidential information that he allegedly obtained. D. 128-9 ¶ 21; D. 155 ¶ 21. Further, the intentional deletion of files is not an independent basis for liability because "[Belesimo] did not exceed his authorization through the deletions themselves." <u>T.H. Glennon Co., Inc.</u>, 2020 WL 1270970, at *11.[13] Accordingly, on this record, the Court denies summary judgment for CDMC and grants summary judgment for Belesimo on Count VI.

### 3. Chapter 93A (Count VII)

CDMC and Belesimo both move for summary judgment as to CDMC's claim for unfair and deceptive trade practices in violation of Mass. Gen. L. c. 93A.[14] "Under Massachusetts law,

---

[13]That <u>Van Buren</u> bars a CFAA claim from going forward against Belesimo does not contradict that there remains a disputed issue of fact as to the misappropriation of trade secrets claims against him. As to Counts I and II, CDMC must show Belesimo's use of improper means to acquire and retain trade secrets and CDMC appears to contend that Belesimo exceeded his authority from CDMC to download and retain their trade secret files.

[14] The Court notes that CDMC pled its Chapter 93A claim based on: (1) trade secret misappropriation, (2) copying, transferring and deleting of computer data and files and (3) damage to CDMC's relationship with IHC. D. 1 ¶ 122. It appears that CDMC is abandoning its claim to the extent it was based on the latter two categories as CDMC makes no argument as to these bases. <u>See</u> D. 122-3 at 20-21 (arguing that c. 93A arises from Belesimo's alleged theft of trade secrets, using them for the benefit of Callan and that his ongoing possession of them gives him an advantage that he can exploit for himself and Callan).

misappropriation of trade secrets alone can constitute a violation of Chapter 93A." Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 412 F.3d 215, 243 (1st Cir. 2005). "Chapter 93A does not protect against the unauthorized use of any information developed by one party where that information does not rise to the level of protected intellectual property." Take it Away, Inc., 2009 WL 458552, at *8 (internal quotation marks and citation omitted). Here, to the extent CDMC has predicated its 93A claim on the misappropriation claim against Belesimo based upon use and disclosure to Callan, the claim fails based on the Court's holdings as to same.

Although CDMC states that its chapter 93A claim is also based on Belesimo's potential possession of CDMC trade secrets because there are devices that Belesimo cannot find to turn over, D. 122-3 at 21, that basis does not support summary judgment in CDMC's favor as "the mere fact that [Belesimo may] have [CDMC] materials in [his] possession cannot support a finding in [CDMC's] favor on its claims under c. 93A" where plaintiff has not provided evidence of use of the confidential material. Gillette Co. v. Provost, No. 1584-cv-00149-BLS2, 2017 WL 2292748, at *4 (Mass. Super. April 19, 2017). In the chapter 93A context, courts have recognized that the mere "retention of confidential documents alone by [CDMC's] former employee[] would not constitute misappropriation" because "the misappropriation (that is, the unfair conduct) that is potentially actionable under chapter 93A" would only occur when CDMC's former employee allegedly disclosed—and Callan allegedly acquired and used—the confidential information. Insulet Corp., v. EOFlow Co., No. 23-cv-11780-FDS, 2024 WL 4635197, at *16 (D. Mass. Oct. 31, 2024). Accordingly, summary judgment as to Count VII is denied as to CDMC and granted as to Belesimo.

**D.    CDMC's and Callan's Cross-Motions for Summary Judgment on Counts III, V-VII**

*1.    Interference with Contractual and Business Relations (Count III)*

Callan argues that CDMC cannot establish the elements of this claim because (1) Belesimo was an at-will employee and there was no contract to interfere with and (2) that there is no evidence that Callan "knowingly induced" Belesimo to misappropriate trade secrets.  D. 133 at 21-22. CDMC argues that summary judgment is inappropriate because there are genuine disputes of fact concerning Callan's knowledge of the parties' relationship and intent to interfere with it.  D. 150-1 at 21.  A claim for tortious interference with contractual and business relationships requires a plaintiff to show:  (1) a contract or a business relationship with a third party; (2) that defendant knowingly induced a breach; (3) that defendant's interference was intentional and improper in motive or means; and (4) resulting harm.  Sensitech, Inc. v. LimeStone FZE, 581 F. Supp. 3d 342, 348 (D. Mass. 2022); see Coyle v. Kittredge Ins. Agency, Inc., No. 12-cv-40014-TSH, 2014 WL 1330859, at *9 (D. Mass. Mar. 28, 2014) (recognizing that "[t]he substantive elements of tortious interference with contractual relationships and tortious interference with advantageous business relationships are substantially similar").  The element of the improper motive or malevolence required is "actual malice, . . . a spiteful, malignant purpose, unrelated to the legitimate corporate interest."  Custom Blends, Inc. v. Pearlco of Bos., Inc., No. 0400571, 2006 WL 1537522, at *5 (Mass. Super. Feb. 28, 2006) (internal quotation marks and citation omitted).

Summary judgment in Callan's favor is warranted.  First, it is undisputed that Belesimo had a business relationship with CDMC, but he was an at-will employee who was not subject to a non-compete or confidentiality agreement.  See D. 134 ¶ 66; D. 152-1 ¶ 66; see D. 127-26 at 4; D. 127-23 at 6.  "Massachusetts courts, . . . have held that the offering of a job to a competitor's at-will employee, . . . does not as [a] matter of law constitute improper means."  TalentBurst, Inc. v.

34

Collabera, Inc., 567 F. Supp. 2d 261, 269 (D. Mass. 2008); see Moore v. La-Z-Boy, Inc., 639 F. Supp. 2d 136, 143 (D. Mass. 2009) (granting summary judgment on tortious interference claim because former employee was an at-will employee, there was no contract to interfere with and plaintiffs have not produced a written non-competition agreement).  Accordingly, at a minimum CDMC has not shown that Callan "knowingly induced" Belesimo to break any contract or business relationship or that it did so by improper means.

Second, to the extent that CDMC rests its showing of "improper means" on Callan's misappropriation of CDMC's trade secrets from Belesimo, as discussed above, the undisputed record does not support that Callan misappropriated CDMC's information.  See Network Sys. Architects Corp. v. Dimitruk, No. 06-cv-4717-BLS2, 2007 WL 4442349, at *10 (Mass. Super. Dec. 6, 2007 (reasoning that if plaintiff cannot prove trade secret misappropriation, then the tortious interference claim also fails because "[o]rdinary competition, for personal financial gain, without misappropriation of trade secrets, is not improper").  For these reasons, the Court grants summary judgment on Count III to Callan.

### 2.    Aiding and Abetting Breach of Fiduciary Duty (Count V)

CDMC and Callan have both moved for summary judgment as to Callan aiding and abetting Belesimo's breach of fiduciary duty.  Aiding and abetting a breach of fiduciary duty "requires proof that:  (1) there was a breach of fiduciary duty; (2) the defendant knew of the breach; and (3) the defendant actively participated or substantially assisted in or encouraged the breach to the degree that he or she could not reasonably be held to have acted in good faith."  Prof'l Servs. Grp., Inc. v. Town of Rockland, 515 F. Supp. 2d 179, 192 (D. Mass. 2007).

To the extent this aiding and abetting claim is based on a misappropriation of trade secrets, the claim fails for several reasons.  First, CDMC's claim fails because CDMC has not submitted

evidence that Callan knew of any breach by Belesimo and actively participated.  Of the facts that CDMC cites to in support of its claim that Callan actively participated in the breach, see D. 150-1 at 19, the only potentially relevant fact CDMC cites is a January 20, 2021 email in which Belesimo discloses that CDMC would be announcing a 6,500 cubic yard TSHD.   See 128-9 ¶ 53, D. 114-7 at 311.  The email states that Belesimo was asking for Callan consulting's assistance in production. See D. 114-7 at 311 (noting that "[h]e was asking if Callan Consulting could help him design their production systems").  As discussed above as to this email, there is no indication that Callan was soliciting such information or that Belesimo was disclosing trade secret information.  CDMC claims that, at minimum, Callan "turned a willful blind eye" to Belesimo's misappropriation of trade secrets but willful blindness does not satisfy the requisite element of active participation, substantial assistance or encouragement of the breach of fiduciary duty.  Am.'s Test Kitchen, Inc. v. Kimball, No. SU-cv-201603325BLS2, 2019 WL 1856369, at *2 (Mass. Super. Mar. 20, 2019) (granting summary judgment because there was no evidence that defendant had assisted in any alleged breach or knew about the alleged breach of fiduciary duty).

Second, to the extent the claim is based on deletion of confidential material, that claim also fails because, although neither party directly addresses this basis for the claim, no evidence was presented as to how Callan aided and abetted Belesimo deleting files on his computer.  CDMC has not adduced evidence that Callan assisted in or knew of Belesimo's alleged deletion.

For all of these reasons, summary judgment is granted as to Count V for Callan and denied as to CDMC.

### 3.    CFAA (Count VI)

CDMC predicates its CFAA claim against Callan on Belesimo's liability.  See D. 150-1 at 22.  As discussed above, the Court has held that CDMC cannot succeed on its CFAA claim against

Belesimo, and accordingly, CDMC cannot succeed on its claim against Callan on the same undisputed record. See Koch Acton, Inc., 2024 WL 1093001, at *10 (granting summary judgment on the CFAA claim because plaintiff cannot establish the requisite elements under Van Buren). Accordingly, the Court grants summary judgment on Count VI as to Callan.

### 4. Chapter 93A (Count VII)

CDMC's claim for unfair and deceptive trade practices is predicated on liability for Callan's misappropriation of trade secrets and aiding and abetting Belesimo's breach of fiduciary duty.[15] See D. 124-3 at 20-21. As the Court has held that CDMC cannot succeed on these claims, CDMC similarly cannot succeed on its unfair and deceptive trade practices claim, and summary judgment in Callan's favor is appropriate.[16] See Take It Away, Inc., 2009 WL 458552, at *8.

### 5. Attorneys' Fees

Callan has moved for attorneys' fees and costs on the basis that CDMC has pursued the litigation and misappropriation of trade secrets claim in bad faith. See D. 133 at 24. The DTSA and MUTSA permit attorneys' fees and costs where a misappropriation claim was brought in bad faith. 18 U.S.C. § 1836(b)(3)(D); Mass. Gen. L. c. 93, § 42C. "The bad-faith inquiry is a two-prong test, which requires finding that (1) [plaintiff's] claim was objectively specious; and (2) [plaintiff] exhibited subjective misconduct in bringing or maintaining the claim." Anywhere Com., Inc. v. Ingenico Inc., No. 19-cv-11457-IT, 2023 WL 6961882, at *3 (D. Mass. Oct. 20, 2023) (internal quotation marks and citation omitted). "Objective speciousness exists where there

---

[15]As noted above, CDMC also pled its Chapter 93A claim on damage to CDMC's relationship with IHC. D. 1 ¶ 122. It appears that CDMC is abandoning that claim to the extent it is based on damage to CDMC's relationship with IHC as CDMC makes no argument as to this basis. See D. 124-3 at 20-21. Accordingly, the Court did not consider this basis on the summary judgment motion.

[16] Given the Court's conclusion, the Court does not address Callan's alternative arguments for summary judgment on this claim. See D. 153 at 23.

is a complete lack of evidence as to every element of a misappropriation of trade secrets claim." Id. (internal quotation marks omitted). "Subjective misconduct exists where a plaintiff knows or is reckless in not knowing that its claim for trade secret misappropriation has no merit." Id. (citation omitted).

The allowance of summary judgment to Callan on all counts does not resolve whether there has been a showing of objective speciousness and bad faith by CDMC in asserting and pursuing these claims. See Johnson Matthey Process Techs., Inc. v. G.W. Aru LLC, 603 F. Supp. 3d 1374, 1379–80  (S.D. Ga. 2022) (reasoning that "the failure to properly state a claim, by itself, will not warrant an inference of bad faith justifying an award of attorney's fees" under the DTSA). Although the assertions of trade secret appropriation by Callan now has centered on fourteen emails, there was a plausible basis for CDMC to allege that its former employee, Belesimo, who downloaded many of its filings, allegedly containing trade secrets, for disclosure and use by his new employer in the same field, Callan.  That plausibly gave rise to the trade secret claims and related claims against Callan, even as a developed record has not borne out these claims.  Cf. Degussa Admixtures, Inc. v. Burnett, 277 F. App'x 530, 534 (6th Cir. 2008) (affirming award of attorneys' fees where plaintiff "acknowledged that it had no direct evidence that [defendant] had used, or was threatening to use, its alleged trade secrets" and its other theory of liability was not recognized under state law).  "Although [CDMC] was mistaken about the merits of its claims against [Callan], the Court does not find [CDMC] brought or maintained its claims in bad faith." Johnson Matthey Process Techs., Inc., 603 F. Supp. 3d at 1383.  Accordingly, the Court concludes that attorneys' fees and costs to Callan are not warranted.

**E.    Defendants' Motions to Exclude Expert Testimony**

Defendants have moved to exclude both of CDMC's proffered experts, Sun, a forensic examiner, and Train, a damages expert pursuant to Fed. R. Evid. 702.  D. 115; D. 119.

1.     *Standard of Review*

"Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), vested in trial judges a gatekeeper function, requiring that they assess proffered expert scientific testimony for reliability before admitting it."  Milward v. Acuity Specialty Prods Grp., Inc., 639 F.3d 11, 14 (1st Cir. 2011). An expert opinion is admissible if (1) "scientific, technical, or other specialized knowledge will help the trier of fact," (2) the expert is qualified "by knowledge, skill, experience, training, or education" to testify on that subject, (3) the expert's proposed testimony is based upon "sufficient facts or data," (4) that testimony is the product of "reliable principles and methods" and (5) the expert reliably applies "the principles and methods to the facts of the case."  Fed. R. Evid. 702. Where the parties do not debate the experts' qualifications (as is the case here), the Court must turn to determining whether the specific testimony offered in the case "both rests on a reliable foundation and is relevant to the task at hand."  In re Nexium (Esomeprazole) Antitrust Litig., 842 F.3d 34, 52 (1st Cir. 2016) (quoting Daubert, 509 U.S. at 597 (internal quotation marks omitted)). "The reliable foundation requirement necessitates an inquiry into the methodology and the basis for an expert's opinion."  Samaan v. St. Joseph Hosp., 670 F.3d 21, 31 (1st Cir. 2012).  This requirement "seeks to ensure that there is an adequate fit between the expert's methods and his conclusions" by determining whether the expert's conclusions "flow rationally from the methodology employed."  Id. at 32 (citation omitted).  "[S]o long as an expert's scientific testimony rests upon good grounds, based on what is known, it should be tested by the adversarial process, rather than excluded for fear that jurors will not be able to handle the scientific complexities."  Milward, 639 F.3d at 15 (internal quotation marks and citation omitted).

"Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Id. (internal quotation marks and citation omitted).

        2.    *David Sun*

CDMC retained Sun to opine on whether Belesimo stole CDMC data and whether Belesimo and Callan returned or destroyed all such data. See D. 118-5 at 4; D. 118-6 ¶ XI.

Defendants primarily seek to exclude Sun's opinions as unreliable and lacking any specialized knowledge or accepted methodology as applied to the facts of the case. D. 117 at 4-6. Specifically, Defendants identify and challenge the following opinions by Sun as unreliable: (1) CDMC documents were found in Callan's possession, and it is more probable than not that Belesimo is in possession of CDMC documents, (2) the parties' negotiated court-ordered search protocol was impaired, and the parties have not taken actions "sufficient to demonstrate all CDMC property has been returned or destroyed," (3) Belesimo is a data hoarder that used 26 to 32 USB storage devices to store CDMC intellectual property "the vast majority of which remain unaccounted for," (4) Belesimo used "anti-forensics" when he deleted his internet browsing history and used a hammer on a USB drive, (5) Belesimo "did certain things on the last day of his employment with an intent to steal from CDMC and hide his actions," and (6) Belesimo deleted certain files from his laptop and USB drives on his last day of employment and deprived CDMC of an economic benefit. See D. 117 at 9; D. 118-5 ¶¶ 36-45, 47-51; D. 118-6 ¶¶ 22-24, XI(1)(a)-(b), (d)-(f).

        a)    <u>Callan's Possession of CDMC Documents and Belesimo's Likely Possession of CDMC Documents</u>

Defendants challenge Sun's opinion that Callan was found to be in possession of CDMC documents, claiming his opinion is based exclusively on CDMC's interrogatory responses, and

therefore, unreliable.  D. 117 at 10-11.  Sun's conclusion is based on StoneTurn finding some CDMC documents on Callan systems as well as his reliance upon CDMC's interrogatory responses.  D. 118-6 ¶ 22; see D. 118-1 at 21-31.  "[A]lthough an expert may rely on other witness's testimony or other expert conclusions to form an opinion," the expert must do more than "parrot" another expert's conclusions or wholesale adopt its client's statements about trade secrets.  See Iconics, Inc. v. Massaro, 266 F. Supp. 3d 461, 469 (D. Mass. 2017).  "An expert is responsible for ensuring that his opinion is based on reliable data; he may not blindly rely on his client's representations."  Id.  Here, Sun exclusively relies upon CDMC's interrogatory responses and StoneTurn as a basis for the statement that there were CDMC documents found in Callan's system, and Sun does not conduct his own analysis to form his opinion.  Accordingly, exclusion of this opinion is warranted.

Defendants further challenge Sun's conclusion that Belesimo is likely still in possession of CDMC documents as unsubstantiated because Sun did not do a sufficient analysis to account for the USB drives.  D. 117 at 11-13.  In opining that it is "more probable than not" that Belesimo still retains some CDMC data based on USB drives not yet unaccounted for, Sun conducted a forensic analysis to determine which USB devices had been connected to Belesimo's computer, reviewed StoneTurn's analysis and reviewed Belesimo's Dropbox account activity log which does not permit him to confirm the entirety of Belesimo's actions with the CDMC files that he copied to his account prior to deletion or "rule out additional copies" on other devices.  D. 118-5 ¶¶ 24, 40-43, 49; D. 118-6 ¶ 24.  Sun concluded that there were at least twenty-six USB devices connected to Belesimo's computer within a four-year period, D. 118-6 ¶ XI1(b), and because there are USB devices unaccounted for, it is unclear if Belesimo is still in possession of CDMC data.  Id. ¶ 23.  Sun has also stated, however, that he was unable to determine the usage of the USB devices prior

to March 2021. D. 118-6 ¶ 11. Although Sun was able to determine some files that were connected with USBs, Sun has not identified any CDMC documents that are on the purportedly missing USB devices. See D. 118-5 ¶¶ 27-28. Accordingly, he may proffer only an opinion that there are USB devices that are unaccounted for (which is the result of his forensic analysis), not that Belesimo is still in possession of CDMC data, which is an inference that CDMC may ask the jury to make, but is not an expert opinion for which there is a sufficient factual basis.

b)     Court-Ordered Protocol was Impaired

Defendants contend that Sun's opinion that the Court-ordered protocol was impaired is not a product of an accepted methodology or objective standard because his conclusion is based on his subjective opinion and is not tied to the underlying facts. D. 117 at 13-16. In his report, Sun states that there were several impairments to the search protocol based on his review of the protocol and his opinion, including that the number of search terms was too limited, that the search was based upon only the file names that Sun was able to identify in his forensic analysis, there was not consideration of Dropbox, iCloud or other cloud locations and the protocol did not permit a general review of the document contents. See D. 118-5 ¶ 44; D. 118-1 at 38. Sun testified that in forming his opinion that there were insufficient search terms, for example, he relied upon his experience and expertise that he has assessed the propriety of search terms "[d]ozens of times," "[m]aybe a hundred times" or "[m]aybe more." See D. 116-95 at 245. Sun testified, however, that he did not review the actual search terms but rather a sampling of search terms. D. 118-1 at 43-44. Sun further testified that he is unaware of a source for best practices for conducting a forensic protocol and did not consult such a source. Id. at 39. The Court notes that when confronted with contrary information in his deposition, such as that Cloud storage devices were reviewed, Sun was "willing to revise [his] opinion that limited consideration of cloud storage occurred." See id. at 41.

Although Sun has extensive experience in forensic analysis and indicated in his deposition testimony that he did review the underlying StoneTurn reports in forming his decision, D. 118-5 at 18; D. 118-1 at 41, the Court concludes that Sun's opinion is not reliable because it is based in part upon factual predicates that are contrary to the undisputed record evidence and Sun does not provide a reliable methodology.  For example, Sun's opinion that the protocol was impaired is predicated in part upon his determination that the initial fifteen search terms he reviewed was insufficient, but Sun's report does not contain any indication of which search terms and keywords that he reviewed that he found to be insufficient and he did not review the final search terms.  See D. 118-5 ¶¶ 44-45; D. 118-1 at 43-44;  see D. 118-7 at 5; D. 118-8 at 2; Iconics, Inc., 266 F. Supp. 3d at 473 (reasoning that expert's blanket assertions warranted exclusion as he did not explain his conclusions and methodology).  Accordingly, the Court will exclude Sun's opinions on the "impairment" of the search protocol as it is unreliable given the record here.

c)    Use of the Term "Data-Hoarder"

Defendants contend that Sun's opinion that Belesimo exhibits characteristics as a "data hoarder" is unreliable because it is not based on anything other than Sun's experience.  D. 117 at 16-17.  "While an expert may. . . testify solely on the basis of experience, he must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and that that experience is reliably applied to the facts."  McGovern ex rel. McGovern v. Brigham & Woman's Hosp., 584 F. Supp. 2d 418, 426 (D. Mass. 2008) (internal quotation marks and citation omitted).  Sun stated that he did a forensic review of Belesimo's usage of USB storage devices between 2008 and 2021 and based his conclusions on his investigation and "experience working with thousands of computer users."  D. 118-5 ¶¶ 24, 48; D. 118-6 ¶ 17.  Sun testified that being a "data hoarder" in the field of cybersecurity is a "term of art" and data hoarders typically

exhibit similar traits.  D. 116-95 at 323.  Sun further testified that he identified the "generally accepted characteristics" of data hoarders through his twenty years of experience, including working with thousands of computer users and other people he would characterize as data hoarders, reliance upon "various literature" and discussions with other professionals in the field. Id. at 324-35.  Sun stated that the "various literature online" he relied upon in forming his opinion included "Wikipedia" and "cybersecurity sources" that are fairly consistent in their description of what constitutes "data hoarders."  Id. at 325.  Defendants, however, dispute that the term data hoarder is a term of art and elicited testimony from O'Day, that there is not an agreed upon definition in the field.  See D. 159 at 3; D. 114-15 at 216-22.

Here, the Court concludes that Sun has provided a sufficient basis for his conclusion based on his experience that he has applied to the facts, namely his review of the forensic evidence, and his own experience "working with thousands of computer users," which underscored his observations of how Belesimo's actions exhibited signs of data hoarding.  D. 118-5 ¶ 48. Defendants' contentions can be explored on cross-examination, but do not warrant wholesale exclusion of Sun's opinion.  See United States ex rel. Bawduniak v. Biogen Idec, Inc., No. 12-cv-10601-IT, 2022 WL 2662678, at *9 (D. Mass. July 8, 2022) (reasoning that expert opinion based on relevant professional experience rather than peer-reviewed studies was not basis for exclusion because "[v]igorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence") (internal quotation marks and citation omitted).

In the alternative, Defendants argue that Sun's opinion is irrelevant to the claims in the case, and therefore, should be excluded as unhelpful to the jury.  See D. 117 at 17 n.7.  Here, Belesimo has justified his use of USB hard drives to save CDMC information because he

experienced a loss of data when he was working at CDMC.  D. 132 at 5.  This aspect of Sun's opinion would at least be relevant to rebuttal to this defense.  Accordingly, the Court does not exclude Sun's use of the term "data hoarder."

d)    <u>Use of the Term "Anti-Forensics"</u>

Defendants challenge Sun's conclusion that Belesimo used "anti-forensics" because Sun's knowledge is not based on scientific knowledge or analysis and he does not supply a commonly accepted definition or standard by which the techniques he refers are considered "anti-forensics." D. 117 at 17-18.  The Court agrees with CDMC that the record evidence Defendants cite to challenge Sun's opinion conflates the use of anti-forensic tools, which Sun did not opine on, with anti-forensic techniques, which is the focus of Sun's opinion.  <u>See</u> D. 139 at 16; <u>compare</u> D. 118-2 at 3 (testifying that Sun did not observe the use of "anti-forensic tools"); and D. 128-5 ¶ 56(B) (noting that O'Day did not "identify any anti-forensic tools" on Belesimo's computer); <u>with</u> D. 118-5 ¶ 29 (opining that "Belesimo implemented anti-forensic techniques which severely impairs the ability to determine the full extent of his actions").  Sun opines that Belesimo used anti-forensic techniques because he "unilaterally and surreptitiously performed a targeted deletion of thousands of files," deleted his Internet browsing history and system restore history and destroyed a USB device.  <u>Id.</u> ¶¶ 33, 36-38.  Sun's states that his opinion is predicated on his experience with departing employees, review of the "Veriato monitoring software" installed on Belesimo's computer prior to his resignation which revealed that he deleted thousands of files and folders from his portable USB hard drives, and a "forensic analysis of his CDMC laptop" in which Sun determined that Belesimo uninstalled the Dropbox application and subsequently deleted thousands

45

of files and folders as well as deleted iCloud files and folders stored locally on his computer, which obscured his use of that service and files stored there.  Id. ¶¶ 29-30, 32-33.

Although Defendants' claim that Sun does not use an accepted methodology to reach this conclusion, Defendants' rebuttal expert, O'Day, appears to use a similar approach of a forensic review of Belesimo's laptop to opine that Sun overstated his observations that Belesimo used "anti-forensic" techniques because historical reconstruction of events related to the USB drives were still available on Belesimo's computer.  D. 128-5 ¶ 56.  Further, O'Day also testified to his opinions of whether Belesimo engaged in "anti-forensic activity," suggesting that there is an accepted definition within the field.  D. 114-15 at 182-83.  For all of these reasons, the Court will not exclude Sun's use of the term "anti-forensics" to opine about Belesimo's conduct.  Costa v. FCA US LLC, No. 20-cv-11810-ADB, 2022 WL 18910359, at *5 (D. Mass. Sept. 30, 2022) (declining to exclude expert because, among other things, "there is evidence in the record that [the expert's] principles and methodology are generally accepted by experts in the field").

The Court, however, will exclude Sun's opinion concerning anti-forensic techniques to the extent that he offered an opinion on whether Belesimo "surreptitiously" performed a targeted deletion and acted with "pre-meditation," D. 118-5 ¶¶ 33, 39, which suggest an opinion about Belesimo's mental state.  See Bawduniak, 2022 WL 2662678, at *3 (recognizing that "[a] party's intent or state of mind is not the proper subject of expert testimony") (internal quotation marks and citation omitted).

e)    Belesimo's Activities on his Last Day of Employment

Sun's investigation of Belesimo's activities on his last day included reviewing the Veriato monitoring software that Sun has previously installed on his computer and Sun took screenshots

on the last day that captured Belesimo's activity which informed his conclusions that Belesimo uploaded and had deleted files on his last day.  D. 118-5 ¶¶ 17-19, 34.

First, the Court is not persuaded by Defendants' contention that Sun does not have familiarity with Veriato to render his opinion unreliable, D. 159 at 6, where Sun has used the Veriato software for over ten years.  See D. 116-95 at 116.  Moreover, Sun was able to testify to the functionality of the Veriato software including that the default interval for recording was thirty seconds, one cannot review the keystrokes and screen in real time, and Veriato in this situation could not viewed by someone else at CDMC.  See D. 116-95 at 118-23.

Second, the Court concludes that Sun's review of the Veriato screenshots does require specialized knowledge for which Sun is qualified to opine.  Interpretations of forensic computer programs are the province of expert testimony because the interpretation requires specialized knowledge.  See United States v. Ganier, 468 F.3d 920, 925-27 (6th Cir. 2006) (reasoning that interpretations of a forensic software used to understand what searches had been run at particular dates and times was more akin to "specialized knowledge" than outputs of popular software programs).  Here, the Court agrees Sun's specialized knowledge makes him qualified to opine about the functioning of the Veriato monitoring software.

Third, Defendants also challenge that Sun's opinion concerning the screenshots is highly prejudicial because many of the screenshots were deleted.  D. 159 at 6.  Sun testified that not all screenshots were preserved as he did not save screenshots that did not indicate "suspicious" activity or duplicate information.  D. 116-126 at 223-24.  The Court concludes that the fact that Sun did not produce all of the screenshots goes to the credibility of his determination, but does not warrant exclusion.  See United States v. Greco, 734 F.3d 441, 447 (6th Cir. 2013) (recognizing

that "[a] failure to collect evidence that may or may not have been available for collection is very different from the intentional destruction of evidence that constitutes spoliation").

Finally, Defendants contend that Sun's opinion that Belesimo intended to take CDMC documents on his last day of employment is beyond the proper bounds of his expert opinion. Similar to the conclusion above, Sun may testify about what he observed in the data and monitoring software, Veriato, see D. 118-5 ¶¶ 21, 30, but he may not proffer an opinion about Belesimo's intention or state of mind.

f)    Whether Sun Impermissibly Offers Opinions on Belesimo's Intent

On this same note, Defendants challenge other of Sun's opinions in which they contend that he provides his subjective views on Belesimo's mental state. D. 117 at 19-20. It is well-established that "[i]nferences about the intent or motive of parties or others lie outside the bounds of expert testimony." In re Solodyn (Minocycline Hydrochloride) Antitrust Litig., No. 14-cv-MD-02503, 2018 WL 734655, at *2 (D. Mass. Feb. 6, 2018) (internal quotation marks and citation omitted). Defendants challenge that the following statements in Sun's report improperly opine on Belesimo's mental state: (1) Belesimo "intentionally deleted a significant amount of CDMC documents from those devices and purged information about his computer activity," 118-5 ¶ 29, (2) "Belesimo was not helping clean up his computer for the next user by deleting all his documents . . . Belesimo unilaterally and surreptitiously performed a targeted deletion of thousands of files," id. ¶ 33, (3) Belesimo "improperly deleted or destroyed CDMC data," D. 118-6 ¶ XI(1)(d), (4) Belesimo "employed multiple techniques to steal" from CDMC, D. 118-5 ¶ 47, (5) Belesimo's use of "anti-forensic techniques takes advanced knowledge and pre-meditation not normally contemplated by a departing employee," id. ¶ 39, (6) Belesimo "intended to obscure his actions and make it more difficult to identify or recover deleted CDMC documents, their versions, and

48

any unique edits within them," id. ¶ 50, and (7) Belesimo maintained a copy of CDMC data "under the guise of protecting the company from an IT operational risk." id. ¶ 48; see D. 117 at 20-21.

Although Sun has testified that he "cannot opine upon [Belesimo's intent]," D. 116-131 at 319, the Court agrees that the breadth of these opinions impermissibly opine on Belesimo's mental state. See Bawduniak, 2022 WL 2662678, at *3 (holding that an expert may not opine on defendant's intent based upon any alleged non-conformance with standards and expert opinion went too far because it "leaves no room for the jury to draw its own inferences" as to defendant's intent). Accordingly, the Court also excludes these proffered opinions by Sun.

### g)    Whether Sun Offers Opinions Outside his Expertise

Defendants also challenge that Sun improperly opines on topics outside his expertise by stating that Belesimo deprived CDMC of the economic benefit of his efforts to maintain data for which he was paid when Sun does not have a basis to provide an opinion on the economic impact of Belesimo's alleged actions. D. 117 at 20-21. The Court agrees that to the extent Sun is opining that the data had economic benefit to CDMC, that is not Sun's area of expertise, and that portion of his opinion also is excluded. Levin v. Dalva Bros., Inc., 459 F.3d 68, 78 (1st Cir. 2006) (recognizing that "a district court acts properly by excluding opinions that are beyond the witness's expertise").

### 3.    Kimberly Train

Defendants also seek to exclude Train, CDMC's proffered expert on damages. D. 119. Train offers two damages calculations based on a theory of unjust enrichment[17] related to the

---

[17] Massachusetts and federal trade secrets law allows damages based upon theories of disgorgement and unjust enrichment. See Iconics, Inc., 266 F. Supp. 3d at 467; T.H. Glennon Co., 2020 WL 1270970, at *16 (recognizing that under Massachusetts law and DTSA a court may award damages based on actual losses or unjust enrichment).

misappropriation of CDMC data:    (1) a calculation of the costs incurred for producing bid estimates and proposals and the hopper dredge Market Study (the "Cost Calculation") and a calculation of Belesimo's salary eighteen months prior to departure (the "Compensation Calculation").  See D. 120-10 at 4, 14-19.  In relation to the Cost Calculation, Train concluded that "Defendants have received ill-gotten benefits of at least $5,974,091 associated with the receipt of data and intelligence including CDMC's trade secrets related to price and cost information, production data and rates for equipment, and its means and methods for estimating and proposing on work."  Id. at 19.  In relation to the Cost Compensation, Train concluded that "Belesimo received benefits in 2020 and 2021 in the form of compensation amounting to $767,692."  Id.

a)    Cost Calculation

Defendants seek to exclude Train's Cost Calculation primarily because it fails to apply an accepted damages methodology to the facts of the case.  D. 130 at 6.  Specifically, Defendants argue that exclusion is warranted because (1) Train's methodology does not reflect specialized knowledge because her analysis included merely adding up hours for the projects, which does not reflect expert skills, (2) her methodology is flawed and does not have a factual basis because she assumed liability in calculating damages, she assumed that the files have independent economic value without looking at the underlying files, and the Cost Calculation does not use the actual costs of the data associated with the relevant project, assumes Defendants have benefited from the files and compensates CDMC for information still within their possession and (3) that the purported range associated with the Cost Calculation will not assist the jury in determining alleged damages. Id. at 6-7, 13-22.

To conduct the Cost Calculation, Train calculated the time invested for bid estimating and proposals and research and development of the market study and cost to restore the effects of the

misappropriation.  D. 120-10 at 9.  To calculate the loss of bid estimating and proposals, Train used job codes that employees used to document the time spent on bid estimates and proposals from 2015 to July 2021 based on CDMC's accounting system.  Id.  As the job codes were not implemented prior to 2015, Train also calculated the time invested from 2008 through 2014 by estimating the time by year spent by finding the average of the time per year and multiplying that by seven years.  Id. at 9-10.  Train similarly calculated the time spent on preparing proposals from January 2015 to July 2021 by year.  Id.  Train added these values to conclude that the total value of investment in estimating and proposals was $19,856,117 during Belesimo's tenure at CDMC from 2008 through July 2021.  Id. at 10.  Train also calculated the investment in the research and development of the hopper dredge market study between 2019 and 2021 by similarly reviewing the job codes associated with the hours employees spent on the project and totaling those numbers. Id. at 12.  Train concluded that the time and expense related to the hopper dredge research project was $2,200,139.  Id.

Train used these calculations to estimate the unjust enrichment related to the misappropriation of data based on the assumption that Belesimo misappropriated the trade secrets. D. 120-10 at 14.  In determining the alleged loss, Train relied upon CDMC's analysis that Belesimo copied and removed at least 5,445 files and that they all contained trade secrets.  Id. at 16.  Train stated that she calculated the median value and upper quartile value of loss based on files CDMC identified that were associated with the 385 unique projects, 104 files relating to General Electric, 76 proposals and 47 submittal files and estimated a total median value for the trade secrets of $5,974,091 to an upper quartile of $12,482,912.  Id. at 17-18.

First, Defendants challenge that Train's calculations were rudimentary and do not reflect specialized skill because Train merely added up the number of hours spent on bid estimates, hours

spent on proposals and the number of hours spent on the market study, multiplied them by the file listing and calculated the median value and upper quartile value for the trade secrets.  D. 130 at 13-14.  Although calculating the median and averages is not complicated math, "[t]here is not, however, an implicit requirement . . . for the proffered expert to make <u>complicated</u> mathematical calculations."  <u>United States ex rel. Banigan v. Organon USA Inc.</u>, No. 07-cv-12153-RWZ, 2016 WL 6571269, at *3 (D. Mass. Jan. 20, 2016) (emphasis in original) (internal quotation marks and citation omitted).  The Court agrees with CDMC, D. 138-1 at 8, that Train's calculations, which included providing estimates for certain years and calculating the lower and upper quartiles, went beyond mere addition, and, therefore, does not exclude Train's opinion on this basis.

Second, Defendants argue that Train's analysis was improper because it was based on (1) an assumption of liability and that Defendants could benefit from the files listing which have been returned, (2) an assumption that Defendants received a benefit from the purported trade secret information without citing any evidence, (3) Train never reviewed the underlying files to assess their individual contents and assumes each file had unique information and (4) the Cost Calculation overinflates the associated costs as it includes costs not related to the files such as overhead expenses, and (5) Train's opinion that CDMC should receive the costs associated with its work back is unfounded based on the evidence.  D. 130 at 14-20.

As an initial matter, Train merely adopts CDMC's identification of the trade secrets and assumes liability for trade secret misappropriation, which is permissible for the purpose of offering an opinion supporting CDMC's theory of damages.  <u>See</u> <u>Iconics, Inc.</u>, 266 F. Supp. 3d at 475 (declining to exclude expert testimony on damages that relied upon assumption of liability of trade secrets to frame the damages' analysis).  Similarly, although Defendants critique Train's calculations because they included costs like overhead expenses, such an assumption "often go to

52

the weight of the proffered testimony, not to its admissibility." Crowe v. Marchand, 506 F.3d 13, 18 (1st Cir. 2007) (internal citations omitted); see Iconics, Inc., 266 F. Supp. 3d at 476. Accordingly, exclusion is not warranted on these grounds.

The Court also declines to exclude Train's Cost Calculation based on Defendants' contention that CDMC has pointed to no evidence of a benefit gained from Belesimo. CDMC contends that Train's analysis is applicable because CDMC has suffered damages from Belesimo's possession. D. 138-1 at 17. As there is a genuine dispute of fact concerning whether Belesimo improperly acquired and retained CDMC's trade secrets, an expert opinion remains helpful to the jury to understand the purported value of the trade secrets.

There are, however, more fundamental problems with Train's proffered Cost Calculation. First, Train's proffered range for same assumes that all of the 5,445 files contain trade secrets, D. 120-10 at 16, when some contain publicly available information. Second, the Cost Calculation does not apportion any damages among the four categories of trade secrets, particularly where, as discussed above, the singular features of a TSHD do not amount to CDMC's Specification. See 02 Micro Int'l Ltd. v. Monolithic Power Sys., Inc., 399 F. Supp. 2d 1064, 1077 (N.D. Cal. 2005) (concluding that exclusion of expert testimony was warranted where the "jury was then left without sufficient evidence, or a reasonable basis, to determine the unjust enrichment damages" because there was no basis for the jury to apportion damages among the trade secrets). Third, Train's range of $5,974,091 as a "floor" to an upper quartile of $12,482,912, D. 120-10 at 17-18, will not be helpful to the jury in the absence of a factual basis for the upper range. Train contends that the upper value of $12,482,912 is a data point associated with "more complex and time consuming estimates and proposals." Id. at 18; see D. 116-119 at 189 (testifying that the alternative upper quartile calculation is provided to the extent the "trier of fact finds that the files that have been

removed are more complicated, more time intensive in the investment that CDMC has had to make"). Train testified, however, that she has not provided a "ceiling" as to what could be considered damages in this case. D. 116-119 at 191; D. 120-28 at 18.

The Court also disagrees with CDMC's position that Train could explain how to apportion the cost data she used to the range at trial, D. 138-1 at 21, because Train did not include this basis in her expert report. See Fed. R. Civ. P. 26(a)(2)(B); cf. Neural Magic, Inc. v. Meta Platforms, Inc., 659 F. Supp. 3d 138, 193-94 (D. Mass. 2023) (reasoning that expert opinion on trade secret damages range did not warrant exclusion because there was a sufficient factual basis for the apportionment of trade secrets and range). Given all of these issues (and/or whether Train's opinion is helpful in the absence of evidence of acquisition or use by Callan),[18] the Court will reserve on these issues in anticipation of any further motion in limine as to her opinion in the pretrial phase of the trial on the remaining claims against Belesimo.

b)      Compensation Calculation

As to Train's Compensation Calculation, Train appears to base her calculation of unjust enrichment damages on Belesimo's misappropriation of trade secrets and a violation of the Employee Handbook prohibited removal of confidential information. See D. 120-10 at 19. The Court agrees with Defendants that Train's calculations should be excluded because her calculation does not represent specialized knowledge. D. 130 at 22-23. "If a layperson is capable of understanding an issue without the aid of an expert, a district court may properly decline to admit expert testimony on that issue on the ground that it would not be helpful to the jury." United States

---

[18] The Court notes that the parties only addressed exclusion of Train's Cost Calculation in the context of the trade secret misappropriation claim, D. 130; D. 138-1, and the Court has similarly limited its analysis to that claim. The Court notes that the impact of Train's analysis as to the other claims or between the defendants remains unclear as Train testified that she did not apportion her analysis based on specific claims or defendants in this case, D. 116-119 at 54-56.

v. Navedo-Ramirez, 781 F.3d 563, 568 (1st Cir. 2015).  Here, Train opines that Belesimo received benefits of at least $767,692 between 2020 and 2021 by merely adding his salary for each of those years of $505,578.32 and $262,113.60.  See D. 120-10 at 19.  This calculation constitutes basic math that a jury can compute without the assistance of an expert.  See Neelon v. Krueger, No. 12-cv-11198-IT, 2015 WL 12964643, at *2 (D. Mass. Sept. 2, 2015) (excluding expert's testimony regarding salary calculation because "the jury is equally able to complete the relatively simple calculation of hours worked x rate charged—overhead = income").  Accordingly, such proffered opinion is inappropriate for expert testimony and the Court will exclude Train's opinion as to the Compensation Calculation.[19]

Accordingly, the Court ALLOWS the motion to exclude Train's opinion as to the Compensation Calculation, but reserves on how much else of Train's opinion on the Cost Calculation will be admissible at trial.

## V.    Conclusion

For the foregoing reasons, the Court ALLOWS Defendants' motion to preclude the testimony of David Sun as to Sun's opinions on Callan's possession of CDMC information, whether the search protocol was impaired, Belesimo's intent or mental state and any opinions outside his area of expertise, but otherwise DENIES the motion as to his remaining opinions, D. 115.  The Court ALLOWS the motion to preclude the testimony of Kimberly Train as to the Compensation Calculation, but reserves on how much else of her opinion on the Cost Calculation will be admissible at trial, D. 119.  The Court DENIES CDMC's motion for summary judgment against Callan as to Counts I-II, Count V and Count VII, D. 123.  The Court ALLOWS Callan's

---

[19] To the extent that CDMC sought an evidentiary hearing, see D. 138-1 at 22, the Court denies same, in light of the conclusion reached here.

motion for summary judgment as to all of the claims against it, Counts I-II (federal and state trade secret misappropriation claims), Count III (interference with contractual and business relations claim), Count V (aiding and abetting breach of fiduciary duty claim), Count VI (CFAA claim) and Count VII (Chapter 93A claim), but DENIES Callan's motion for attorneys' fees, D. 126. The Court DENIES CDMC's motion for summary judgment against Belesimo as to Counts I-II (federal and state trade secret misappropriation claims), Count IV (breach of fiduciary duty claim), Count VI (CFAA claim), and Count VII (Chapter 93A claim). D. 121. The Court DENIES Belesimo's motion for summary judgment as to Counts I-II, and Count IV, but ALLOWS his motion as to Count VI (CFAA claim) and Count VII (Chapter 93A claim), D. 131.

      **So Ordered.**

/s Denise J. Casper<br>
United States District Judge